UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TIMOTHY C. PIGFORD
2093 East Arcadia Road
Riegelwood, N.C.  28456

    and

LLOYD SHAFER
P. O. Box 382
Bentonia, MS 39040

    and

GEORGE HALL
Route 2, Box 163-A
Boligee, AL 35443

ON BEHALF OF THEMSELVES AND
ALL OTHERS SIMILARLY SITUATED,

        Plaintiffs,

    vs.

DAN GLICKMAN, Secretary
THE UNITED STATES DEPARTMENT
 OF AGRICULTURE
14th and Independence Avenue, SW
Washington, D.C. 20250

        Defendant.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

**FILED**

AUG 2 8 1997

NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

CASE NUMBER  1:97CV01978

JUDGE: Paul L. Friedman

DECK TYPE: Civil General

DATE STAMP: 08/28/97

JURY ACTION

JURY TRIAL REQUESTED

CLASS ACTION COMPLAINT
(FOR DECLARATORY JUDGMENT, REVIEW OF AGENCY
ACTION, VIOLATIONS OF EQUAL CREDIT OPPORTUNITY ACT,
VIOLATIONS OF TITLE VI OF CIVIL RIGHTS ACT OF 1964
AND OTHER RELIEF)

Individual and representative plaintiffs Timothy C. Pigford,

Lloyd Shafer, and George Hall ("plaintiffs"), on behalf of

themselves and all others similarly situated, complain of defendant

as follows:

1

## NATURE OF THE CASE

This case involves defendant's administration, during the period January 1983 to January 1997, of applications by African American farmers for farm loans and credit and participation in federal farm programs, (referred to hereinafter as, generally, "farm programs"). Plaintiffs contend that defendant, when processing applications of African American farmers for farm programs (1) willfully discriminated against them, and (2) when, in response, plaintiffs filed written discrimination complaints with defendant, defendant failed, although required by, et al., the Civil Rights Act of 1964 and the Equal Credit Opportunity Act, to investigate the complaints.  For example, when African American farmers filed complaints of discrimination with defendant, defendant wilfully either (1) avoided processing and resolving the complaint by stretching the review process out over many years; (2) conducted a meaningless, or "ghost investigation", or (3) failed to take any action.  These two acts:  (1) the discrimination in denial of the application and (2) the failure to properly investigate the discrimination complaints, deprived the African American farmers, inter alia, of equal and fair access to farm credit and farm programs, and due process, resulting in damages to them.

In May 1997, defendant's officials admitted that in early 1983 the Reagan administration had quietly disbanded and dismantled the civil rights enforcement arm at United States Department of

Agriculture ("USDA") and that discrimination complaints had not been properly investigated since that time.  Two federal reports, issued in February, 1997, verified these allegations.

The proposed Class consists of 641 African-American farmers who filed written complaints of discrimination during the period January, 1983 to January, 1987.  The claim for damages is $512,800,000,.00

### JURISDICTION

1.   Jurisdiction is founded upon 15 U.S.C. §1691, 28 U.S.C. 1331, 28 U.S.C. §1343, 28 U.S.C. 2201, 42 U.S.C. 2000d and 5 U.S.C. 706.

### VENUE

2.   Venue lies in this judicial district because the claim arose in this judicial district, and pursuant to 28 U.S.C. 1391(e).

### PARTIES

3.   Plaintiff and proposed Class representative, Timothy C. Pigford ("Pigford"), is an African-American farmer and resident of Riegelwood, North Carolina.  Mr. Pigford (a) timely applied for various loan programs with defendant during the years 1976 to 1986 and was the subject of wilful and continuous racial discrimination, including denial of his applications for farm ownership loans, and

refusal to provide operating credit, and appropriate loan servic-
ing, by reason of his race, causing him substantial damages and (b)
timely filed complaints to defendant of these acts of discrimina-
tion, which complaints were denied by defendant, although such
denial was contrary to the facts and applicable law causing him
substantial damages.

4.   Plaintiff and proposed Class representative, Lloyd Shafer
("Shafer") is an African-American farmer and resident of Yazoo
County, Mississippi.   Mr. Shafer is a farmer who (a) timely
applied for various loan programs with defendant's agency, FmHA,
for the years 1992 and 1993 and was the subject of wilful and
continuous racial discrimination, including refusal to provide full
operating credit and appropriate loan servicing, by reason of his
race, causing him substantial damages, and (b) timely filed
complaints to defendants of these acts of discrimination, which
complaints were never acted upon pursuant to the applicable law,
causing him substantial damages.

5.   Plaintiff and proposed Class representative, George Hall
("Hall") is an African-American farmer and resident of Greene
County, Alabama who (a) timely applied for disaster payments with
defendant for 1994 and was the subject of willful and continuous
racial discrimination, including initial refusal by defendant to
provide disaster payments and then acts of reprisal when Hall
appealed the initial denial, and (b) timely filed complaints to

5

defendants of these acts of discrimination, which complaints were never acted upon pursuant to the applicable law, causing him substantial damages.

6.    Defendant, Dan Glickman, is Secretary of the United States Department of Agriculture ("USDA"), and is the federal official responsible for the administration of the statutes, regulations and programs which are the focus of this action.

### HOW DEFENDANT IS ORGANIZED AND, GENERALLY, THE GOVERNMENT PROGRAMS AT ISSUE

7.    USDA's Farm Service Agency ("FSA") provides commodity program benefits (such as deficiency payments, price support loans, conservation reserve benefits), disaster payments, farm loans and other farm credit benefits to U.S. farmers.  The agency was created in 1994, as a result of a reorganization of USDA, primarily by the merger of the Agricultural Stabilization and Conservation Service ("ASCS", which previously had handled commodity program benefits, price support loans, CRP payments, disaster payments, and related services) with the Farmers Home Administration ("FmHA", which previously had provided farm loans and other farm credit benefits).

8.    The FmHA was created decades ago to provide loans, credit and technical assistance for farmers.  FmHA made loans directly to farmers or guaranteed loans made to farmers by private, commercial lenders.  These loans included "farm ownership", "operating", and "continuing assistance" loans, as well as loans that "restructure" existing loans and "emergency disaster" loans.

9.    ASCS was an agency of USDA created to provide services to U.S. farmers under the price support, deficiency payment, CRP, and related programs to stabilize farm income and prices, and to assist in the conservation of land.   It was consolidated into the Farm Service Agency in 1994.

10.    Defendant, Glickman is responsible for the administration of the Farm Service Agency (FSA) and previously FmHA & ASCS.   FSA, like FmHA and ASCS before it, administers the federal farm programs through a three-tiered review system consisting of (1) county offices and committees, (2) state offices and committees, and (3) a federal level of review in Washington, D.C., the National Appeals Division ("NAD").   The local county committees consist of producers from a county who have been elected by other producers in that county; they oversee the county offices.   The state committees consist of producers from each state selected by the Secretary of USDA; they oversee the state offices.   At the federal level NAD renders final determinations of administrative appeals.   (Prior to the 1994 consolidation, FmHA had its own administrative appeal process).

