UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| TIMOTHY PIGFORD, <u>et al</u>., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 97-1978 (PLF) |
| ) | |
| ANN VENEMAN, Secretary, ) | |
| United States Department of Agriculture, ) | |
| ) | |
| Defendant. ) | |
| ) | |
| CECIL BREWINGTON, <u>et al</u>., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 98-1693 (PLF) |
| ) | |
| ANN VENEMAN, Secretary, ) | |
| United States Department of Agriculture, ) | |
| ) | |
| Defendant. ) | |

<u>OPINION</u>

This matter is before the Court on a motion to modify the Consent Decree filed by

certain African American farmers and a motion to disqualify lead class counsel filed by a

number of the same African American farmers and others.  As a result, the Court again finds

itself called upon to review the fairness of the Consent Decree memorializing a settlement

agreement entered into more than five years ago by the United States Department of Agriculture

and the plaintiff class of African American farmers, and the adequacy of plaintiff class counsel.

The terms of the Consent Decree were approved by this Court in April 1999. Since then, more than 13,500 farmers have received more than $830 million in cash and other relief from the government.  In the present motions, however, a small number of individual African American farmers seek to overturn these gains, renegotiate with the government, and fashion what they believe would be a better solution.  Because the motion to modify and the motion to disqualify concern common issues, the Court will address them together.  As explained in this Opinion, the Court finds no grounds to grant the extraordinary relief sought by movants and again reminds all parties, movants and counsel that the Federal Rules of Civil Procedure and the relevant case law provide an avenue for such relief only in the rarest of circumstances.  Consequently, the Court will deny both motions.

## I.  BACKGROUND

The issues raised by movants in their motions to modify the Consent Decree and to disqualify class counsel cover a broad range of matters related to the fairness of the negotiated settlement of this case, as approved by the Court after a fairness hearing and embodied in the Consent Decree, and the process of its implementation.  Because these issues are bound up with the progress of the case over the past five years, a review of its history is appropriate.  It is important to note that many of the arguments advanced by movants have already been raised and decided both by this Court and by the United States Court of Appeals for the District of Columbia Circuit.  As counsel for movants is well aware, those decisions constitute the law of this case and therefore, absent extraordinary changed circumstances, must be followed.  This Court and the court of appeals have described the history and context of the case as follows:

On August 28, 1997, three African-American farmers filed suit on behalf of a putative class of similarly situated African-American farmers alleging racial discrimination in the administration of USDA programs and further harm from the allegedly surreptitious dismantling of USDA's Office of Civil Rights in 1983, which together were alleged to violate the Fifth Amendment, the Administrative Procedure Act, 5 U.S.C. § 551 et seq.; Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d; and the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691, prohibiting discrimination in consumer credit. Following amendments to the complaint, the district court granted class certification in October 1998. See Pigford, 185 F.R.D. at 90. At that time, most of the farmers' ECOA claims were arguably barred by a two-year statute of limitations. See 15 U.S.C. § 1691e(f). Responding to petitions from class members, Congress enacted, and the President signed in November 1998, an amendment to retroactively extend the limitations period for persons who had filed administrative complaints between January 1, 1981, and July 1, 1997, for acts of discrimination occurring between January 1, 1981, and December 31, 1996. A second class action, Brewington v. Glickman, Civ. No. 98-1693, filed in July 1998 and making similar allegations covering a different time period, was consolidated with Pigford for purposes of settlement, and a new class was certified. See Pigford, 185 F.R.D. at 90.

As the February 1999 trial date drew near, the parties' negotiations shifted from individual claims to a global settlement, id., and with the assistance of a court-appointed mediator, the parties developed and agreed to a consent decree that contemplated a two-track dispute resolution mechanism to determine whether individual class members had been the victims of discrimination and, if so, the amount of monetary relief to which they were entitled.

Pigford v. Glickman, 206 F.3d 1212, 1215 (D.C. Cir. 2000) (footnotes omitted).

Designed to "ensure that in their dealings with USDA, all class members receive full and fair treatment that is the same as the treatment accorded to similarly situated white persons," the decree establishes procedures for resolving class members' individual claims. Consent Decree at 2. Specifically, the decree allows class members to choose between two claims procedures, known as Tracks A and B. In recognition of the fact that "most . . . [class] members . . . had little in the way of documentation or proof" of either discriminatory treatment or damages suffered,

3

Track A awards $ 50,000 to those farmers able to "meet only a minimal burden of proof." Pigford, 185 F.R.D. at 103. Track B . . . imposes no cap on damages, but requires farmers who choose this track, after limited discovery consisting "essentially [of] an exchange of lists of witnesses and exhibits and depositions of the opposing side's witnesses," to prove their claims by a preponderance of the evidence in one-day mini-trials before an arbitrator. Id. at 106. . . . Track A and B decisions are final, except that the losing side may petition for review by a court-appointed monitor. [Consent Decree] at ¶¶ 9(a)(v), 9(b)(v), 10(i), 12(b)(iii).

Pigford v. Glickman, 292 F.3d 918, 920-21 (D.C. Cir. 2002).

By law, the proposed consent decree could not take effect until the district court had approved it, see FED. R. CIV. P. 23(e), and the district court's approval could not be granted until notice had been given to the class of the proposed settlement and a fairness hearing had been held to determine whether the "settlement is fair, adequate, and reasonable and is not the product of collusion between the parties." Pigford, 185 F.R.D. at 98 (quoting Thomas v. Albright, 139 F.3d 227, 231 (D.C. Cir. 1998)). The district court held a day-long hearing in which representatives of eight organizations and sixteen individuals . . . voiced their objections to the terms of the proposed consent decree. Many . . . objected to the absence of certain forms of prospective structural relief, notwithstanding the fact that the complaint, as amended, did not seek such injunctive relief. 185 F.R.D. at 110. While USDA was likely to face billion-dollar monetary liability under the decree, no changes to the county committee system were mandated, and objectors feared that no improvements would be made to the way in which the farm credit and non-credit programs are administered. See Transcript of Fairness Hearing ("Tr."), Mar. 2, 1999 at Joint Appendix (JA) 388 (Mr. Bowens); 493 (Mr. Cooper). They also maintained that insufficient information had been exchanged during the discovery period leading up to the settlement. . . .

Following the hearing, the district court suggested fourteen changes to the proposed consent decree, including modifying paragraph 19 to require USDA to use its best efforts to comply with laws prohibiting discrimination and modifying paragraph 21 to make clear that the district court retained jurisdiction to enforce the consent decree with its contempt power. The class and USDA rejected the first suggestion and adopted the second. The district court then allowed another round of written objections to be filed

4

to the revised consent decree.  After considering all of the objections and the entire record, the district court approved the proposed consent decree as fair under Rule 23 and ordered that the decree be entered.

Pigford v. Glickman, 206 F.3d at 1215-16 (footnotes omitted).

Shortly after the Court approved the Decree, seven individual putative class members appealed the Court's order approving the Consent Decree to the court of appeals, arguing that the Decree was unfair in certain respects and should be set aside. Appellants' arguments were considered and summarily rejected by the court of appeals.  See Pigford v. Glickman, 206 F.3d 1212 (D.C. Cir. 2000), aff'g Pigford v. Glickman 185 F.R.D. 82 (D.D.C. 1999).  While that appeal was pending, the same seven appellants/movants filed [a motion] asking the [District] Court to reconsider the fairness of the Consent Decree in light of "changed circumstances" which, they argue[d] justify vacating the Decree. . . .

Pigford v. Glickman, 127 F.Supp. 2d 35, 37 (D.D.C. 2001).  The motion to reconsider the

fairness of the Consent Decree was denied, see id., and implementation of the Consent Decree

continued unimpeded.

Given the size of the class, disputes about the adjudication and arbitration

processes were bound to arise.  Fortunately, the Consent Decree anticipated these problems and

established means to address them:

The Consent Decree provided that the Court would appoint an independent Monitor and that the Monitor would have the authority to direct the facilitator, adjudicator, or arbitrator to reexamine a claim if the Monitor determined that a "clear and manifest error" had occurred and had resulted in, or was likely to result in, a "fundamental miscarriage of justice."  Consent Decree ¶ 12(b)(iii).  The Consent Decree did not provide a time limit within which a claimant could petition for Monitor review of his or her claim.  See id.