### HOW FARMERS (1) APPLIED FOR LOANS AND CREDIT WITH FmHA (2) APPLIED FOR PARTICIPATION IN OTHER FARM PROGRAMS WITH ASCS

11.    Traditionally, when a farmer applied for any FmHA loan or program, he went to his county office (formerly the FmHA office), and filled out a Farm and Home Plan (FHP), which required the assistance and guidance of defendant's officials to complete.

Assistance and guidance was critical because of the complexity of
the programs and forms.  This application process was done pursuant
to regulations found at 7 C.F.R. 1910, _et_ _seq_.  If the farmer
needed an ASCS-type benefit or assistance, he worked with his
County Executive Director ("CED") and county committee in applying
for participation or benefits.   The process was and is done
pursuant to ASCS regulations (7 C.F.R. Part 700, _et_ _seq_.) and
Commodity Credit Corporation ("CCC") regulations (7 C.F.R. at 1400,
_et_ _seq_.).

     12.  When the FmHA loan application with its supporting
documents was completed it was presented to the county committee.
If approved, the loan was processed.  The Equal Credit Opportunity
Act ("ECOA") prohibits discrimination in credit based on sex,
marital status, race, color, age, or national origin, religion,
etc. (15 U.S.C. §1691(a)).  If an FmHA loan was denied on discrimi-
natory grounds, the farmer could file a complaint of discrimination
with the FmHA - Equal Opportunity ("EO") office or with the Office
of Civil Rights Enforcement and Adjudication ("OCREA"), or both.

     13.  With respect to ASCS-type programs, the application was
reviewed by the CED and then presented to the county committee.  If
approved, the ASCS benefits were awarded.  Title VI of the Civil
Rights Act of 1964 prohibits exclusion of participation in federal
programs based on race, color or natural origin.  With respect to
ASCS-type applications, if a farm program application was denied on

discriminatory grounds, the farmer could file a complaint of
discrimination with OCREA.

### HOW PLAINTIFFS AND MEMBERS OF THE CLASS WERE DAMAGED -- WHAT DEFENDANT DID IN RESPONSE TO COMPLAINTS OF DISCRIMINATION

14.   Unbeknownst to plaintiffs and members of the Class,
defendant disbanded the enforcement ability of EO and OCREA in
1983, leaving defendant with no ability to investigate discrimina-
tion complaints.   In a May 25, 1997 Richmond News Dispatch inter-
view of Lloyd Wright, Director of USDA Office of Civil Rights, Mr.
Wright stated that (1) no systematic probes or investigations had
been taken since 1983, when the Reagan administration disbanded the
Civil Rights investigative staff, and (2) that agency regulations
and the provisions of the Civil Rights Act of 1964, et al. were
violated.   Further evidence of defendant's willful failure to
investigate discrimination complaints is evident in the February
27, 1997, Office of Inspector General Report ("OIG Report"), and
the February, 1987 Civil Rights Action Team Report ("CRAT Report"),
both explained below.

15.   The Department of Justice (DOJ) was required to ensure
that Federal agencies met their Title VI enforcement obligations
and provide civil rights protection to persons filing discrimina-
tion complaints in the FSA programs. DOJ failed to ensure that
defendant met its Title VI obligations.

16.   Within USDA, The Policy Analysis and Coordination Center
(PACC), an agency under the Assistant Secretary for Administration,

was responsible for civil rights compliance and developing regulations for processing program discrimination complaints at USDA. [OIG Report, p. 4] OCREA was responsible for processing program discrimination complaints received by USDA from participants in FSA programs. [OIG Report, p. 4]

17. OCREA was required to forward written complaints from FSA program participants of discrimination to the appropriate agency within USDA asking the agency to attempt conciliation of the complaint. If conciliation was not successful, the agency was to be instructed to perform a preliminary inquiry and make a recommendation of a finding of "discrimination" or "no discrimination". OCREA was to perform its own analysis of the complaint and the preliminary inquiry and make a recommendation to the Assistant Secretary for Administration on the finding of "discrimination" or "no discrimination". This process never occurred during the relevant period covered by this lawsuit. [OIG Report, p. 4]

18. FSA's Civil Rights and Small Business Staff (CR&SBUS) was responsible for handling program discrimination complaints within FSA. CR&SBUS never followed proper procedure pursuant to the law during the relevant period. [OIG Report, p. 5]

19. The applicable State Civil Rights Coordinator in FSA was responsible for obtaining a conciliation agreement or performing a preliminary inquiry and forward it to CR&SBUS. If a conciliation agreement was reached with the complainant, CR&SBUS was to forward

the agreement to OCREA and recommend the discrimination complaint be closed.  If a preliminary inquiry was performed, CR&SBUS would analyze the information and determine if discrimination was found; CR&SBUS was to forward the preliminary inquiry and its analysis to OCREA with its determination.  These procedures were never properly followed.

20.  USDA has codified regulations, 7 C.F.R., Part 15 - "Nondiscrimination," which states USDA's policy of nondiscrimination in federally assisted and conducted programs in compliance with Title VI of the Civil Rights Act of 1964.  The regulations should have served as a basis for civil rights compliance and enforcement with respect to participants in FSA programs, however, defendant admits the regulations have long been and still are outdated and never reflected the departmental agencies, programs and laws.  (Emphasis supplied)  [OIG Report, p. 5]

21.  USDA Regulation 4330-1, which is over 11 years old, dated June 27, 1986, set the departmental policy for program civil rights compliance reviews, but does not provide policy and guidance for processing program discrimination complaints.  [OIG Report, p. 5]

22.  On December 12, 1994, in a management alert to the then Office of Civil Rights Enforcement, defendant's Office of Inspector General (OIG) reported problems with how USDA received, processed, and resolved program discrimination complaints.  OIG recommended that "a departmental regulation be promulgated that sets forth the

authorities of the Office of Civil Rights Enforcement and that written procedures and controls be established governing the receipt, processing, and resolution of program discrimination complaints within established timeframes". [OIG Report, p. 5]

23. The regulation was never published.[1]

24. After years of abuse and benign neglect of African American farmers, OIG finally undertook an investigation and review, the results of which were released on February 27, 1997, of defendant's program discrimination complaints within FSA as well as 10 other agencies within USDA. OIG found, inter alia, that the discrimination complaint process within USDA lacked "integrity," and "accountability" was without a tracking system, was in "disorder", did not resolve discrimination complaints, and had a massive backlog:

> "The program discrimination complaint process at FSA lacks integrity, direction and accountability. The staff responsible for processing discrimination complaints receives little guidance from management, functions in the absence of any current position descriptions or internal procedures, and is beset with its own personnel EEO problems. The staff also processes discrimination complaints without a reliable tracking system to determine the status of the complaints and, apparently, without deadlines to resolve the complaints. The resulting climate of disorder has brought the complaint system within FSA to a near standstill. Little gets accomplished to resolve discrimination complaints or to make