To bring finality to the proceedings under the Consent Decree, the parties stipulated on July 14, 2000, that any claimant

> who had already received an adverse decision from the
> Adjudicator would have 120 days from the date of the Order, until
> November 13, 2000, to file a petition for Monitor review.  See July
> 14, 2000 Stipulation and Order ("Stipulation and Order") at 4.
> They further stipulated that all claimants who were to receive
> adjudication decisions after July 14, 2000 would have 120 days
> from the date of their adverse decision to file a petition for
> Monitor review.  See id.  The Stipulation and Order specifically
> provided that "no extensions of these deadlines will be granted for
> any reason."  Id.

Pigford v. Veneman, 307 F.Supp. 2d 43, 45-46 (D.D.C. 2004) (footnotes omitted).

Less than a year after the denial of the first motion to reconsider the fairness of the Consent Decree, several pro se members of the plaintiff class filed motions before this Court to vacate the Decree and remove lead class counsel, arguing that the decision of the court of appeals in Pigford v. Veneman, 292 F.3d 918 (D.C. Cir. 2002), proved that the Consent Decree was "unworkable."  The decision by the court of appeals, however, had focused on problems with the Track B process, and the court of appeals found that class counsel's failure to meet critical deadlines for arbitration of certain individual Track B claims amounted to an "unforeseen obstacle" that warranted a tailored modification of the Consent Decree to permit the arbitrator to set new deadlines for both parties in certain Track B cases.  See id. at 927.  Thus, when later considering the motion to vacate the Consent Decree and remove class counsel, this Court found the movants' reliance on the court of appeals' decision to be misplaced:

> With respect to the motion to vacate the Consent Decree,
> movants rely on the court of appeals' statement that the Decree is
> "unworkable."  See Motion to Vacate Consent Decree at 2.  In
> making that determination, however, the court of appeals was
> referring only to the tight deadline schedule of the Track B process
> – since that was the matter before it – although the judgment was
> influenced by the court's assessment of counsel's overall
> performance when faced with a workload well beyond what
> anyone could have imagined and counsel's failure to seek
> assistance of this Court or other lawyers earlier.  See Pigford v.

6

> Veneman, 292 F.3d at 926-27.  The Consent Decree therefore was
> described as "unworkable" only with respect to the Track B
> process established by the Consent Decree and the relatively few
> Track B cases in which crucial deadlines were missed.  See id.

Pigford v. Veneman, 217 F.Supp. 2d 95, 98 (D.D.C. 2002).

Today, slightly more than two years after that decision, certain individual class members once again ask the Court to modify the Consent Decree and remove class counsel.  The present motions are significantly more expansive than the 2002 motions, however, and present a dizzying array of grounds for the Court to consider.[1]

Movants' complaints can be grouped into two overarching arguments: (1) the Consent Decree was unfair, and (2) implementation of the Decree has been flawed.  See Movants' Reply to Oppositions to Amended Motion to Modify Consent Decree ("Mov. Reply (Consent Decree)") at 4.  The first argument raises four primary concerns: (a) the number of objectors to the settlement was discounted by the Court, (b) the award amounts were insufficient and payments have been unduly delayed, (c) necessary forward-looking injunctive relief was not included in the Decree, and (d) notice of the settlement was inadequate.  See id. at 5-14.  The second argument is comprised substantially of three claims: (a) full recovery by claimants has been thwarted by unwarranted and aggressive opposition by the government, (b) discrimination at the USDA persists, and (c) class counsel has been inadequate.  See Mov. Reply (Consent Decree) at 14-21.

---

[1]     Whereas previous movants confined their concerns to a handful of issues of particular concern, movants here assert dozens of claims with no particular priority or order, attaching more than 100 exhibits – many of which are never referenced in their briefs – and hundreds of pages of Congressional testimony.  The seemingly indiscriminate approach by which movants have made their case renders it considerably more difficult to discern the bases for their claims.  The Court will attempt to address herein all the clearly articulated claims that movants have presented.

The last rationale is further expressed in movants' motion to disqualify class counsel. In that context, movants assert that class counsel: (a) failed to provide adequate notice to putative class members, (b) agreed to an allegedly deficient settlement and, in doing so, "fail[ed] to follow the demands" of class members, (c) performed poorly and missed crucial deadlines, (d) colluded with defendant regarding a "secret confidential [fee] settlement arrangement," and (e) refuse to communicate with class members. See Movants' Motion to Disqualify Class Counsel and Request for Emergency Hearing ("Mov. Mot. (Class Counsel)") at 3-5, 13-15.

## II.  DISCUSSION

As the history of this case makes clear, the present motions are not the first of their kind. See Pigford v. Veneman, 217 F.Supp. 2d 95 (D.D.C. 2002) (denying motions to vacate Consent Decree and remove lead class counsel); Pigford v. Glickman, 127 F.Supp. 2d 35 (D.D.C. 2001) (refusing to vacate Consent Decree in light of alleged "changed circumstances"); Pigford v. Glickman, 206 F.3d 1212 (D.C. Cir. 2000), aff'g Pigford v. Glickman, 185 F.R.D. 82 (D.D.C. 1999) (upholding fairness of Consent Decree). Nor are the issues that movants raise novel. See Pigford v. Glickman, 185 F.R.D. 82, 102 (D.D.C. 1999) (notice to class members); Pigford v. Veneman, 208 F.R.D. 21, 23 (D.D.C. 2002) (same); Pigford v. Glickman, 185 F.R.D. at 102 (number of objectors); id. at 108-09 (sufficiency of Track A monetary award); id. at 110-12 (forward-looking injunctive relief); Pigford v. Glickman, 206 F.3d at 1215-16 (same); Pigford v. Glickman, 127 F.Supp. 2d at 38 (difficulty of recovery); Pigford v. Glickman, 182 F.R.D. 341, 350 (D.D.C. 1998) (adequacy of class counsel); Pigford v. Glickman, 127 F.Supp. 2d at 38-40 (same); Pigford v. Veneman, 292 F.3d. 918, 921-22 (D.C. Cir. 2002) (same); Pigford

v. Veneman, 217 F.Supp. 2d at 98-100 (same).

With this background, it is important to note at the outset that many, if not all, of the issues raised by movants are foreclosed by this Court's approval of the Consent Decree after notice and a comprehensive fairness hearing and the entry of a final judgment in this case. See Pigford v. Glickman, 206 F.3d 1212, aff'g Pigford v. Glickman, 185 F.R.D. 82.[2] Because the Consent Decree operates as a final judgment in the case, see Consent Decree at ¶17, and given the length of time that has passed since it was approved (over five years), movants have limited avenues available for relief.[3] Consequently, as the present motions are addressed in turn, particular attention will be paid to whether movants' claims even qualify for reconsideration.

---

[2]      As movants are well aware, the Court gave careful consideration to an analogous set of issues when it approved the Consent Decree following the March 1999 fairness hearing. See Pigford v. Glickman, 185 F.R.D. at 99-113.

[3]      The Federal Rules of Civil Procedure strictly limit reconsideration of final judgments, particularly when motions to reconsider come so many years after entry of judgment. See FED. R. CIV. P. 59(e) ("Any motion to alter or amend a judgment shall be filed no later than 10 days after entry of the judgment."). After the time limits imposed by the Rules, the Court may relieve a party from a final judgment only when certain unusual or extraordinary conditions are met. See FED. R. CIV. P. 60(b).

*A. Standing*

1. Motion to Modify Consent Decree

The issue of movants' standing to seek modification of the Consent Decree has been raised by defendant and by class counsel. <u>See</u> Defendant's Opposition (Consent Decree) at 2 n.1; Plaintiffs' Opposition (Consent Decree) at 2 n.1. The doctrine of "standing" concerns which persons or entities have the right to make a legal claim or present an issue for resolution in court. The issue of the lack of standing of some of the movants has been invoked previously in response to motions to modify the Consent Decree. <u>See</u>, <u>e.g.</u>, <u>Pigford v. Veneman</u>, 217 F. Supp.2d at 97 n.1. Because some of the named movants are members of the class, it is conceivable that they could possibly have standing with respect to some of their claims. Since none of them speak for the class or for all of the class members – including Thomas Burrell, who inexplicably suggests in all of his filings that he does – it is highly unlikely, however, that these movants have standing to raise all or even most of their claims. For example, one of the primary grounds for relief posited by movants is that many farmers did not receive adequate notice of the settlement, <u>see</u> Mov. Reply (Consent Decree) at 10-14, but none of the movants actually appears to fall within this category.