---

[1]The U.S. Commission on Civil Rights issued a report in June 1996, titled Federal Title VI Enforcement to Ensure Nondiscrimination in Federally Assisted Programs. This report also had specific findings and recommendations critical of the USDA discrimination complaints processing system.

program managers aware of alleged problems within their
programs. After developing our own data base of unre-
solved cases, we determined that as of January 27, 1997,
FSA had an outstanding backlog of 241 complaints."
(Emphasis supplied) [OIG Report, p. 6]

25. OIG found that the staff responsible for processing the

discrimination complaints consisted of two untrained and unquali-

fied people:

>     "The FSA staff responsible for processing discrimi-
> nation complaints, the Civil Rights and Small Business
> Utilization Staff (CR&SBUS)" has two full-time program
> specialists working to resolve program complaints. These
> program specialists are supplemented by an administrative
> assistant who provides secretarial support and two staff
> assistants who maintain case files and the tracking
> system. The two program specialists and the two staff
> assistants transferred to FSA from the civil rights staff
> of the former Farmer's Home Administration (FmHA) during
> the Department's reorganization in October 1995. The
> staff assistants have been performing analyses of the
> preliminary inquiries conducted on the complaints,
> although they are not trained or otherwise qualified to
> do so. None of the former FmHA employees with CR&SBUS
> have position descriptions to reflect their current
> duties and responsibilities, and none have received
> performance appraisals for fiscal year 1996." (Emphasis
> supplied) [OIG Report, p. 6]

26. OIG found a "massive backlog" of unprocessed FSA com-
plaints. [OIG Report, p. 6]

27. OIG found the FSA files "disorganized" and unaccountable:

>     "...CR&SBUS was unable to provide us with an
> accurate number of outstanding complaints or their
> status. We reviewed the case files and found them
> generally disorganized. It was difficult for us to
> readily determine the date of the complaint, the reason
> it was brought, and the status of its resolution."
> (Emphasis supplied) [OIG Report, p. 7]

28. OIG found hundreds of FSA cases unresolved:

13

"Our review at the CR&SBUS and CREA disclosed that, between them, they had listed a total of 272 cases as being active. <u>The oldest case listed dates back to 1986.</u> * * * After resolving all duplications and determining the actual status of the 272 cases, we found that FSA had 241 cases of program discrimination complaints that had <u>not been resolved."</u> (Emphasis supplied) [OIG Report, p. 7]

29. OIG found repeated unaccountability and missing files:

"During our reconciliation of the two agencies' lists, we noted that some cases were listed by one or the other agency but could not be found in its filing system. CR&SBUS listed 32 cases that we could no find in its filing system, and CREA listed 28 cases that we could not find in its filing system. We also noted that CR&SBUS listed cases unknown to CREA. CR&SBUS listed 19 cases that CREA did not list." [OIG Report, p. 7]

30. OIG found there was no reliable method to the processing:

"CREA had officially closed 30 of the 272 cases with findings of no discrimination. CREA had also closed one case with a finding of discrimination, and the complainant was compensated. The case involved the FSA disaster program, and the complainant received the benefits which were at first denied by FSA. Four of the remaining 24 cases had findings of discrimination as determined by CREA and are pending resolution. One of the four complainants has not responded to the Department's written notice regarding filing a claim for compensation. Office of Operations officials are negotiating a settlement with the remaining three complainants." [OIG Report, pp. 7-8]

31. OIG found improperly closed files and improper reviews, and many files with no documentation:

"We found that FSA improperly closed and forwarded 30 complaints to program managers, without notifying the Department (26 of 30 cases were closed under the old FmHA agency management). The civil rights staff concluded without first receiving concurrence from the Department that these cases were the result of "programmatic discrepancies" (i.e., agency error rather than civil rights violations). Without departmental concurrence with its findings, the agency may not have addressed the legiti-

mate cases of discrimination.  CREA has the responsibili-
ty to make final determination of program discrimination.
FSA may recommend to CREA that cases be closed, but it
does not have the authority to close these cases without
concurrence from CREA.  For example, we noted that in one
instance FSA (the former FmHA) incorrectly concluded that
a case had only programmatic concerns and closed the case
without forwarding it to the Department.  Only after a
civil rights staff member complained, did FSA process the
case as a civil rights discrimination case.  The civil
rights staff stated in a letter that the allegation of
racial discrimination was overlooked.  The mixup was
discussed with the Department, which determined that the
case should be processed by the civil rights staff.  For
most of the <u>remaining cases, we found no documentation in
the case files at FSA that the Department has reviewed
these cases</u>." (Emphasis supplied) [OIG Report, p. 8]

32.  OIG found 58% of the FSA civil rights complaint case
files were over 1 year old and over 150 cases were almost two years
old:

". . . the average age of the 241 cases we consider
open because they were not officially closed by the
Department.

| No. of Cases | Program | Average Age |
|---|---|---|
| 151 | Ag. Credit (Farm Loans) | 703 Days |
| 40 | Disaster | 485 Days |
| 50 | Others | 482 Days |

Of the 241 open cases, 139 (58 percent) were known to be
over 1 year old.  Of the 241 cases, 129 (54 percent) are
awaiting action in FSA; the remaining 112 cases (46
percent) are in the hands of the CREA staff in USDA's
Office of Operations. Sixty-five of the cases at FSA (50
percent) need a preliminary inquiry.  Some of these date
back to 1993."  [OIG Report, p. 8]

33.  OIG found no system within FSA for reconciliation or

tracking of civil rights complaint cases:

"CR&SBUS has no procedures in place to reconcile or
track the status of complaints after they are forwarded
to CREA.  <u>Therefore, CR&SBUS could not tell us the status</u>

15

of complaints at CREA. As noted above, both CR&SBUS and
CREA had different numbers and were not aware of all the
outstanding complaints." (Emphasis supplied)   [OIG
Report, p. 8]

34. OIG found no management oversight within FSA with respect
to the handling of civil rights complaints:

> "CR&SBUS also does not prepare management reports to
> inform FSA program managers of alleged problems of
> discrimination within their programs. Without this
> information, program managers may not be aware of
> potential discrimination in the programs they are
> responsible for administering." [OIG Report, p. 9]

35. With respect to defendant's Office of Operations, Civil
Rights Enforcement and Adjudication (CREA), OIG found repeated
inaccuracies and unaccountability:

> "...that the listing of outstanding cases provided
> by CREA contained inaccurate information. In some
> instances we were unable to locate the case files at CREA
> that were on its outstanding case list. Without review-
> ing the case files, we were unable to verify the status
> of the complaints. Also, CREA and FSA had not reconciled
> their cases, and neither could inform us of the correct
> number of outstanding cases."