In fact, many of the movants have been involved in this case since before the terms of the settlement were proposed and the Consent Decree was approved. Thomas Burrell and Eddie Slaughter, for instance, both spoke in opposition to the Consent Decree at the fairness hearing this Court held in March 1999. <u>See</u> Transcript of Fairness Hearing, Mar. 2, 1999 at 105-14 (Burrell), 154-56 (Slaughter). Why neither individual chose to opt out of the class because of his disagreement with the terms of the settlement is unclear. Had they done so, of course, they could have pursued their individual claims as they saw fit. What is clear is that both

10

had actual notice of the terms of the Consent Decree and both continue to lodge essentially the same objections they have held since 1999.  Indeed, for Mr. Burrell, Mr. Slaughter and another movant, William Miller, this attempt to modify the Consent Decree is their second.  See Pigford v. Veneman, 217 F. Supp.2d at 97.  The Court understands their determination but suggests that their unwillingness to accept the Court's rulings – rulings that they are bound by because of their own decisions to remain within the class – is inconsistent with the class action process established by law and thus ultimately and predictably unlikely to bear fruit.  These movants have attempted to have it both ways, accepting the benefits of class membership while attacking many of the limits they knew would be imposed upon it.

Furthermore, at least eight of the eleven movants have been claimants under either Track A or Track B of the procedures established by the Consent Decree, some successful and some unsuccessful.  Five of the unsuccessful ones have petitions for review pending before the Monitor and thus ultimately may obtain relief under the Consent Decree.  See Plaintiffs' Motion to Strike or, in the Alternative, Opposition to Movants' Motion to Modify Consent Decree at 2 n.1.  It follows that they also had notice of the settlement process and the terms of the Consent Decree and chose to play by the rules agreed to rather than exercise their rights to opt out.

2.  Motion to Disqualify

The motion to remove class counsel names an additional 31 individual African American farmers, an unnamed  "approximately 2,700 clients" of James W. Myart, Jr., and the Black Farmers and Agriculturalists Association, Inc. ("BFAA").  Neither Mr. Myart's 2,700 unnamed clients nor the BFAA are properly before the Court.  The standing of the individually named movants also is doubtful, as they appear to allege no facts that would demonstrate

11

concrete individual injury caused to them personally by class counsel.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (to have standing a movant must allege a concrete injury resulting from the conduct complained of that can be redressed by a favorable decision of the court).  While movants who are class members had standing as members of the class to bring their individual claims of discrimination, they chose not to opt out of the class and their claims therefore are governed by the procedures established under the terms of the Consent Decree.  And under the Decree's terms settling the class action, all individual claims, including theirs, have been dismissed with prejudice.  See Consent Decree ¶ 17.  Since the motion to disqualify class counsel effectively sets forth a new claim, movants must demonstrate separate standing – personal and individual injury to them as a result of class counsel's conduct – in order to pursue it.  See Friends of the Earth v. Laidlaw Environmental Services, 528 U.S. 167, 185 (2000) (movant must demonstrate standing separately for each form of relief sought); Lewis v. Gross, 518 U.S. 343, 358 n.6 (1996) ("[S]tanding is not dispensed in gross."); Blum v. Yaretzky, 457 U.S. 991, 1001-02 (1982) (same); Taylor v. Resolution Trust Corp., 56 F. 3d 1497, 1507-08 (D.C. Cir. 1995) (same).  This they have failed to do.

### B.  Motion to Modify the Consent Decree

At this stage, over five years after approval of the Consent Decree and entry of final judgment in this case, this Court has a very limited role to play.  As the United States Court of Appeals for the District of Columbia Circuit made clear in an earlier decision in this case, "district courts enjoy no free-ranging 'ancillary' jurisdiction to enforce consent decrees, but are instead constrained by the terms of the decree and related order."  Pigford v. Veneman, 292 F.3d at 924.  Along with the limited ability to "interpret and enforce a decree to the extent authorized

either by the decree or by the related order," district courts "may modify a decree pursuant to Federal Rule of Civil Procedure 60(b)(5)." Id. at 923. The appeals court recognized these sources of authority as reflecting the "hybrid character" of consent decrees, which have qualities of both contracts agreed to by the parties and court orders entered by the court. See id.

Movants here do not contend that the interpretation of the Consent Decree is flawed. Instead, they ask the Court to reconsider the fairness of the Consent Decree under Rule 60(b)(5) of the Federal Rules of Civil Procedure.[4] Rule 60(b)(5) permits a court "upon such terms as are just" to "relieve a party or a party's legal representative from a final judgment, order, or proceeding . . . [if] it is no longer equitable that the judgment should have prospective application." FED. R. CIV. P. 60(b)(5); see Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 378-83 (1992); Pigford v. Veneman, 292 F.3d at 925; United States v. Western Elec. Co., 46 F.3d 1198, 1202-04; (D.C. Cir. 1995) (applying Rufo analysis to request under Rule 60(b)(5) to modify consent decree). Parties seeking the modification of a consent decree under Rule 60(b)(5) must show a "significant change in circumstances" and "establish that a significant change in facts or law warrants revision of the decree and that the proposed modification is suitably tailored to the changed circumstances." Rufo v. Inmates of Suffolk County Jail, 502 U.S. at 383, 393; see Pigford v. Veneman, 292 F.3d at 925; NLRB v. Harris Teeter Supermarkets, 215 F.3d 32, 35 (D.C. Cir. 2000). To succeed on their motion in this case, therefore, movants must demonstrate that subsequent events or changed facts (1) "make

---

[4]     Movants also suggest that the Consent Decree was "unfair and inadequate pursuant to Rule 23(c) and case law." Mov. Mot. (Consent Decree) at 3. Defendant notes that movants' argument "appears to be that the Court 'abused its discretion' in approving the Consent Decree in the first place." Def. Opp. (Consent Decree) at 6. To the extent that movants assert this claim, the Court declines to address it. Pigford v. Glickman, 206 F.3d 1212, aff'g Pigford v. Glickman, 185 F.R.D. 82, serves as the "law of the case" with respect to all Rule 23 determinations.

compliance with the decree substantially more onerous"; (2) make the decree "unworkable

because of unforeseen obstacles"; or (3) make "enforcement [of the decree] detrimental to the

public interest." Rufo v. Inmates of Suffolk County Jail, 502 U.S. at 384; see NLRB v. Harris

Teeter Supermarkets, 215 F.3d at 35.  Movants satisfy none of these three tests.

       In their reply brief, movants assert that the "factual circumstances . . . have

changed, dramatically."  Mov. Reply (Consent Decree) at 4.  They then attempt to characterize

these changes as falling within all of the categories listed above.  They allege, for instance, that

implementation of the Consent Decree has been "fraught with delay and would render further,

documented deprivation of Constitutional rights to . . . class members," thereby making the

Decree's continued enforcement "substantially more onerous" to class members and

"unworkable" given the "unforeseen obstacles" causing delay.  See id.  Movants assert that

continued enforcement of the Decree would be "detrimental to the public interest."  See id. at 3.[5]

Closer scrutiny of the factual circumstances, however, reveals that none of the asserted changes

in circumstances rises to the level of significance necessary to permit revision or modification

under Rule 60(b)(5).[6]

---

[5]      Movants argue that the decision by a subcommittee of the Judiciary Committee of the
House of Representatives to conduct hearings that focus on this case is "clear and convincing
evidence of the public's interest in this matter" and, thus, grounds for applying a flexible
modification standard.  Mov. Reply (Consent Decree) at 3 n.2.  The Court fully agrees that
Congressional hearings represent a faithful barometer of issues that are of public concern.  But
the Supreme Court in Rufo was concerned about "detriment" to the "public interest" in the sense
that it denotes harm to the "public good" from continued enforcement rather than mere
"awareness."  See Rufo v. Inmates of Suffolk County Jail, 502 U.S. at 384-85.  Because
Congressional attention cannot be considered a statement of the public interest in this sense –
legislation fills that role – the argument is unavailing.