> "CREA does not have controls in place to monitor and
> track discrimination complaints. When complaints are
> received they are logged in, given a case number, and
> after the agency forwards the preliminary inquiry to
> CREA, the case is assigned to one of its seven program
> specialists. There are no procedures to require the
> program specialists to follow up on overdue responses
> from the agency. We have found that CREA is not follow-
> ing up on discrimination cases it returned to FSA for
> conciliation or performance of a preliminary inquiry.
> CREA advises the agency that it has 90 days to complete
> its review, but it does not follow up with the agency to
> determine the status of the complaint." [OIG Report,
> p. 9]

16

36.  OIG surveyed 10 other USDA program agencies in addition to FSA, to determine the procedures used for processing program discrimination complaints and <u>found the same problems</u>. [OIG Report, pp. 10-11]

37.  OIG compiled a list of outstanding ("open") program discrimination complaints, as late as 1996, within the Department, totalling 271.  [OIG Report, Attachment A]

38.  At the same time that OIG released its report, a USDA Civil Rights Action Team released a report, dated February 1997, condemning defendant's lack of civil rights enforcement and accountability which, <u>inter alia</u>, was a cause of the drastic decline in the number of African American farmers.  (The Report is hereinafter referred to as "CRAT"):

> "According to the most recent Census of Agriculture, the number of all minority farms has fallen -- from 950,000 in 1920 to around 60,000 in 1992.  For African Americans, the number fell from 925,000, 14 percent of all farms in 1920 to only 18,000, 1 percent of all farms in 1992." [CRAT, p. 14]

39.  CRAT found a common problem involving minority farmers applying to defendant for loans:

> "The minority or limited-resource farmer tries to apply for a farm operating loan through the FSA county office well in advance of planting season.  The FSA county office <u>might claim to have no applications available</u> and ask the farmer to return later.  Upon returning, the farmer might receive an application <u>without any assistance</u> in completing it, then be asked repeatedly to correct mistakes or complete oversight in the loan application.  Often those requests for correcting the application could be stretched for months, since they would come only if the minority farmer contacted the

17

office to check on the loan processing.  <u>By the time
processing is completed, even when the loan is approved,
planting season has already passed</u> and the farmer either
has not been able to plant at all, or has obtained
limited credit on the strength of an expected FSA loan to
plant a small crop, usually without the fertilizer and
other supplies necessary for the best yields.  The
farmer's profit is then reduced." (Emphasis supplied)
[CRAT, p. 15]

40.  CRAT found systematic mistreatment of minority farmers:

"If the farmer's promised FSA loan finally does
arrive, it may have been <u>arbitrarily reduced</u>, leaving the
farmer without enough money to repay suppliers and any
mortgage or equipment debts.  <u>In some cases, the FSA loan
never arrives</u>, again leaving the farmer without means to
repay debts.  Further operating and disaster loans may be
denied because of the farmer's debt load, making it
impossible for the farmer to earn any money from the
farm.  As an alternative, the local FSA official might
offer the farmer an opportunity to lease back the land
with an option to buy it back later.  The appraised value
of the land is set very high, presumably to support the
needed operating loans, but also making repurchase of the
land beyond the limited-resource farmer's means.  <u>The
land is lost finally and sold at auction</u>, where it is
bought by someone else at half the price being asked of
the minority farmer.  Often it is alleged that the person
was a friend or relative of one of the FSA county
officials."  (Emphasis supplied) [CRAT, p. 16]

41.  CRAT found insufficient oversight of farm credit to

minorities:

"Currently, the Farm and Foreign Agricultural
Services (FFAS) Mission Area, which manages the FSA
program delivery system, provides <u>ineffective oversight
of the local delivery of farm credit services</u>." (Emphasis
supplied) [CRAT, p. 16]

42.  CRAT found a lack of diversity in FSA program delivery

structure:

"Because of the ways in which State and county
committees are chosen and county offices are staffed,

<u>FSA lacks diversity in its program delivery structure</u>.
Federal EEO and Affirmative Employment laws and policies
do not govern the FSA non-Federal workforce except by
agency regulation." (Emphasis supplied) [CRAT, p. 18]

43.  CRAT found a lack of minority employees in FSA county

offices:

"A recent GAO study indicated that in the 101
counties with the largest concentration of minority
farmers, one-quarter had no minority employees in their
offices." [CRAT, p. 18]

44.  CRAT found lower participation rates and lower approval

rates for minorities in FSA programs:

"Recent studies requested by Congress and FSA have
found <u>lower participation</u> and <u>lower loan approval rates
for minorities in most FSA programs</u>. Participation rates
in 1994 in programs of the former Agricultural Stabiliza-
tion and Conservation Service (ASCS), particularly
commodity programs and disaster programs, were dispropor-
tionately low for all minorities. The GAO found that
between October 1, 1994 and March 31, 1996, 33 percent of
minority applications but only 27 percent of non-minority
applications in the Agricultural Conservation Program
(ACP) were disapproved. During the same period, 16
percent of minority but only 10 percent of non-minority
loans in the direct loan program were disapproved."
(Emphasis supplied) [CRAT, p. 21]

45.  For some states, the approval rates for farm loans were

widely disparate:

"For example, only 67 percent of African-American
loans were approved in Louisiana, compared to 83 percent
of non-minority loans. Alabama showed a similar dispari-
ty -- only 78 percent of African-American loans approved,
compared to 90 percent of non-minority loans." [CRAT,
p. 21]

46.  CRAT found minorities endured longer loan processing

times:

"Again, however, some States showed consistently longer processing times for minorities.  In the Southeast, for example, in several States in took three times as long on average to process African-American loan applications as it did non-minority applications. Similar disparities between non-minority loan processing and American Indian loan processing appeared in records for a number of States included in FSA's Northwest region." [CRAT, p. 21]

47.   CRAT found discrimination complaints at USDA were often ignored:

"Farmers who told the CRAT stories of discrimination and abuse by USDA agencies also described a complaints processing system which, if anything, often makes matters worse.  They described a bureaucratic nightmare where, even after they receive a finding of discrimination, USDA refuses to pay damages. They charged USDA with forcing them into court to seek justice, rather than working with them to redress acknowledged grievances. They painfully described the toll these ongoing battles with USDA has taken on their families, and on their health."  [CRAT, pp. 22-23)

48.   CRAT found decisions favoring farmers routinely not enforced by USDA:

"However, many farmers, especially small farmers, who have managed to appeal their cases to FSA charge that even when decisions are overturned, local offices often do not honor the decision.  They claim that decisions favoring farmers are simply "not enforced"." [CRAT, p. 23]

49.   CRAT found a lack of USDA regulations for discrimination complaint processing:

"Program discrimination complaints generally fall within two categories: (1) programs conducted directly by a USDA agency, such as USDA loan programs, and (2) federal assisted programs, where USDA does not directly offer services to customers, but recipients of USDA funds do.  The recipients must obey civil rights laws, and USDA can be sued under such laws as Title VI, the Rehabilita-