[6]      Movants in their reply brief attempt to clarify their request for relief but, in doing so,
only confuse the matter further.  According to their reply brief, they ask only that the Court
"appoint a committee to evaluate the Pigford Consent Decree and report proposed modifications,
or no modifications, to the Court and the parties for their deliberate consideration."  Mov. Rep.

1.  Fairness of the Consent Decree

After notice to class members of the proposed settlement of a class action and a fairness

hearing where objections are heard, the Court may approve the negotiated and proposed

settlement if it finds that it is "fundamentally fair, adequate and reasonable" under Rule 23(e) of

the Federal Rules of Civil Procedure.  MOORE'S FEDERAL PRACTICE § 23.85[1] at 23-347 (3d ed.

2002).  This Court set out the relevant factors for its consideration in assessing the fairness,

adequacy and reasonableness of the settlement more than five years ago, the court of appeals

affirmed this Court's decision, and no "changed circumstances" justify reconsideration now.

While movants assert that the Consent Decree is "fundamentally and legally flawed," see Mov.

Mem. (Consent Decree) at 12, none of their claims vary in material respects from the issues that

were carefully evaluated by the Court at the time the Decree was approved.  Specifically,

objections related to the sufficiency of Track A monetary awards, see Pigford v. Glickman, 185

F.R.D. at 108-09, lack of forward-looking injunctive relief, see id. at 110-12, and adequacy of

notice, see id. at 102, all were considered at the fairness hearing and addressed by this Court

---

(Consent Decree) at 1-2.  Movants' protestation that they are asking only for a committee to
review the Consent Decree is disingenuous.  The thrust of their request amounts to a court-
ordered modification or dissolution of the Consent Decree, as is clear elsewhere in their brief,
where movants note that the alleged problems "can only be remedied by meaningful
modification of the Consent Decree."  Id. at 23.  Even if one were to ignore this contradictory
language, however, movants' characterization of their requested relief is outside the scope of
Rule 60(b)(5) of the Federal Rules of Civil Procedure, the only avenue currently available for
relief.

in its decision approving the proposed settlement agreement.[7]  Moreover, the validity of these

determinations was upheld by the court of appeals on direct appeal:

> [T]here is no doubt that the district court exercised its discretion
> [to determine the fairness of the consent decree] well within the
> boundaries of the law.  The serious concerns and objections to the
> proposed consent decree were carefully considered by the district
> court and balanced against the likely alternatives in a manner
> reflecting a considered and compassionate conclusion.

Pigford v. Glickman, 206 F.3d at 1219.  Given the history of the case, it is difficult to conceive

how these claims can amount to the "significant change[s] in circumstances" required by Rufo.

Nonetheless, in the interests of fairness and finality, the Court will once again address these

issues.

a.  Sufficiency of Awards

Movants first assert that the "awards to date are insufficient and unduly delayed."

Mov. Reply (Consent Decree) at 7.  To the extent that this claim encompasses the argument that

the recovered amount is too low, the Court references its earlier decision:

> Putting a monetary value on the damage done to someone
> who has experienced discrimination at the hands of the
> government obviously is no easy matter, and it is probable that no
> amount of money can fully compensate class members for past
> acts of discrimination.  It is quite clear, as the objectors point out,
> that $50,000 is not full compensation in most cases.

---

[7]      At best, only one aspect of the present claims –  that the number of objectors was
underestimated because organizational leaders were not seen to be speaking on behalf of the
whole of their membership –  is even a new argument.  Although the Court may not have known
the exact number of members of each organization represented by each leader who testified, the
Court was well aware that in many cases leaders were expressing the views of membership
organizations.  Because this claim relies on information known and considered by the Court at
the time the Consent Decree was approved, it is a wholly insufficient ground for the requested
relief.

> To the extent that a specific value can be put on such compensation, however, class counsel have thoroughly researched the issue and provided persuasive evidence that the amount is fair. As class counsel points out, every claimant who prevails under Track A will receive not $50,000 but at least $62,500 (the sum of a $50,000 cash payment plus $12,500 in tax relief).

Pigford v. Glickman, 185 F.R.D. at 108-09 (internal citations omitted).

> The Court went on to note that the relief would be significant,

> especially in view of the fact that a claimant who lacks the detailed records required in a normal civil action to prove his case by a preponderance of the evidence need [under the terms of the Consent Decree] only establish his claim by substantial evidence in order to receive that compensation.

Pigford v. Glickman, 185 F.R.D. at 108-09 (internal citations omitted).  "As our court of appeals has said, in considering a proposed class action settlement, the Court must first compare the likely recovery that plaintiffs would have realized if they had gone to trial with the terms of the settlement."  Id. at 103 (citing Thomas v. Albright, 139 F.3d 227, 231 (D.C. Cir. 1998)).  As this Court noted when approving the Consent Decree in 1999, "most of the members of the class had little in the way of documentation or proof of their claims and likely would have recovered nothing if they were required to prove their cases by the traditional preponderance of the evidence standard."  Pigford v. Glickman, 185 F.R.D. at 103.  Nothing has changed.  Indeed, the fact that thousands of claimants chose Track A and only a handful chose Track B (in which the traditional preponderance standard must be met) only underscores the point.

To the extent that movant's claim involves concerns not just about the amount of the awards, but also about the length of the claims process and other delays in the receipt of payment, movants aver no facts to support their argument.  While movants note that "[o]nce an award is challenged, the class member must wait until the decision is reviewed," Mov. Reply

17

(Consent Decree) at 7, they nowhere indicate that this is a common circumstance.  The Court

notes that the government has challenged awards by filing petitions for Monitor review with

respect to the claims of only 687 of the more than 13,000 successful claimants – only 5% of the

cases.  See Testimony Submitted by the Monitor, Randi Ilyse Roth, to the Constitution

Subcommittee of the House Judiciary Committee on September 28, 2004 ("Roth Testimony") at

Appendix 1, Chart 1.  Although the Court understands movants' frustration with respect to

delays in the petition process, it is well-documented that the process itself ultimately benefits

claimants.  See id. (55% of losing claimants file petitions for Monitor review, and in 50% of

those cases, the Monitor has directed reexamination).  This is a complex and detailed process,

and the Court is confident that both the parties and the neutrals are expending every effort to see

that it moves as quickly and smoothly as possible.

### b.  Lack of Injunctive Relief

Movants also reiterate the previous objection of certain class members that much-

needed injunctive relief was not included in the Consent Decree.  See Mov. Reply (Consent

Decree) at 8-9.  Movants contend that this objection is now relevant to demonstrate "changed

circumstances" because "[s]uch fears of continued discrimination have been realized through the

actions and/or omissions of Defendant and the DOJ attorneys during implementation of the

Consent Decree."  Id. at 9.  Again, however, the Court finds this post hoc justification

unavailing.  Plaintiffs did not request an injunction in their Seventh Amended Complaint and did

not allege any constitutional violation in their complaint that would have supported such relief.

The Court therefore determined at the time it approved the settlement that such relief was either

outside the scope of the complaint filed in this case or unavailable in view of the violations

alleged . See Pigford v. Glickman, 185 F.R.D. at 110-11 ("The Court cannot reject the Consent Decree merely because it does not provide relief for some other hypothetical case that plaintiffs could have but did not bring.").

Furthermore, the Court finds no basis for movants' incongruous statement that "the existing Constitutional and statutory law . . . does not [] prohibit the [USDA] from discriminating and retaliating against class members." Mov. Mot. (Consent Decree) at 31. As the Court repeatedly has recognized, "the USDA is not above the law." Pigford v. Glickman, 185 F.R.D. at 111. In fact, considerable safeguards are in place to protect against discrimination and, when it occurs, provide for relief:

> Whether or not the government explicitly states it in this Consent
> Decree, . . . the Constitution and laws of the United States continue
> to forbid discrimination on the basis of race, see, e.g., U.S. CONST.
> amend. V; 15 U.S.C. § 1691; 42 U.S.C. § 2000d, as do the
> regulations of the USDA. See 7 C.F.R. §§ 15.1, 15.51.