20

tion Act, IX, the Equal Credit Opportunity Act, and
others. CRAT members were informed by OGC that USDA
presently has no published regulations with clear
guidance on the process or time lines involved in program
discrimination complaints. When a farmer does allege
discrimination, "preliminary investigations" are typi-
cally conducted by the agency that has been charged with
violating her or his right." [CRAT, p. 24]

50. CRAT found discrimination complaints often are not

responded to by USDA:

". . . USDA doesn't respond even when they do file
complaints. In Tulsa, OK. an advocate representing black
and American Indian farmers said, "we have filed 72 civil
rights complaints. Not one complaint has even been
answered." [CRAT, p. 24]

51. CRAT found recordkeeping on discrimination complaints

"non-existent" and that a backlog existed:

"The CRAT was unable to gather historical data on
program discrimination complaints at USDA because record
keeping on these matters has been virtually nonexistent.
Complaints filed with the agencies are not necessarily
reported to USDA's Civil Rights office. Some figures are
available however, for cases that were open as of
December 31, 1996. The largest number of pending discri-
mination complaints, as comments at the listening
sessions suggests, are concentrated in three agencies at
USDA. There were 205 case pending, representing 42
percent of the total, against the FSS: 165, or 33.3
percent against the Rural Housing Service (RHS): and 62,
or 12.5 percent against the Food and Consumer Services.
Sixty three cases, or 12.7 percent of the total, were
pending against other agencies. The Department had a
total of 495 pending program discrimination complaints.
Approximately one-half of the pending cases are 2 years
old or older, verifying farmers contention that com-
plaints are being processed slowly, if at all. According
to the Complaints Processing Division at the Office of
Operation (OO), which processes complaints that make it
to the Department level. USDA averages about 200 new
program discrimination complaints each year. However, in
fiscal year 1996, an average of only 9 cases were closed
per month, or 108 during the year -- increasing a backlog

21

of program complaints." (Emphasis supplied) [CRAT, pp. 24-25]

52.  CRAT uncovered neglect of and bias against minorities by USDA, resulting in a loss of farmers' land and income.

"The recent Civil Rights listening-sessions revealed a general perception of apathy, neglect, and a negative bias towards all minorities on the part of most local USDA government officials directly involved in decision making for program delivery.  A reporter at the recent listening session in Tulsa, OK. observed that minority farmer are not sure which condition "was worse -- being ignored by the USDA and missing potential opportunities or getting involved with its programs and facing a litany of abuses.  Minority farmers have lost significant amounts of land and potential farm income as a result of discrimination of FSA programs and the programs of its predecessor agencies, ASCS and FmHA.  Socially disadvan- taged and minority farmers said USDA is part of a conspiracy to take their land and look to USDA for some kind of compensation for their loses."  [CRAT, p. 30]

53.  CRAT found USDA the fifth worst (of 56 government agencies) in hiring minorities:

"According to the US Department of Labor, between 1990 and 2000, women, minorities, and immigrants will account for 80 percent of the United States labor force growth.  The "Framework for Change: Work Force Diversity and Delivery of Programs," a USDA report released in 1990, found that USDA had a need to remedy under-repre- sentation in its workforce by providing equal employment and promotion opportunities for all employees. When this statement was made, USDA ranked 52 out of 56 Federal agencies in the employment of minorities, women, and individuals with disabilities." [CRAT, p. 33]

54.  CRAT found the lack of diversity at USDA adversely affects program delivery to minorities:

"USDA's workforce does not reflect the diversity of it customer base.  The lack of diversity in field offices adversely affects program delivery to minority and women customers of USDA." [CRAT, p. 45]

55.  CRAT found a lack of resources at USDA to ensure fair and equitable (non-discriminatory) program delivery to farmers:

> "The Assistant Secretary for Administration is USDA's senior official responsible for civil rights. Although that position has the responsibility for civil rights policy and compliances, it does not have the authority or resources necessary to ensure that programs are delivered and employees are treated fairly and equitably." [CRAT, p. 46]

56.  CRAT found enforcement of civil rights at USDA in program delivery lacking:

> "Another problem with enforcing civil rights in program delivery is fragmentation.  Agency civil rights directors have a number of responsibilities.  For example, USDA agencies each perform some complaint processing functions. However, the Commission noted that the respective roles of OCRE and the agencies were not clearly defined.  The Commission also found that OCRE was providing technical assistance to agencies on civil rights statutes, not proactively, but only when requested."  [CRAT, p. 51]

57.  CRAT found a lack of civil rights specialists and knowledge for program-related civil rights issues at USDA:

> "The Civil Rights Commission's report on the lack of Title VI enforcement also pointed to USDA's lack of civil rights specialists in program-related civil rights issues.  Many of the Department's civil rights resources are devoted to processing of employment discrimination complaints.  Of the current staff in the Department's two civil rights offices, two-thirds work on EEO complaints. That means only a small percentage of USDA's civil rights staff works on civil rights issues relating to program delivery.  According to the Commission, the 1994 civil rights reorganization was deficient because OCRE did not separate internal and external civil rights issues into separate offices.  The Commission predicted that "a probable consequence is that USDA's Title VI enforcement program may suffer as OCRE responds to pressures to improve USDA's internal civil rights program."  It recommended that USDA establish "two separate units, with

23

different supervisory staff," one for internal and one for external civil rights issues." [CRAT, p. 54]

58.   CRAT found defendant's counsel hostile to civil rights,

if not racist:

> "The perception that the Office of the General Counsel [at USDA] is hostile to civil rights has been discussed earlier in this report.  OGC's legal positions on civil right issues are perceived as insensitive at the least, and racist at worst.  Correcting this problem is critical to the success of USDA's civil rights program." [CRAT, p. 55]

59.   CRAT found defendant's counsel often have no civil rights

experience or education:

> "However, the CRAT has found that attorneys who practice civil rights law at [USDA's] OGC are not required to have specialized experience or education in civil rights when they are hired.  They acquire their civil rights experience on the job.  In addition, most of OGC's lawyers working on civil rights issues work on non-civil-rights issues as well."  [CRAT, p. 55]

60.   In sum, CRAT concluded that defendant does not support or

enforce civil rights:

> "USDA does not have the structure in place to support an effective civil rights program.  The Assistant Secretary for Administration lacks authority and resources essential to ensure accountability among senior management ranks.  There has been instability and lack of skilled leadership at the position of USDA Director of Civil Rights.  Dividing up the Department's Civil Rights office between policy and complaints has further exacerbated the problem.  The division of responsibility for civil rights among different USDA offices and agencies has left confusion over enforcement responsibilities. Finally, OGC is perceived as unsupportive of civil rights."  [CRAT, p. 56]

61.   In sum, defendant's willful disregard of, and failure to

properly investigate, African-American discrimination complaints

24

began with the disbanding of civil rights enforcement functions back in 1983, and continued until March, 1987 when the current administration reorganized and reestablished the proper enforcement staff of the civil rights office.