Id. at 112. If movants believe that the USDA continues to violate the law, they are encouraged to bring forward evidence to the relevant authorities in the two political branches of the government or, if appropriate, file a new lawsuit alleging discrimination. The present motions are not the appropriate vehicles for such complaints.

### c. Adequacy of Notice

The final claim with respect to the fairness of the Consent Decree involves notice. Movants repeat their contention that the Consent Decree did not provide adequate notice to putative class members. See Mov. Reply (Consent Decree) at 9-14. They support this assertion with allegations that "nearly 80,000 black farmers" were not included in the lawsuit, see id. at 2-3, and that "it is undisputed that two-thirds of the class did not receive notice." Id. at 4.

19

Although both statements are demonstrably false, the fact remains that while more than half of the late-filing applicants acknowledged that they did in fact have notice, a large number of African American farmers filed late claims and cited lack of notice as the primary reason for their failure to file on time.  See Hearing Before the Subcommittee on the Constitution of the Committee of the Judiciary, U.S. House of Representatives, Supplemental Testimony of Michael Lewis, Hearing Record at 1598 (noting that 28,854 of 64,006 petitions for leave to file late claims specified lack of knowledge as the primary reason for missing the deadline, while half conceded that they had notice).  The Court shares the concern of movants about the fate of these farmers, who, because they failed to file on time, may be barred from entering the adjudication or arbitration process to prove their claims of discrimination.  No matter how harsh it may appear, however, this result is unavoidable under the law governing class action litigation and the negotiated terms of the Consent Decree.

Under Rule 23 of the Federal Rules of Civil Procedure, all members of a class are bound by the judgment entered in the action unless they make a timely election for exclusion, so-called "opting out."  See Matsushita Elec. Indus. Co., Ltd., v. Epstein, 516 U.S. 367, 379 (1996).  For class members who fail to opt out, however, any final judgment or settlement binds all class members, precluding any claims they may wish to assert individually.  Thus, all African American farmers who fall within the definition of the Pigford class are bound by the terms of the Consent Decree unless they opted out in a timely fashion.  See Consent Decree ¶ 2.  These farmers cannot bring a similar lawsuit regarding the same time period in another court or claim that the Consent Decree's provisions do not apply to them.  Under the law, that simply is the way class actions work.  See MOORE'S FEDERAL PRACTICE § 23.11 at 23-53 (3d ed. 2002) ("A class member who does not opt out [prior to the entry of a final judgment] may challenge the

judgment only by filing objections with the district court or, in appropriate circumstances, by appealing a final judgment or an order approving a settlement."). Given these serious consequences of class action litigation, due process concerns would arise if notice were not required and an opportunity to opt out not afforded. See In re Veneman, 309 F.3d 789, 792 (D.C. Cir. 2002) ("Because members of a class seeking substantial monetary damages may have divergent interests, due process requires that putative class members receive notice and an opportunity to opt out."). The standard for providing notice therefore is correspondingly high.

      "When a class is certified and a settlement is proposed, the parties are required to provide class members with the 'best notice practicable under the circumstances.'" Pigford v. Glickman, 185 F.R.D. at 101 (quoting FED. R. CIV. P. 23(c)(2)). If all (or most) class members can be individually identified and located, courts will require that individual notice be sent via mail or other direct means. See Eisen v. Carlisle & Jacquelin, 417 U.S. 155, 174-75 (1974); FED. R. CIV. P. 23(c)(2)(B) (the "best notice practicable" includes "individual notice to all members who can be identified through reasonable effort."). When all class members cannot be identified, however, practical issues of effectuating notice arise and other methods, such as publication in newspapers or periodicals, are deemed sufficient. See, e.g., Reppert v. Marvin Lumber & Cedar Co., Inc., 359 F.3d 53, 56-57 (1st Cir. 2004) (upholding notice provided through ads published in 33 newspapers of general circulation); 3 NEWBERG ON CLASS ACTIONS § 22:85 (4th ed.) (noting that "courts have usually required a combination of first-class mailed notice to the identifiable members and publication in one or more newspapers" when difficulties arise locating all putative class members). See also MANUAL FOR COMPLEX LITIGATION §§ 21.311, 21.312 (4th ed. 2004). Whether class members are provided notice through direct or indirect means, the consequence remains the same: "[I]f the absent class members fail to opt out

21

of the class action, [they] will be bound by the court's action, including settlement and judgment, even though those individuals never <u>actually</u> received notice." <u>Reppert v. Marvin Lumber & Cedar Co., Inc.</u>, 359 F.3d at 56-57 (emphasis added). Thus, it is particularly important that efforts to notify absent class members be the "best notice practicable under the circumstances."

Notice in this case has been "more than adequate." <u>Pigford v. Glickman</u>, 185 F.R.D. at 101. The Court came to that conclusion in 1999 and stands by it today.[8] The record is clear that, under the prevailing standards, "the timing and breadth of notice [were] sufficient under Rule 23." <u>Id</u>. at 102. Indeed, the efforts made to notify class members were extensive. "The parties . . . exerted extraordinary efforts to reach class members through a massive advertising campaign in general circulation and African American targeted publications and radio and television stations." <u>Id</u>.

> Within ten days after the preliminary approval of the Consent Decree, the facilitator mailed a copy of the Notice of Class Certification and Proposed Class Settlement to all then-known members of the class. The facilitator also arranged a print notification program with one-quarter page advertisements in 26 general circulation newspapers for January 21, 1999, and in 100

---

[8]    As stated above, the D.C. Circuit's decision in <u>Pigford v. Glickman</u>, 206 F.3d 1212, <u>aff'g</u> <u>Pigford v. Glickman</u>, 185 F.R.D. 82, serves as the "law of the case" with respect to all Rule 23 determinations. Moreover, to find notice inadequate at this stage, under the guise of Rule 60(b)(5) and "changed circumstances," would undermine this and potentially all future class action settlement negotiations:

> A too liberal application of Rule 60(b) in class actions would undermine the finality of judgments entered therein and would discourage settlement of such actions. Defendants will be loath to offer substantial sums of money in compromise settlement of class actions unless they can rely on the notice provisions of Rule 23 to bind class members.

4 Newberg on Class Actions § 11:63 (4th ed.). This result would be doubly true were the Court today to find wanting the extensive efforts of the parties to notify a large and scattered class more than five years after the fact.

>African-American newspapers between January 13, 1999 and
>January 27, 1999. . . .  The facilitator also arranged to have a full
>page advertisement announcing the preliminary approval of the
>Consent Decree and the time and place of the fairness hearing
>placed in the editions of TV Guide that were distributed in an 18-
>state region, and a half page advertisement in the national edition
>of Jet Magazine.  In addition, the facilitator aired 44 commercials
>announcing the preliminary approval of the Consent Decree and
>the time and place of the fairness hearing on the Black
>Entertainment Network and aired 18 similar commercials on the
>Cable News Network over the course of a two-week period.  The
>facilitator estimates that on average, the print and television notice
>campaign "reached 87 percent of African-American farm
>operators, managers or others in farm-related industries, an
>average frequency of 2.4 times."

Id. at 92 (internal citations omitted).

These efforts continued after the Consent Decree was approved.  More than 200 informational meetings were held around the country in the regions with the highest concentrations of class members, and the facilitator fielded 96,000 telephone calls before the cut-off date.  See Class Counsel's Surreply to Reply in Support of Motion to Disqualify Class Counsel, Exh. 2, Hearing Before the Subcommittee on the Constitution of the Committee of the Judiciary, U.S. House of Representatives, Supplemental Testimony of Jeanne Finegan ("Finegan Testimony") at 9.  "Prior to the claims filing deadline, a total of 52,736 claims packages and 192,277 Schedules of Meetings were distributed."  Id. at 6.[9]  Additional media coverage supplemented the notice program, including a segment regarding the case that aired on the CBS news program "60 Minutes" and reached 1.15 million African American television viewers over the age of 25.  See id. at 8 n.16.  While hindsight may provide insights as to missed

---

[9]     Although 52,736 claim packages were distributed, only approximately 22,000 farmers filed eligible claims within the announced time frame.  See Testimony Submitted by the Monitor, Randi Ilyse Roth, to the Constitution Subcommittee of the House Judiciary Committee on September 28, 2004 at 4.

opportunities, it is difficult to fathom how this notice program could be considered insufficient. As class counsel, J.L. Chestnut, told Congress, "I don't know any class action where the notice was any more complete than in this case."  <u>See</u> Hearing Before the Subcommittee on the Constitution of the Committee of the Judiciary, U.S. House of Representatives, Supplemental Testimony of J.L. Chestnut, as quoted in Jeffrey McMurray, "Black Farmers Blame Inadequate Notice For Missing Settlement Deadline," AP, Nov. 19, 2004.