### CLASS ACTION ALLEGATIONS

62. Plaintiffs bring this Class action on behalf of themselves and all other similarly situated for the purpose of asserting the claims alleged in this Complaint on a common basis. Plaintiffs' proposed Class is defined as all participants in FSA's farm programs who petitioned USDA at any time between January 1, 1983 and February 21, 1997, for relief from acts of racial discrimination visited on them, as they tried to participate in such farm programs and who, because of the failings in the USDA civil rights complaint processing system described above, were denied equal protection under the laws of the United States and deprived of due process in the handling of their discrimination complaints. During the period January 1, 1983 to February 21, 1997, plaintiffs and members of the Class filed not less than 641 discrimination complaints. Plaintiffs allege that approximately 400 cases were not properly investigated yet officially "closed" by defendant; defendant has admitted at least 241 complaints are still "open." Plaintiff also alleges that in addition to the 641 cases, there were many written complaints of discrimination that were

25

never properly processed by defendant and thus are presently not on defendant's case lists, but in defendants files.

63.  This action is brought and may properly be maintained as a Class action pursuant to the provisions of Federal Rules of Civil Procedure 23(a)(1)-(4) and, as appropriate, 23(b)(1), (b)(2) and/or (b)(3).  This action satisfies the numerosity, commonality, typicality, adequacy and predominance and superiority requirement of those provisions.

64.  <u>Numerosity of the Class. Fed. R. Civ. P. 23(a)(1)</u>.  The Class is so numerous that the individual joinder of all its members is impracticable.  FSA has approximately 2,750 county committees throughout the United States.  They process applications for approximately 1,400,000 farmers.  There is no dispute that, during the period January 1, 1983 to February 21, 1997, USDA processed at least 400 discrimination cases which defendant contends were completed and closed [hereinafter the "closed" cases] and 241 discrimination cases that are still open [hereinafter the "open" cases].  These "closed" and "open" cases, totalling 641, have files within the records systems of USDA; accordingly, plaintiffs are informed and believe, and on that basis allege, that the Class includes not less than 641 members.  However, plaintiffs and members of the Class contend that many written complaints of discrimination were never properly docketed in defendant's "system" and therefore were never acknowledged by or responded to by

defendant.  Without discovery from defendant, plaintiffs have no specific knowledge as to how many complaints were so treated. Class members may be informed of the pendency of this Class action by published and broadcast notice; in addition, defendant has each Class member's farm number, address, application date and payment results on computer, and thus readily available.

65. _Existence and Predominance of Common Questions Of Law and Fact. Fed. R. Civ. P. 23(a) and 23(b)(3)_.  Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual members of the Class. These common legal and factual questions arise from one central issue, which does not vary from Class member to Class member and which may be determined without reference to the individual circumstances of any particular Class member: defendant's institutional and systematic course of conduct in denying civil rights complainants due process of law in the handling of their complaints.  These common legal and factual questions include, but are not limited to, the following:

a)  Whether and when defendant's officials discriminated against plaintiffs and Class members in failing to process discrimination complaints;

b)  Whether and when defendant's officials discriminated against plaintiffs and Class members in granting credit and providing other program benefits;

27

    c)   Whether defendant's officials failed to provide plaintiffs and Class members equal opportunity to credit or other program benefits;

    d)   Whether defendant's institutional and systematic failure to provide plaintiffs and Class members equal opportunity for and access to credit or other program benefits was arbitrary, capricious, an abuse of discretion, and/or in excess of statutory jurisdiction;

    e)   Whether defendant's institutional and systematic refusal and denial of plaintiffs' and Class members' rights constitutes a violation of the Civil Rights Act, Title VI, and due process under the Fifth Amendment To The Constitution;

    f)   Whether defendant's actions violated plaintiffs' and Class members' statutory rights and rights to due process pursuant to the Equal Credit Opportunity Act;

    g)   Whether plaintiffs and Class members are entitled to (1) a declaration of their eligibility to receive damages or other monetary relief, (2) costs, (3) attorneys fees and (4) interest from the date they should have been paid to the actual date of payment;

    h)   How any and all payments plaintiffs are declared eligible to receive should be equitably allocated among the Class.

These questions of law as to each Class member arose at the same time - following the release of the OIG Report and CRAT, in

February, 1997, exposing for the first time, the institutional and systematic failure of the discrimination complaint process at USDA.

66.   Typicality of Claims. Fed. R. Civ. P. 23(a)(3). Plaintiffs' claims are typical of the claims of the members of the Class, all of whom have been denied equal access to credit or other program benefits and due process in the enforcement of their discrimination complaints, who have been subject to defendants' institutional and systematic failure to enforce the civil rights law intended to benefit plaintiffs and members of the Class, due to defendant's arbitrary and unlawful actions.

67.   Adequacy of Representation.  Fed. R. Civ. P. 23(a)(4). Plaintiffs are adequate representatives of the Class because they are members of the Class and their interests do not conflict with the interests of the members of the Class they seek to represent.  They have retained competent counsel experienced for over 14 years in the prosecution of complex agricultural disputes involving review of adverse agency action, and they intend to prosecute this action vigorously for the benefit of the Class.  Mr. Pires, after 7 years at the U.S. Department of Justice, has spent 14 years in private practice representing farmers; he has been lead counsel in over 50 federal cases involving farmers.  Mr Fraas has been in private practice representing farmers for 8 years, before that he was Chief Counsel of the House Agriculture Committee, responsible for all USDA programs and laws.  The interests of the

29

members of the Class will be fairly and adequately protected by plaintiffs and their counsel.  Counsel for plaintiffs have signed retainer agreements with plaintiffs stating that in the event of a successful settlement or judgment (1) 100% of all monies received will go to plaintiffs and Class members; (2) counsel will seek recovery of legal fees and costs under the Equal Access To Justice Act and the Equal Credit Opportunity Act.

68.  Superiority.  Fed. R. Civ. P. 23(b)(3).  A Class action is superior to other available methods for the fair and efficient adjudication of this litigation since individual litigation of Class members' claims regarding the defendant's institutional and systematic deprivation of their civil rights as described in this Complaint is impracticable.  Even if any Class members could afford individual litigation, the court system could not.  It would be unduly burdensome to the courts in which individual litigation of the facts of not less than 641 cases would proceed.  Individual litigation further presents a potential for inconsistent or contradictory judgments and increases the delay and expenses to all parties and the court system in resolving the legal and factual issues of the case. By contrast, the Class action device presents far fewer management difficulties and provides the benefits of single adjudication of what essentially is one problem, economies of scale, and comprehensive supervision by a single court. Notice of the pendency of any resolution of this Class action can be

provided to Class members by publication and broadcast; in addition, defendant has each Class member's farm number, address, application date and payment results on computer, readily available.