   In April 1999, this Court determined that the settlement in this case was fair, reasonable and adequate.  It reaffirms that judgment today.  As a result, there are more than 13,500 farmers who have received  monetary relief.  As Mr. Chestnut described it:  "This settlement is not perfect, [but] nobody will devise a settlement better than this one which will give money to as many people as quickly as this one."  Transcript of Fairness Hearing, Mar. 2, 1999 at 174.

2.  Implementation of the Consent Decree

Implementation of the Consent Decree, while a complex process, has not

generated any changes in factual circumstances on which the Court could base relief under Rule

60(b)(5) of the Federal Rules of Civil Procedure.  The <u>Rufo</u> analysis focuses on the facts that

existed at the time the decree was approved rather than on the opinions or predictions of certain

class members regarding how those facts likely would play out.  See <u>Thompson v. HUD</u>, 220

F.3d 241, 247 (4th Cir. 2000).  Most of movants' claims fail because they ignore this temporal

distinction.  For instance, movants assert that full recovery by claimants has been thwarted by

unwarranted and overly aggressive opposition by the government.  See Mov. Reply (Consent

Decree) at 14-16.  They imply that the Consent Decree contemplated a particular rate of

recovery and that this rate was not achieved in the Track A process.  This objection ignores the

terms of the Consent Decree or, at least, emphasizes the "purpose" of the settlement above the

specific terms agreed upon to further it.  The parties bargained for a process, not an outcome.

<u>See</u> Consent Decree ¶¶ 5-10.  While movants may argue that the arbitrations resemble "a full

scale litigation battle," <u>see</u> Mov. Reply (Consent Decree) at 15, nowhere do they state how the

process as it currently operates is either inconsistent with the negotiated terms of the Consent

Decree or amounts to a significant change in facts that fits any of the three categories in <u>Rufo</u>.

Thus, it cannot be grounds for relief.

Similar problems plague movants' next claim regarding implementation, that

discrimination at the USDA persists.  While the behavior of the USDA certainly served as the

foundation for the complaints in this case, the Consent Decree did not vest the Court with

permanent oversight over USDA's actions and continued compliance with the Equal Credit

Opportunity Act or other civil rights laws.  Nor was the likelihood of continued discrimination a

factual basis for decision that might be subject to changed circumstances.  Any allegation of

present violations would be beyond the scope of this case, as the Court recognized when it

approved the decree: "The Court cannot guarantee class members that they will never experience

discrimination at the hands of the USDA again, and the Consent Decree does not purport to

make such a guarantee."  Pigford v. Glickman, 185 F.R.D. at 111.  This is not to say that the

USDA is above the law.  As noted earlier, if movants believe that the USDA has violated the

law, they are encouraged to assert their claims in the proper forum.[10]

   Movants' final attempt at relief rests on the theory that class counsel's actions

during the implementation phase constituted "ineffective assistance of counsel."  See Mov.

Mem. (Consent Decree) at 39-41 (citing Strickland v. Washington, 466 U.S. 668, 688 (1984)).

Not only does this argument rely on a line of criminal law cases regarding the Sixth Amendment

that is wholly inapplicable in this context, but it also fails to provide any basis for the Court to

grant modification at this time.  The mistakes of class counsel following the entry of a negotiated

Consent Decree settling a class action cannot justify vacating the settlement itself.  This

conclusion was articulated by the Court in response to an earlier motion asserting similar claims.

See Pigford v. Veneman, 217 F.Supp. 2d at 99 ("Class Counsel's failings in handling certain

matters after entry of the Consent Decree cannot provide a basis for vacating the Consent

Decree.").

---

[10] Movants' request for a writ of mandamus to compel the Secretary of Agriculture to enforce civil rights laws is denied on similar grounds.  To the extent that movants believe the Secretary has failed to uphold the terms of the Consent Decree, paragraph 13 of the Consent Decree provides an avenue for enforcement.  Any other grounds for an issuance of the writ is beyond the scope of this case.

While movants allege a litany of mistakes by class counsel other than those raised two years ago, the Court's previous discussion of class counsel's performance applies with equal force today:

> Class Counsel ably litigated the case throughout its early stages, and they negotiated and entered into a fair settlement for the class as a whole.  Indeed, this Court has noted just how remarkable Class Counsel's performance was at those early stages in vigorously litigating this case to the brink of trial and negotiating a landmark settlement with the government.  <u>See</u> [Memorandum Opinion and Order of April 27, 2001] ("Class Counsel have earned accolades of acclaim for their efforts in initiating this case, litigating it to the verge of trial, and then negotiating a truly historic settlement with the government.").  To the extent that the Court has been justifiably critical of Class Counsel, its concerns have related only to counsel's handling of the implementation process *after* entry of the Consent Decree.

<u>Pigford v. Veneman</u>, 217 F. Supp. 2d at 99 (emphasis in original).  Therefore, as with movants' other claims regarding the post-Consent Decree implementation process, the allegations proffered by movants that class counsel served the plaintiff class inadequately cannot amount to changed circumstances.  Because nothing about the implementation of the Consent Decree has been shown to make compliance substantially more onerous, create an undue burden, or make enforcement of the decree detrimental to the public interest, the movants have not met their burden under Rule 60(b)(5) and <u>Rufo</u>.

### 3.  Consequences of Modifying the Consent Decree

Finally, movants fail realistically to confront the consequences of this Court granting their motion to modify the Consent Decree.  Since the settlement and its terms would not exist if the Court modified the Decree as proposed by movants, the 13,500 African American farmers who have received a total of $830 million would have to return the money, and there is

no guarantee that the government would again agree to settle the case on terms as favorable.  As

this Court noted when faced with a similar motion two years ago, "to vacate the Consent Decree

would nullify the settlement of this case [and] undo the substantial progress that has been made

for so many African-American farmers in the long five years since this case was filed." Pigford

v. Veneman, 217 F.Supp at 98.  "To vacate the Consent Decree also would require that every

dollar already paid out to African-American farmers, whether in cash awards or in the form of

debt relief or tax relief, be returned to the government." Id.  These concerns are amplified today.

To date, more than $830 million of relief has gone to approximately 13,500

families of African American farmers.  See National Statistics Regarding Pigford v. Veneman

Track A Implementation as of December 27, 2004 available at

http://www.pigfordmonitor.org/stats/.  This Court believed in 2002, and continues to believe

today, that "[r]equiring these families to pay back the considerable sums that they received

would be an extreme, unwarranted remedy that would bring great hardship to thousands of

members of the class." Pigford v. Veneman, 217 F.Supp. 2d at 98.

Movants claim in their reply brief that these drastic implications need not arise

from a decision vacating the Consent Decree.  See Mov. Reply (Consent Decree) at 16.  Calling

arguments about returning previously-awarded benefits a "red herring" meant to dissuade the

Court from fairly considering their motion, movants state that "[t]here is no rigid requirement

that the Court set aside all findings and awards that have occurred and been received to date."

Id. at 16-17.  Instead, movants offer a cryptic solution:

> [A]dditional protections could be added to the existing guidelines
> governing the Monitor and the Adjudicator regarding timetables
> for completion of appeals and to permit, where necessary, limited

> discovery by class members to obtain information necessary to
> submit their claim.  The modification order can grant the
> government a credit for any benefits already provided to class
> members.

Id. at 17.  While the Court does not entirely understand movants' proposal for "grant[ing] the

government a credit," it is sufficiently clear that their argument is untenable and without any

basis in law.