69. The various claims asserted in this action are additionally or alternatively certifiable under the provisions of Federal Rules of Civil Procedure 23(b)(1) and/or 23(b)(2) because:

a) The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual Class members, thus establishing incompatible standards of conduct for defendant;

b) The prosecution of separate actions by individual Class members would create a risk of adjudications that would, as a practical matter, be dispositive of the interests of the other Class members not parties to such adjudications or would substantially impair or impede the ability of such non-party Class members to protect their interests; and

c) Defendant has acted on grounds generally applicable to the Class, thereby making appropriate final declaratory relief with respect to the Class as a whole.

## FACTUAL ALLEGATIONS

70. With respect to plaintiff Timothy C. Pigford:

On a number of separate occasions beginning in 1976 and extending through 1987, Tim Pigford applied for farm ownership

31

loans ("Fos") from FmHA and was turned down by the Bladen County FmHA office.  The denial of this credit was due to racial discrimination against Tim Pigford -- this was acknowledged at the highest level of the agency, and the Civil Rights Office at USDA also concluded there was discrimination in the handling of Pigford's appeal on one of the FO denials.

A draft analysis of the Pigford FO denials done by FmHA staff on May 23, 1986, noted that FmHA had "placed an unyielding burden on [Tim Pigford] in rejecting his FO loan application. . . The rejection of the FO by the County Committee was directly counter to Agency regulations as well as to its own actions before and after the FO loan decision", and further noted that the County Supervisor failed to provide Pigford farm program servicing according to FmHA regulations "comparable to that provided white borrowers".  It was suggested as a remedy then that Tim be given an inventory farm to take ownership of.

A memorandum by the Administrator of FmHA, dated August 22, 1986, said that "Our review of the files of the white farmers mentioned indicates the county supervisor was more tolerant of the problems experienced by them. . . The two white farmers also received large loans in a timely manner despite irregularities noted in paying FmHA, and in not following their established Farm and Home Plans.  It is our conclusion Mr. Pigford was treated differently than the two white farmers."

A later (July 7, 1987) memorandum from one member of USDA's civil rights staff to another person on that staff stated that "Mr. Pigford has again charged discrimination regarding his denial of a farm ownership loan in 1987. . . We believe the hearing officer erred when he declined to accept Mr. Pigford's allegations of discrimination during the appeal process."

In addition, the statistics on the award of FOs in Bladen County, North Carolina, show disparity of treatment between white and black applicants for these loans.

Pigford timely filed a civil rights complaint matter with USDA on the racially discriminatory denial of the farm ownership loans. However, the Civil Rights Office at USDA in a December 19, 1986, determination <u>chose to ignore</u> the FmHA findings and held against Pigford on the issue of discrimination on the FO loan denials as well as on unrelated matters of FmHA's servicing of his operating loan debts.  Pigford refiled his complaints in 1987, and USDA's civil rights staff again rejected them, as reflected in a July 7, 1997, memorandum (which is quoted above).  Pigford has continued to press his complaints since then, both at USDA and with members of Congress.

As a result of these actions of USDA, Pigford has suffered frustration, humiliation, anxiety, and other mental distress at his inability to obtain redress from USDA for the racial discrimination committed against him; and members of his family have been

33

subjected to mental and emotional stress after Pigford's loss of his farm and his homestead due to his inability to obtain such redress for the racial discrimination.

Further, by being denied the farm ownership loan due to racial discrimination, Pigford additionally has suffered the loss of the ability to purchase a farm, the loss of the opportunity to continue farming, the loss of profits from a farming operation, and related pain and suffering on his part and that of his family.

71.  With respect to Plaintiff Lloyd Shafer

Shafer began farming in 1992, and as a beginning farmer sought operating loan credit from FmHA.  The Yazoo County, Mississippi, FmHA office initially denied him credit, but was later forced to retract the denial as baseless.  However, the operational credit provided by FmHA was delayed and inadequate to allow Shafer to harvest crops.

This pattern of FmHA only grudgingly providing Safer operational credit, at times with onerous restrictions on the use of the funds, continued through 1994.  Shafer, however, was making every effort to succeed as a farmer.  For example, in 1993, Shafer enrolled in classes in agricultural science at Alcorn State University (an USDA designated minority farmer outreach grantee), and the Alcorn staff assisted him in preparing his farm plan in 1993 (although Yazoo County FmHA office refused to use it).

34

Again in 1994, Shafer was initially denied operative credit, but the denial was reversed.  However, FmHA retaliated against Shafer by delaying and restricting operating loan funds.

In 1995, Shafer's crops were adversely affected by natural disasters and he applied to FSA for a disaster loan.  Again, his application was initially denied, but an appeal over the head of the Yazoo County FSA office was approved.  However, the payment to Shafer of the disaster loan funds was delayed for a substantial period of time, to August 1995.

Over time, Shafer concluded that as an African-American farmer he was being discriminated against by FmHA and FSA an Yazoo County, Mississippi.  He had been the President of the Yazoo County Chapter of the National Association for the Advancement of Colored People (NAACP), and there has been for some time an atmosphere of hostility toward the NAACP and its work in Yazoo County.  Most recently, this racial animus resulted in the arson burning of a black church located near Yazoo City.  Shafer believes the Yazoo County FSA office is part of the oppressive white establishment of Yazoo County.

A report in the Jackson, Mississippi, <u>Clarion-Ledger</u>, dated January 12, 1997, included a table showing the disparate treatment given white farmers, on the one hand, and minority and women farmers on the other than, in the award of farm loans by FSA in Mississippi:

Sunday, January 12, 1997 The Jackson, Mississippi Clarion-Ledger - 9A

## FEDERAL FARM LOANS

### FISCAL YEAR 1996

| Loan type | No. | Amount | Minority | Amount | Female | Amount |
|---|---|---|---|---|---|---|
| Direct Operating | 285 | $16,800,410 | 77 | $3,097,040 | 0 | $0 |
| Guaranteed Operating | 217 | 40,136,405 | 10 | 1,168,320 | 0 | 0 |
| Direct Farm Ownership | 3 | 365,150 | 3 | 247,700 | 1 | 76,650 |
| Guaranteed Farm Ownership | 37 | 5,277,570 | 0 | 0 | 1 | 40,200 |

### FISCAL YEAR 1995

| Loan type | No. | Amount | Minority | Amount | Female | Amount |
|---|---|---|---|---|---|---|
| Direct Operating | 243 | $13,871,300 | 100 | $4,949,030 | 0 | $0 |
| Guaranteed Operating | 273 | 54,533,980 | 26 | 2,657,525 | 0 | 0 |
| Direct Farm Ownership | 2 | 199,000 | 4 | 400,800 | 0 | 0 |
| Guaranteed Farm Ownership | 69 | 9,034,820 | 2 | 300,000 | 4 | 430,000 |
| Direct | | | | | | |

Shafer timely filed his civil rights complaint in early 1997. Because of numerous financial set-backs he has suffered as a farmer, due in no small part to the Yazoo County FSA office's racially discriminatory actions, Shafer is on the verge of financial ruin and cannot wait for a flawed civil rights review process to slowly wind its way to a conclusion. He seeks a fair and reasoned resolution of his complaint, and for that reason joins as a plaintiff in this law suit.