Movants provide no case law to support the notion, for instance, that discovery

could be unilateral, or that the Court can impose its own guidelines on the Monitor or the

Adjudicator outside the terms of the Consent Decree.  Nor do movants suggest that the defendant

would ever agree to such modifications.  Furthermore, movants end their discussion on this point

by stating that their motion "is not a request for a finding that Defendant should not have paid

successful class members," because the adjudication process already has led to a finding of

discrimination in those cases.  Id.  In essence, then, movants are willing to accept the Consent

Decree where plaintiffs have benefited from it but seek modifications elsewhere.  This attitude

not only has been rejected explicitly by the court of appeals in this very case as contrary to the

contractual aspect of consent decrees, whereby both sides must receive the benefit of their

bargain.  See Pigford v. Veneman, 292 F.3d at 923-25.

*C.  Motion to Disqualify Class Counsel*

Even if any of the movants had standing to raise the issue of disqualification, removal of class counsel at this late stage of the proceedings would be an extreme and unwarranted action.  See Pigford v. Veneman, 217 F.Supp. 2d at 99.  Notwithstanding its gravity, movants' present motion marks the second time that the Court has been asked to take such a step.  See id. at 97.  Movants here allege that lead class counsel (1) failed to ensure that adequate notice was provided to putative class members, (2) agreed to an allegedly deficient Consent Decree against the wishes of class members, (3) performed poorly and missed crucial deadlines, (4) colluded with defendant regarding a "secret [fee] arrangement," and (5) refuse to communicate with certain class members.  See Mov. Reply (Class Counsel) at 3-5, 13-15.  While movants assert a litany of facts that they contend amount to new grounds for disqualification, the Court finds none of their arguments persuasive.[11]

In making this determination, the Court relies on its reasoning in response to the previous motion to remove class counsel, brought more than two years ago:

> Removal of counsel would be appropriate only if the Court were to find that it was absolutely necessary to preserve the integrity of the adversary process, as, for example, where an attorney's conflict of interest undermines the Court's confidence in the vigor of the attorney's representation of his or her client, or where the attorney is in a position to use privileged information concerning the other side as a result of prior representation.  See Board of Education of the City of New York v. Nyquist, 590 F.2d

---

[11]  Movants again assert numerous vague claims with no particular priority or order.  In one section of their brief, they list 23 "allegations of misconduct and disciplinary violations," see Mov. Mot. (Class Counsel) at 3-5, while in another they include 24 "actions and/or omissions . . . to the detriment to [sic] class members."  Id. at 13-15.  The indefinite nature of many of these allegations, coupled with claims that duplicate issues raised in the motion to modify the Consent Decree, substantially reduces the number of issues before the Court here.  To the extent that movants raise cognizable claims related to class counsel's performance, the Court will attempt to address them in this discussion.

30

> 1241, 1246 (2d Cir.1979);  see also Koller ex rel. Koller v.
> Richardson-Merrell, Inc., 737 F.2d 1038, 1055-56 (D.C.Cir.1984),
> vacated on other grounds, 472 U.S. 424, 105 S.Ct. 2757, 86
> L.Ed.2d 340 (1985);  Ackerman v. National Property Analysts,
> Inc., 1993 WL 258679 (S.D.N.Y.1993).  Here, movants have
> presented no evidence of a conflict of interest or the potential
> misuse of privileged information by Class Counsel.  Furthermore,
> the Court sees nothing that would be gained by the removal of
> Class Counsel now since this case already has reached the
> advanced stages of settlement implementation.  See In re Barnett,
> 97 F.3d 181, 184 (7th Cir.1996) (removal of class counsel
> improper where trial was almost concluded and nothing would be
> gained from expelling attorneys).

Pigford v. Veneman, 217 F.Supp. 2d at 99-100.

While movants here allege some forms of asserted misconduct not before the

Court in 2002, none of the present claims undermine the Court's rationale for maintaining the

status of lead class counsel.  Indeed, the Court recognized the success class counsel has achieved

and emphasized the appropriateness of their continued role in this case.

> The efforts of Class Counsel have resulted in relief for thousands
> of African-American farmers.  Although final decisions and
> awards have been made in thousands of individual claims, many
> claims remain to be finally determined and Class Counsel
> continues to make important contributions.  None of the mistakes
> in the implementation process that have come to the attention of
> this Court and been discussed by the court of appeals warrants the
> removal of Class Counsel in the midst of the Consent Decree
> implementation process.

Pigford v. Veneman, 217 F. Supp. 2d at 100.  The Court believes these grounds remain

compelling.  The Court nonetheless will address the specific claims made by movants here.

In many respects, movants' claims against class counsel track arguments they put

forth in the context of their motion to modify the consent decree.  These arguments consequently

fail for the same reasons.  Movants assert, for instance, that class counsel should be removed

because they supported a notice program that failed to inform a large number of putative class

members about the settlement.  Because the Court already has discussed why it continues to

believe that notice was adequate, class counsel's support for the notice program in no way

impugns their competence.  Movants' claim with respect to poor performance and missed

deadlines is important; the Court is acutely aware, however, of the difficulties class counsel

encountered in the petitions process and, where appropriate, has taken measures to deal with

them.  See e.g. Pigford v. Veneman, 307 F. Supp. 2d 51 (D.D.C. 2004) (ordering class counsel to

pay fines in connection with missed deadlines in petitions process); Pigford v. Veneman, 144 F.

Supp. 2d 16 (D.D.C. 2001) (announcing schedule of fines).  Although admittedly troubling, the

Court reiterates its view that this conduct does not warrant the removal of class counsel,

particularly at this late stage in the case.

        Movants also argue that class counsel should be disqualified because of their

failure, in many cases, to identify a similarly situated white farmer to prove the class members'

claims of discrimination.  This issue is not new.  In declining to vacate the Consent Decree in

2001, the Court stated:

> With respect to movants' argument that the Consent Decree should
> be vacated because Class Counsel has been unable to assist a
> sufficient number of claimants to identify a similarly-situated
> white farmer (which is critical to success in a Track A claim), the
> Court again finds that movants' assertion, even if true, does not
> make the Consent Decree unfair.

Pigford v. Veneman, 127 F. Supp. 2d at 39 (refusing to vacate the Consent Decree).  Although

the Court went on to explain at that time that it was not possible to know how many of these

claimants would ultimately prevail on their petitions to the Monitor, see id., the Court now notes

that the success rate on petitions for review by the Monitor is approximately 50%, see Roth

Testimony at 5, thus demonstrating that many of the farmers whose Track A claims were denied

initially are ultimately prevailing on their claims.[12]  Class counsel's admitted failure "to identify

as many similarly situated white farmers as it had anticipated," see 127 F. Supp. 2d at 39, did not

justify vacating the Consent Decree in 2001 and does not justify disqualifying class counsel now.

Movants raise three other claims against class counsel, none of which implicates

the continued validity of the Consent Decree.  These include failure to heed the desires of class

members, collusion with the defendant to hide fees, and refusal to communicate with certain

class members.  The purported evidence in support of these allegations, however, is

unconvincing.  In fact, movants' accusation about a "secret [fee] arrangement" borders on the

absurd.  Counsel for movants is well aware that the fees received by class counsel are a matter of

public record.  See e.g., Pigford v. Veneman, 369 F.3d 545 (D.C. Cir. 2004); Pigford v.

Veneman, 292 F.3d at 921-22; Pigford v. Veneman, 239 F. Supp. 2d 68 (D.D.C. 2002).  Some

were negotiated as part of a fee dispute settlement, others awarded by the Court after requests

and responses were filed on the public docket of this Court.  Any suggestion of collusion is

wholly without foundation.  Moreover, no member of the class was harmed by any fee award.

Unlike some class actions, this was not a case where there was a finite "pot" of money to be

divided among class members or apportioned among successful class members and their

counsel.  The amount awarded to lawyers in no way affects class members' recovery.

While the other two claims are less offensive on their face, neither is justified.