72. With respect to Plaintiff George Hall:

Hall suffered racially-based disparate treatment in being denied disaster payments in 1994. Disaster payments have been made

36

available to U.S. farmers in most years since 1987, to compensate farmers for losses to their production because of natural disasters.

In 1994, Hall's county, Greene County, Alabama, was declared eligible for the disaster payment program on 1994 crop losses. All applications for disaster payments were approved by the Greene County ASC committee except for Hall's application on four of his crops. Further, when Hall appealed these denials, the Greene County, ASC office retaliated against him by reducing his payment yield on the crops. He appealed the denials and reprisals to the state office and his benefits were restored.

Hall filed a timely complaint of racial discrimination with USDA on August 9, 1996. USDA found that the Green County ASC committee discriminated against Hall on the basis of race, in denying his application for disaster payments. However, one year later, no corrective action based on this finding has been made, the discrimination against Hall has never been compensated, and the racially discriminatory situation in the Green County FSA office still exists.

73. The foregoing allegations are typical as to all Class Members. Plaintiffs for the members and members of the Class will present a _prima_ _facie_ case of discrimination showing (1) defendant's awarding of credit and farm program participation to whites was a pattern different than for plaintiffs and all Class

members and (2) a willful failure of defendant to properly investigated the 641 discrimination complaints of plaintiffs and members of the Class.

<u>COUNT I</u>
(Declaratory Judgment)

74. Plaintiffs, on behalf of themselves and all others similarly situated, reallege Paragraphs 1-73 above as if fully set forth herein.

75. An actual controversy exists between plaintiffs and Class members and defendant as to their rights with respect to defendant's farm programs.

76. Plaintiffs and the Class pray that this Court declare and determine, pursuant to 28 U.S.C. 2201, the rights of plaintiffs and Class members under defendant's farm programs including their right to equal credit, participation in farm programs, and their right to full and timely enforcement of racial discrimination complaints.

<u>COUNT II</u>
(Agency Action That Is Arbitrary
Capricious, An Abuse Of Discretion, Not In Accordance
With Law, And In Excess of Statutory Jurisdiction)

77. Plaintiffs, on behalf of themselves and all others similarly situated, reallege Paragraphs 1-76 above as if fully set forth herein.

78. Defendant's acts of denying plaintiffs and Class members credit or other benefits and systematically failing to process their discrimination complaints was racially discriminatory and

38

were not authorized nor justified by any statute, regulation, or reasonable interpretation of program procedures, and thus constitutes arbitrary, capricious and unlawful action.

79. Plaintiffs and the Class pray defendant's actions be reversed as arbitrary, capricious, an abuse of discretion, and not in accordance with law, pursuant to 5 U.S.C. 706(2)(A), and in excess of defendant's statutory jurisdiction, pursuant to 5 U.S.C. 706(2)(C), and in violation of the Fifth Amendment of the Constitution.

<u>COUNT III</u>
(Violation of Equal Credit Opportunity Act/
Administrative Procedures Act)

80. Plaintiffs, on behalf of themselves and all others similarly situated, reallege Paragraphs 1-79 above as if fully set forth herein.

81. Defendant's acts of denying plaintiffs and Class members credit and other benefits and systematically failing to process their discrimination complaints was racially discriminatory and contrary to the requirements of such Act.

82. Plaintiffs and the Class pray defendant's actions be reversed as arbitrary, capricious, an abuse of discretion, contrary to 15 U.S.C. 1691(a) and not in accordance with law, pursuant to 5 U.S.C. 706(2)(A), and in excess of defendant's statutory jurisdiction, pursuant to 5 U.S.C. 706(2)(C).

83.  Plaintiffs prays for money damages for plaintiffs and Class members of $512,800,000.00.

<u>COUNT IV</u>
(Violation of Title VI of the Civil Rights Act of 1964 and the Fifth Amendment to the Constitution)

84.  Plaintiffs, on behalf of themselves and all others similarly situated, reallege Paragraphs 1-83 above as if fully set forth herein.

85.  Defendant's acts constitute a violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d and the Fifth Amendment to the Constitution.

86.  As a direct and proximate result of defendant's acts, plaintiffs and the Class members have sustained damages, including payments rightfully due plaintiffs and the Class members.

87.  Defendants pray for appropriate relief under the Administrative Procedures Act, including (1) compensation to plaintiffs and Class members for there having been no proper investigation of their complaints of not less than $512,800,000.00, and (2) specific performance (i.e., award of disaster payments, CRP payments, etc.) of their program benefits.

WHEREFORE, plaintiffs, on behalf of themselves and all others similarly situated, request this Court enter judgment against defendant as follows:

(1)  An Order certifying the Class, and any appropriate subclass thereof, under the appropriate provisions of Fed. R. Civ.

P. 23, and appointing plaintiffs and their counsel to represent the Class;

(2)  An Order declaring, pursuant to 28 U.S.C. §2201, that plaintiffs and the Class members were denied equal credit and other farm program benefits and full and timely enforcement of their civil rights discrimination complaints.

(3)  An Order declaring defendant's actions arbitrary, capricious, an abuse of discretion, not in accordance with the law, and in excess of defendant's statutory authority and jurisdiction;

(4)  An Order declaring defendant's actions to be a breach of plaintiffs' rights under the Equal Credit Opportunity Act and the Administrative Procedures Act and declare plaintiffs and the Class members' eligible to receive monetary and other relief of not less than $512,800,000.00.

(5)  An Order declaring defendant's actions to be a breach of plaintiffs' rights under the Civil Rights Act of 1964 and the Fifth Amendment for the Constitution and declare plaintiffs and Class members eligible to receive monetary of not less than $512,800,000.00 to the relief.

(6)  An Order declaring defendant estopped from contending, as a defense to relief to some Class members, that said Class members failed to exhaust their administrative remedies.

(7)  An Order granting plaintiffs' and the Class members' attorneys' fees pursuant to the Equal Access to Justice Act and the

41

Equal Credit Opportunity Act, costs of suit, and interest from date when plaintiffs and the Class members should have been paid to actual date of payment, and all other relief that the Court determines proper and fair.

Respectfully submitted,

By: _____
Alexander J. Pires, Jr. #185009
CONLON, FRANTZ, PHELAN & PIRES
1818 N Street, N.W., Suite 700
Washington, D.C.  20036
(202) 331-7050

By: _____
Philip L. Fraas #211219
1025 Thomas Jefferson Street, N.W.
Washington, D.C.  20007
(202) 342-1300

August 28, 1997                    Counsel for Plaintiffs