Class counsel certainly have a duty to represent the class as a whole, but the diversity of

membership in class action cases makes unanimity impossible.  Consequently, class counsel may

---

[12]     When a claimant succeeds on a petition for review to the Monitor, the Monitor will direct
reexamination of his or her claim by the adjudicator.  Claimants have ultimately prevailed in
90% of the cases in which the Monitor has directed reexamination.  See Roth Testimony,
Appendix 1, Chart 1.

well disagree sharply with some members of the class.  Still, they must attempt to represent and

protect the class as a whole.  See MANUAL FOR COMPLEX LITIGATION § 21.641 (4th ed. 2004)

(advising that class counsel is responsible for "protecting the interests of the class as a whole,

even in circumstances where the class representatives take a position that counsel consider

contrary to the interests of absent class members. . . . [Class counsel] must act in the best

interests of the class as a whole.").  Class counsel has done this, even though doing so has

exposed class counsel to countless personal attacks.  As class counsel notes:

> The[] real complaint [of movants] is that Class Counsel will not
> join with them in their effort to rewrite and undo the Consent
> Decree.  On that score, if nothing else, they are correct.  Class
> Counsel will continue to work diligently to fully implement the
> Consent Decree for the benefit of all class members.

Class Counsel's Surreply to Reply in Support of Motion to Disqualify Class Counsel at 12-13.[13]

Finally, movants' claims about class counsel's communications with class members is anecdotal

at best.  The overwhelming evidence in the record of this case demonstrates that class counsel

has actively sought out, advised, and responded to class members including those dissatisfied

with certain aspects of the settlement or the performance of class counsel.  See, e.g., Plaintiffs'

Opposition to Motion to Disqualify Class Counsel at 10-11 and Exhibit 3.

Because none of movants' claims warrants the extreme remedy of disqualification

after the entry of the Consent Decree, the Court declines to disqualify and remove class counsel.

### D.  Movants' Unrealistic Agenda

---

[13]     To the extent that movants criticize class counsel for agreeing to a deficient Consent
Decree over the wishes of some members of the class, as previously noted, such class members
could have opted out but chose not to.

Both of the motions denied in this Opinion were filed by James Myart, Esquire, Thomas Burrell – on behalf of himself personally, and as President of the Black Farmers and Agriculturalists Association – and other African American farmers, most of whom never opted out of the class and who in fact took advantage of the procedures established by the negotiated Consent Decree.  In some cases, Mr. Myart and/or Mr. Burrell and some of the other movants have purported to speak for all members of the class or "on behalf of all plaintiffs."  As this Opinion makes clear (if it was not clear before), they do not.  <u>See</u> Memorandum Opinion and Order of July 29, 2004.  Class counsel speaks for the class.  Furthermore, as anyone familiar with the history of this case – as Mr. Myart and Mr. Burrell surely are – and any reasonably sophisticated attorney familiar with Rule 23 (class actions) and Rule 60(b) (relief from final judgment) should have anticipated, these motions to modify or vacate the Consent Decree and to disqualify class counsel could not have succeeded.

By filing these motions and trumpeting their optimism in the press and on the Black Farmers and Agriculturalists Association, Inc. website, Mr. Myart and Mr. Burrell have given false hope to thousands of African American farmers.  To the extent that these motions were meant to benefit those who did not get notice of the requirements of the Consent Decree or those who sought to file late claims, Mr. Myart should have understood that under the law

governing class actions, negotiated settlements and finality of judgments, and the constraints under which judges are bound to operate, this was simply the wrong forum in which to seek relief.

Judges are not legislators or policymakers.  Their job is to interpret and apply the laws as written by Congress, the rules of procedure adopted by the Supreme Court, and the law and legal precedents announced by the Supreme Court and the courts of appeals.  The federal judiciary was intended by the Founders to be the least active branch of the federal government and, correspondingly, it operates under significant constraints – not the least of which are the statutes enacted by Congress, the rules of procedure and legal precedents.  Principles of judicial restraint that govern the judicial branch turn on what Professor Wechsler called the application of "neutral principles," Herbert Wechsler, *Toward Neutral Principles of Constitutional Law*, 73 HARV. L. REV. 1, 14, 16 (1959), and what, more recently, Judge Tatel has referred to as "those principles of judicial methodology that distinguish judging from policymaking" – principles that include stare decisis (following precedent), "faithful[ness] to constitutional and statutory text and to the intent of the drafters," and appropriate deference to "the policy judgments of Congress and administrative agencies."  David S. Tatel, *Judicial Methodology, Southern School Desegregation, and the Rule of Law*, 79 N.Y.U. L.R. 1071, 1074 (2004).  Although faithfulness to these principles sometimes can be frustrating, they also can, as Judge Tatel explained, be "immensely reassuring. . . .  Although [judges] have personal views about such questions, we have neither the expertise to resolve them nor the accountability to the electorate for doing so."  Id. at 1075.

> These methodological constraints . . . mean that we judges
> sometimes sustain actions we think make little sense, invalidate
> programs we like, or apply precedents we believe were wrongly

36

> decided. . . .  In all these cases, though we may have been troubled
> by the outcomes, we knew that vindicating the rule of law was far
> more important to our constitutional system than the issues at stake
> in any particular case.

Id.  at 1075-76.[14]

Applying the relevant law, this Court found that the Consent Decree embodied a fair, reasonable and adequate negotiated settlement.  Under the Federal Rules and the law of this circuit, this is all the Court could do.  The judicial power reaches only so far.  Legislatures, however, can take steps that judges cannot.  If Congress believes that burdens imposed by the administration of the Consent Decree are unfair, or that a significant number of African American farmers – despite extraordinary efforts to reach them – never received notice, or that the class members who were unsuccessful in their attempts to receive restitution through Track A or Track B deserve compensation, then it surely has means at its disposal to correct these wrongs.  Legislative solutions are not unprecedented, see, e.g. 50 U.S.C. App. § 1989 et. seq (Japanese internment reparations); Fla. HB 591 (reparations for Rosewood, Florida families), and the Court is confident that Congress could devise the means to provide relief for these farmers.

---

[14]      Justice Ginsburg has referred to the "decisionmaking mores to which legions of federal judges adhere: restraint, economy, prudence, respect for other agencies of decision . . ., reasoned judgment, and, above all, fidelity to law."  Ruth Bader Ginsburg, *Remarks on Judicial Independence: The Situation of the U.S. Federal Judiciary*, Presented at the University of Melbourne Law School (Feb. 1, 2001)

III.  CONCLUSION

Forty acres and a mule.  The Court invoked that broken promise five years ago when it approved what was then "the largest civil rights settlement in history."  Pigford v. Glickman, 185 F.R.D. at 112.  At the time, the Court noted that "[h]istorical discrimination cannot be undone" but believed that the Consent Decree "represent[ed] a significant first step" toward undoing its effects.  Id. at 112-13.  Less than two years later, the Court was able to report that "[i]n the 20 months since that settlement was approved, more than 11,000 African American farmers have filed successful claims for relief and have received monetary compensation and/or debt relief totaling more than $500,000,000."  Pigford v. Glickman, 127 F.Supp. 2d at 40. Today, both the number of successful claimants and the total amount of money awarded have increased, and it is without hesitation that this Court recalls the parties' belief that the Consent Decree "is a grand, historical first step toward righting the wrongs visited upon thousands of African American farmers."  Id.

This praise cannot be repeated, however, without an acknowledgement of the challenges that persist and a recognition that a first step, no matter its value, is only that – a beginning.  That the Consent Decree has not solved every problem faced by African American farmers is less an indictment of its terms and implementation than a reflection of the scope of the problem and the limitations of litigation.  The task of "assuring that the kind of discrimination that has been visited on African American farmers since Reconstruction will not continue into [this] century" is far from accomplished.  Pigford v. Glickman, 185 F.R.D. at 85-86.  But this beginning remains a bright one, with circumstances no more onerous or conditions changed so much as to dampen the Court's faith in it.  Therefore, because the movants fail to support a Rule

60(b)(5) claim, their motion to modify the Consent Decree is denied.  Similarly, the Court finds

no grounds to justify the disqualification and removal of class counsel.

      An Order consistent with this Opinion shall issue this same day,

      SO ORDERED.


                           _____
                           PAUL L. FRIEDMAN
                           United States District Judge

DATE: