THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| TIMOTHY C. PIGFORD, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | 97-1978 (PLF) |
| CHUCK CONNER, Acting Secretary, | ) | |
| United States Department of | ) | |
| Agriculture, | ) | |
| | ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| CECIL BREWINGTON, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | 98-1693 (PLF) |
| CHUCK CONNER, Acting Secretary, | ) | |
| United States Department | ) | |
| of Agriculture, | ) | |
| | ) | |
| Defendant. | ) | |

MONITOR'S REPORT REGARDING IMPLEMENTATION OF
THE CONSENT DECREE FOR THE PERIOD OF
JANUARY 1, 2006, THROUGH DECEMBER 31, 2006

TABLE OF CONTENTS

I.   EXECUTIVE SUMMARY ................................................................................ 1

II.  CLAIMS PROCESSING STATISTICS .......................................................... 2
     A. Track A.......................................................................................................... 3
          *Table 1*: Statistical Report Regarding Track A Claims............................... 5
     B. Track B .......................................................................................................... 5
          *Table 2*: Statistical Report Regarding Track B Claims ............................... 7
     C. Debt Relief .................................................................................................... 8
          *Table 3:* Statistical Report Regarding Debt Relief..................................... 9
     D. Total Monetary Relief for Track A and Track B Claims ............................. 9
          *Table 4A:* Statistical Report Regarding Total Track A Monetary
          Relief to Prevailing Class Members ......................................................... 10
          *Table 4B:* Statistical Report Regarding Total Track B Monetary
          Relief to Prevailing Class Members ......................................................... 11
          *Table 4C:* Statistical Report Regarding Total Track A and Track B
          Monetary Relief to Prevailing Class Members ........................................ 11
     E. Relief by State .............................................................................................. 12
          *Table 5*: Statistical Report Regarding States With 100 or More
          Prevailing Paid Claimants ....................................................................... 12
     F. Injunctive Relief............................................................................................ 13
          *Table 6:* Statistical Report Regarding Injunctive Relief .......................... 14

III. COURT ORDERS ......................................................................................... 14
          *Table 7*: Court Orders................................................................................ 15

IV.  MONITOR'S ACTIVITY AND OBSERVATIONS........................................ 17
     A. Reporting — Paragraphs 12(a) and 12(b)(i) of the Consent Decree............ 17
          1. Reporting Directly to Secretary of Agriculture...................................... 17
          2. Written Reports to the Court, the Secretary, Class Counsel, and
             Defendant's Counsel ............................................................................. 18
     B. "Resolving Any Problems" — Paragraph 12(b)(ii) of the Consent Decree.... 18
     C. Reexamination of Claims — Paragraph 12(b)(iii) ....................................... 20
          *Table 8*: Statistical Report Regarding Petitions for Monitor Review ...... 21
          1. Petitions for Review of Facilitator Screening Decisions ....................... 21
          *Table 9*: Statistical Report Regarding Petitions for Monitor Review of
          Facilitator Eligibility Screening Decisions ............................................. 23
          2. Petitions for Review of Adjudicator Decisions..................................... 23

i

*Table 10*: Statistical Report Regarding Track A Adjudicator
Reexamination Decisions................................................................................25
   3.  Petitions for Review of Arbitrator Decisions...........................................25
      *Table 11*: Statistical Report Regarding Track B
Arbitrator Reexamination Decisions.............................................................26
  D.  Calls to Toll-Free Telephone Number ..............................................................26

V.   SIGNIFICANT CONSENT DECREE IMPLEMENTATION ISSUES..............................27
  A.  Late Claims ...........................................................................................................27
  B.  Claims Processing..................................................................................................29
      1.  Pending Claims .............................................................................................29
      2.  Amended Adjudicator Decisions ................................................................29
  C.  Relief for Successful Class Members .................................................................31
      1.  Payments of Cash Relief .............................................................................31
      2.  Tax Relief.......................................................................................................31
      3.  Debt Relief.....................................................................................................32
      4.  Injunctive Relief...........................................................................................34
  D.  Government Accountability Office (GAO) Report...........................................35

VI.  GOOD FAITH IMPLEMENTATION OF THE CONSENT DECREE...............................35


APPENDICES
  Appendix 1  –  Statistical Report Regarding Track A Claims
  Appendix 2  –  Statistical Report Regarding Track B Claims
  Appendix 3  –  Statistics for Individual Track B Claimant Awards
  Appendix 4  –  Statistical Report Regarding Debt Relief
  Appendix 5  –  Statistical Report Regarding Prevailing Paid Claimants by
                  State of Residence
  Appendix 6  –  Statistical Report Regarding Injunctive Relief
  Appendix 7  –  List of Monitor Office Training Events: January 1, 2006 –
                  December 31, 2006
  Appendix 8  –  Statistical Report Regarding Petitions for Monitor Review
  Appendix 9      Sample Claim Sheet and Election Form
  Appendix 10 –  Statistical Report Regarding Adjudicator Reexamination Decisions

This is the sixth in a series of Monitor reports concerning the good faith implementation of the Consent Decree.[1] This report covers the period of January 1, 2006, through December 31, 2006. The report fulfills, in part, the Monitor's obligation to make periodic written reports on the implementation of the Consent Decree to the Court, the Secretary of Agriculture, Class Counsel, and counsel for the United States Department of Agriculture (USDA).[2]

## I.   EXECUTIVE SUMMARY

During calendar year 2006, the parties and the neutrals (the Facilitator, the Adjudicator, and the Arbitrator) continued to work in good faith to implement the Consent Decree. As of the end of 2006, the following cumulative milestones had been reached for the case.

a. The Adjudicator had issued a cumulative total of 22,268 Track A decisions. The Adjudicator approved a cumulative total of 14,751 (approximately 66 percent) of the Track A claims.

b. The Government had provided a cumulative total of approximately $926,442,048 in monetary relief to successful Track A claimants, including cash awards, estimated tax relief payments, and debt relief.

c. The Arbitrator had issued a cumulative total of ninety final decisions in the Track B claims that had not been withdrawn, settled by the parties, or converted to Track A.

d. The Government had provided a cumulative total of approximately $20,491,142 in monetary relief to Track B claimants, including payments in settlement, damage awards, and debt relief. The Arbitrator's average damage award for a successful Track B claim that went to hearing was $499,057.

---

[1]   The Monitor's prior reports are available on the Monitor's website at http://www.pigfordmonitor.org/reports/.

[2]   Paragraph 12(b)(i) of the Consent Decree requires the Monitor to make periodic written reports on the good faith implementation of the Consent Decree. On March 23, 2003, the parties stipulated and the Court ordered the Monitor to report "regarding each twelve-month period, upon the request of the Court or the parties, or as the Monitor deems necessary." The Consent Decree and the Court's orders referenced in this report are available on the Monitor's website at http://www.pigfordmonitor.org/orders/.

e. The Monitor had issued a cumulative total of 5,243 decisions in response to petitions for Monitor review. The Monitor directed reexamination of 2,627 claims.

f. The Adjudicator had issued reexamination decisions in a cumulative total of 1,957 claims, granting relief to 1,704 petitioning class members and granting relief to the Government in sixty-eight claims.

g. The Government had paid a cumulative total of approximately $946,933,190 in monetary relief to class members who prevailed in the Track A and Track B claims processes or who settled their claims. This monetary relief included cash relief, debt relief, and estimated tax payments.

The remainder of this report provides additional information regarding the Consent Decree implementation process and significant developments in the case during calendar year 2006. Section II of this report provides detailed statistical information about the progress and outcomes of the claims process. Section III describes the issues presented to the Court and summarizes Court orders issued in 2006. Section IV describes the Monitor's activity, including efforts to resolve class members' problems, decisions issued in response to petitions for Monitor review, and calls received on the Monitor's toll-free phone line from class members and the public. Section V summarizes significant Consent Decree implementation issues addressed by the parties, the neutrals, and the Court during 2006. Finally, Section VI contains the Monitor's observations regarding the good faith of all of those who are charged with the responsibility of implementing the Consent Decree.

II.  CLAIMS PROCESSING STATISTICS

The claims process has been completed for most of the 22,440 class members who have been found eligible to participate in the claims process. This section of the Monitor's report provides information about the results of the claims process for eligible class members.

The Monitor did not independently compile most of the data discussed in this report. The Monitor obtained information about the results of the claims process from the Facilitator,[3] the Arbitrator,[4] and the United States Department of Agriculture (USDA).

A. Track A

Paragraph 9 of the Consent Decree sets forth the process for deciding claims under Track A of the claims process. Class members who elect Track A submit information in response to a series of questions on a Claim Sheet and Election Form ("Claim Sheet") agreed to by the parties.[5] If the Facilitator finds that a claimant who elected Track A is eligible to participate in the claims process, the Facilitator refers the claim to the Adjudicator.[6] The Adjudicator then determines whether the class member has demonstrated by substantial evidence[7] that the class member was treated less favorably than a specifically identified, similarly situated white farmer and suffered economic damages as a result.

As of the end of 2006, the Adjudicator had issued 22,268 decisions in Track A claims and had awarded relief in 14,751 (approximately 66 percent) of the claims. The relief awarded

---

[3]   The Facilitator is Epiq Systems—Class Action & Claims Solutions (Epiq Systems is the entity that was formerly Poorman-Douglas Corporation). *See* Consent Decree, paragraph 1(i).

[4]   The Arbitrator is Michael K. Lewis of JAMS, formerly of ADR Associates. *See* Consent Decree, paragraph 1(b).

[5]   A sample copy of the Claim Sheet and Election Form is provided in Appendix 9 to this report.

[6]   Under paragraph 1(a) of the Consent Decree, JAMS-Endispute, Inc., is responsible for the final decision in all Track A claims. JAMS-Endispute, Inc. is now known as JAMS.

[7]   Paragraph 1(l) of the Consent Decree defines "substantial evidence" as such relevant evidence as appears in the record before the Adjudicator that a reasonable person might accept as adequate to support a conclusion after taking into account other evidence in the record that fairly detracts from that conclusion.

for a successful Track A claim depends on whether the claim involves a credit claim or a non-credit claim. Credit claims generally involve USDA farm loan programs (such as the Operating Loan, Farm Ownership Loan, Soil and Water Loan, and Emergency Loan Programs) and may also involve loan servicing programs.[8] Non-credit claims generally involve farm benefit programs, such as conservation assistance or disaster relief. Class members who prevail in Track A credit claims receive a cash payment of $50,000, as well as other relief.[9] Class members who prevail in Track A or Track B non-credit claims receive a cash payment of $3,000 for those claims, as well as other relief.[10]

As of the end of 2006, the Government had paid a cumulative total of $714,900,000 in cash relief to class members who prevailed in Track A credit claims and an additional $1,254,000 to class members who prevailed in Track A non-credit claims, for a total of $716,154,000 in cash relief paid to class members who prevailed on Track A claims. Additional cumulative statistics regarding the number of class members who elected Track A, adjudication rates and results, and cash relief payment rates through the end of calendar year 2006 are summarized in Table 1.

---

[8]    As of the end of 2006, these loan programs were described in USDA regulations at 7 C.F.R. Part 1941 (Operating Loans); Part 1943, Subpart A (Farm Ownership Loans); Part 1943, Subpart B (Soil and Water Loans); Part 1945 (Emergency Loans); and Part 1951 (Loan Servicing).

[9]    In addition to a cash payment of $50,000, claimants who prevail on credit claims are also entitled to debt relief, injunctive relief, and tax relief pursuant to paragraph 9(a) of the Consent Decree.

[10]   The Consent Decree does not specify the dollar amount of relief for non-credit claims. The parties have stipulated that successful claimants in Track A and Track B non-credit claims receive a cash payment of $3,000. *See* Stipulation and Order, dated February 7, 2001 (available on the Monitor's website at http://www.pigfordmonitor.org/orders/). In addition to the $3,000 cash payment, relief for successful non-credit claims includes some aspects of injunctive relief. See paragraph 9(b) of the Consent Decree.

| Table 1: Statistical Report Regarding Track A Claims[11] | | |
|---|---|---|
| **Statistical Report as of:** | **End of 2006** | |
| | **Number** | **Percent** |
| A. Eligible Class Members | 22,440 | 100 |
| B. Cases in Track A (Adjudications) | 22,269 | 99 |
| C. Cases in Track B (Arbitrations) | 171 | 1 |
| **Adjudication Completion Figures** | | |
| D. Adjudications Complete | 22,268 | ~100 |
| E. Adjudications Not Yet Complete | 1 | ~0 |
| **Adjudication Approval/Denial Rates[12]** | | |
| F. Claims Approved by Adjudicator | 14,751 | 66 |
| G. Claims Denied by Adjudicator | 7,517 | 34 |
| **Adjudication Approvals Paid/Not Paid** | | |
| H. Approved Adjudications Paid | 14,494 | 98 |
| I. Approved Adjudications Not Yet Paid | 257 | 2 |
| J. Cash Relief Paid to Prevailing Class Members for Track A Credit Claims[13] | $714,900,000 | |
| K. Cash Relief Paid to Prevailing Class Members for Track A Non-Credit Claims[14] | $1,254,000 | |

## B. Track B

Paragraph 10 of the Consent Decree sets forth the process for deciding claims under Track B of the claims process. To prevail in a Track B claim, a class member must prove by a

---

[11] These statistics are provided by the Facilitator and are as of December 31, 2006. Statistics for prior reporting periods are summarized in Appendix 1. Current statistics are available upon request from the Monitor's office (1-877-924-7483) and are updated regularly for Track A claims on the Monitor's website at http://www.pigfordmonitor.org/stats/.

[12] These numbers include both credit and non-credit claims. They reflect the results of Monitor review and Adjudicator reexamination as of the end of 2006.

[13] This figure includes only the $50,000 cash award component of relief in Track A credit claims. See Tables 3 and 4 below for statistics regarding other aspects of Track A relief.

[14] This figure includes only the $3,000 cash award component of relief in Track A non-credit claims.

preponderance of the evidence[15] that the class member was a victim of discrimination and suffered damages as a result of that discrimination. The Track B process includes an exchange of exhibits and written direct testimony, a limited period for discovery, and the opportunity for cross-examination of witnesses at an eight-hour arbitration hearing. The submission of evidence is governed by the Federal Rules of Evidence, and class members who prevail before the Arbitrator receive an award of the amount of their actual damages, as well as debt relief and injunctive relief.[16]

As of the end of 2006, 145 of the 240 class members who initially elected Track B had settled or withdrawn their claims or converted their claims to Track A.[17] As of the end of 2006, the Arbitrator had issued final decisions for ninety of the ninety-five Track B claims that had not been settled, withdrawn, or converted to Track A. The Arbitrator awarded an average of $499,057 to the class members who prevailed before the Arbitrator and received an award of damages after completion of the Track B claims process.

According to the Facilitator, as of the end of 2006, a total of eighty-four class members who elected Track B had received cash payments in settlement or after prevailing in the Track B

---

[15]   Paragraph 1(j) of the Consent Decree defines "preponderance of the evidence" as such relevant evidence as is necessary to prove that something is more likely true than not true.

[16]   There is no tax relief in Track B. See Consent Decree, ¶ 10.

[17]   Under the Consent Decree, at the time a class member submits a completed claim package, the class member must elect whether to proceed under Track A or Track B and a class member's election "shall be irrevocable and exclusive." Consent Decree, paragraph 5(d). Those class members who converted from Track B to Track A did so with the consent of the Government.

claims process.[18] The Facilitator reports that the Government paid a total of approximately $16,826,670 in damage awards and settlement payments to these eighty-four class members.[19] Table 2 provides additional statistics regarding Track B claims, as reported by the Facilitator.

| *Table 2*: Statistical Report Regarding Track B Claims[20] | |
|---|---|
| **Statistical Report as of:** | **End of 2006** |
| A. Eligible Track B Claimants | 240 |
| B. Track B Cases Settled | 71 |
| C. Track B Cases Converted to Track A | 65 |
| D. Track B Cases Withdrawn | 9 |
| **Arbitrations Complete/Not Complete** | |
| E. Contested Track B Cases in Claims Process (Not Settled, Not Converted, Not Withdrawn) | 95 |
| F. Arbitration Decisions Issued | 90 |
| G. Arbitration Decisions Not Yet Issued | 5 |
| **Arbitration Results** | |
| H. Claimant Prevailed Before Arbitrator | 22 |
| I. Average Award to Prevailing Claimants | $499,057 |
| J. Government Prevailed Before Arbitrator | 68 |
| Posture of Decisions in Which Government Prevailed: | |
| 1. Cases Dismissed Before Hearing | 44 |
| 2. Full Hearing, Finding of No Liability | 24 |

---

[18]   Nine of the class members who are reported to have prevailed before the Arbitrator or settled their Track B claims as of the end of 2006 had not been paid by the Government as of the end of 2006. In five of the claims, petitions remained pending before the Monitor. In two of the claims, class members received final decisions in the claims process after Monitor review as of the end of 2006, but the class members had not received payment by the end of 2006. In one of the claims, the claimant prevailed on a preliminary ruling by the Arbitrator and counted as "prevailed" according to the Facilitator's statistical protocols, but the claim remained pending as of the end of 2006. In the final claim, a reported settlement had resulted in debt relief for the claimant but no cash payment to the claimant as of the end of 2006.

[19]   This figure does not include any awards for class members who converted their claims to Track A, nor does this figure include debt relief.

[20]   These statistics are provided by the Facilitator and are as of January 1, 2007. Statistics for prior reporting periods were provided by the Arbitrator and are summarized in Appendix 2. The amount of each individual Track B arbitration award is set forth in Appendix 3. Claimant names and geographic locations are not disclosed.

C. Debt Relief

Paragraphs 9(a)(iii)(A) and 10(g)(ii) of the Consent Decree set forth the debt relief

USDA must provide to prevailing class members. These provisions require USDA to discharge

all of a prevailing class member's outstanding debt to USDA that was "incurred under, or

affected by" the program(s) that were the subject of the claim(s) resolved in the class member's

favor in the claims process. A Stipulation and Order filed on February 7, 2001, further defines

the scope of debt relief.[21]

Table 3 provides statistics regarding the debt relief implemented by USDA for prevailing

Track A and Track B class members. USDA reports that the Government provided debt relief to

a total of 325 prevailing class members as of the end of 2006, forgiving a cumulative total of

$30,291,397 in outstanding principal and interest.

---

[21]   Paragraph 2 of the February 7, 2001, Stipulation and Order states as follows:
      The [debt] relief to be provided in . . . the Consent Decree to a class member who prevails on a
      claim of credit discrimination includes all debts which were identified by the Adjudicator or the
      Arbitrator as having been affected by the discrimination. Additionally, such relief includes all
      debts incurred at the time of, or after, the first event upon which a finding of discrimination is
      based, except that such relief shall not include: (a) debts that were incurred under FSA programs
      other than those as to which a specific finding of discrimination was made by the Adjudicator or
      Arbitrator with respect to the class member (e.g., the Operating Loan program [OL program], the
      Farm Ownership loan program [FO program], the Emergency Loan program [EM program], etc.);
      (b) debts that were incurred by the class member prior to the date of the first event upon which
      the Adjudicator's or Arbitrator's finding of discrimination is based, or (c) debts that were the
      subject of litigation separate from this action in which there was a final judgment as to which all
      appeals have been forgone or completed.

| *Table 3*: Statistical Report Regarding Debt Relief[22] | |
|---|---|
| **Statistical Report as of:** | **End of 2006** |
| A.  Total Amount of Debt Forgiven (Principal and Interest) | $30,291,397 |
| B.  Debt Forgiven for Track A Claimants | $26,626,924 |
| C.  Debt Forgiven for Track B Claimants | $3,664,473 |
| D.  Number of Track A Claimants Who Received Debt Forgiveness | 307 |
| E.  Number of Track B Claimants Who Received Debt Forgiveness | 18 |
| F.  Average Amount of Debt Forgiven Per Track A Claimant Who Received Debt Forgiveness | $86,733 |
| G.  Average Amount of Debt Forgiven Per Track B Claimant Who Received Debt Forgiveness | $203,582 |

D.  Total Monetary Relief for Track A and Track B Claims

In addition to cash awards and debt relief, successful Track A credit claimants receive relief, paid directly into claimants' Internal Revenue Service (IRS) income tax accounts, for partial payment of federal income taxes. Under paragraph 9(a)(iii)(C) of the Consent Decree, the amount of tax relief for each successful Track A credit claim is 25 percent of the $50,000 cash award ($12,500) plus 25 percent of the principal amount of any debt that was forgiven. Thus, the total value of monetary relief to Track A claimants includes cash awards for credit and non-credit claims, payments to Internal Revenue Service tax accounts, and relief from outstanding debt (principal and interest) as provided in the Consent Decree and the February 7, 2001, Stipulation and Order.

---

[22]   These statistics are based on information provided by USDA for debt relief (principal and interest) implemented by USDA through December 31, 2006. Appendix 4 provides information from prior reporting periods regarding debt relief as well as information on debt relief by state.

Table 4A summarizes the total monetary value of relief provided to class members who elected Track A and who had prevailed in the claims process as of the end of 2006.

| *Table 4A:* **Statistical Report Regarding Total Track A Monetary Relief to Prevailing Class Members**[23] | |
|---|---|
| **Status of Payments** | **Amount** |
| A.   Cash Awards for Credit Claims ($50,000 per prevailing claim) | $714,900,000 |
| B.   Cash Awards for Non-Credit Claims ($3,000 per prevailing claim) | 1,254,000 |
| C.   Payments Due to IRS as Tax Relief[24] | 183,661,124 |
| D.   Debt Relief (Principal and Interest) | 26,626,924 |
| **E.   Total Track A Monetary Relief** | **$926,442,048** |

Table 4B summarizes the settlement payments, damage award payments, and debt relief provided to successful Track B class members as of the end of 2006.[25]

---

[23]   These statistics are based on information provided by the Facilitator regarding cash awards and tax relief through December 31, 2006. The debt relief statistics are based on information provided by USDA for debt relief implemented by USDA (principal and interest) through December 31, 2006.

[24]   The tax relief in Table 4A is calculated based on information from the Facilitator about the amount of principal debt relief USDA has provided to class members with prevailing Track A credit claims. Payments due to the Internal Revenue Service as tax relief include 25 percent of the $50,000 cash award for 14,298 successful Track A credit claimants ($50,000 x 14,298 x 25% = $178,725,000) plus 25 percent of the total principal debt forgiven for this group of successful claimants (reported by the Facilitator as $19,744,496 x 25% = $4,936,124). According to the data provided by the Facilitator, the total tax relief payments due to the IRS as of the end of 2006 for Track A claims are: $178,725,000 + $4,936,124 = $183,661,124.

[25]   There is no tax relief in Track B. See Consent Decree, paragraph 10(g) (setting forth relief for successful Track B claims).

| *Table 4B:* Statistical Report Regarding Total Track B Monetary Relief to Prevailing Class Members [26] | |
|---|---|
| **Status of Payments** | **Amount** |
| A.  Total Amount of Payments in Settlement | $ 9,000,293 |
| B.  Total Amount of Payments for Damages Awarded by the Arbitrator | 7,826,376 |
| C.  Debt Relief (Principal and Interest) | 3,664,473 |
| **D.  Total Track B Monetary Relief** | $20,491,142 |

Table 4C summarizes the total monetary relief received by class members as of the end of 2006, including (1) total cash relief (cash awards in Track A credit and non-credit claims, payments in settlement of Track B claims, and payments of damage awards in Track B claims); (2) total tax relief in Track A claims; and (3) total debt relief in Track A and Track B claims.

| *Table 4C:* Statistical Report Regarding Total Track A and Track B Monetary Relief to Prevailing Class Members[27] | |
|---|---|
| **Status of Payments** | **Amount** |
| A.  Total Amount of Cash Relief for Track A and Track B Claims (cash awards, payments in settlement, and damage awards for prevailing class members) | $732,980,669 |
| B.  Total Payments Due to IRS as Tax Relief for Track A Claims | 183,661,124 |
| C.  Total Debt Relief for Track A and Track B Claims (Principal and Interest) | 30,291,397 |
| **D.  Total Track A and Track B Monetary Relief** | $946,933,190 |

---

[26]  These statistics are based on information provided by the Facilitator regarding payments in settlement and cash awards paid to prevailing Track B claimants through December 31, 2006. For purposes of this table, the term, "prevailing class members" includes class members who received payments in settlement of their Track B claims. The debt relief statistics are based on information provided by USDA for debt relief implemented by USDA (principal and interest) through December 31, 2006.

[27]  Statistics for cash awards and tax relief are through December 31, 2006, and are based on information provided by the Facilitator. The debt relief statistics are based on information provided by USDA for debt relief implemented by USDA (principal and interest) through December 31, 2006.

E. Relief by State

The Facilitator reports that the Government has made payments to prevailing class members who currently reside in thirty-nine different states. Most prevailing class members currently reside in southern states. The states with the greatest number of prevailing class members who received cash relief payments from the Government as of the end of 2006 are listed in Table 5. Appendix 5 contains information on the amount of cash relief paid by state as of the end of 2006.[28]

| Table 5: Statistical Report Regarding States With 100 or More Prevailing Paid Claimants[29] | | |
|---|---|---|
| Claimants' Current Residence | Total Number of Prevailing Paid Claimants (Track A and Track B) | Total Cash Relief Paid as of December 31, 2006 (Track A and Track B) |
| Alabama | 3,275 | $160,842,500 |
| Mississippi | 2,959 | 148,551,866 |
| Georgia | 1,876 | 92,791,742 |
| Arkansas | 1,414 | 70,961,444 |
| North Carolina | 1,062 | 56,448,583 |
| South Carolina | 861 | 43,687,500 |
| Oklahoma | 579 | 28,563,000 |
| Louisiana | 537 | 26,768,000 |
| Tennessee | 449 | 23,329,755 |
| Texas | 311 | 17,095,400 |
| Florida | 264 | 12,781,000 |
| Virginia | 167 | 9,320,780 |
| Illinois | 174 | 8,703,000 |
| California | 136 | 7,334,600 |

[28]   As explained above, in addition to cash relief, depending on the type of claim prevailing class members may have been entitled to receive debt relief, tax relief, and injunctive relief.

[29]   These statistics are provided by the Facilitator and are as of December 31, 2006. For purposes of this table, prevailing paid claimants in Track B include claimants who received payments in settlement of their Track B claims.

F.  Injunctive Relief

Paragraph 11 of the Consent Decree describes the injunctive relief that prevailing class members are entitled to receive from USDA. There are three types of injunctive relief for prevailing class members: (1) technical assistance from a qualified USDA official acceptable to the class member; (2) consideration of certain applications in the light most favorable to the class member; and (3) priority consideration for one Farm Ownership Loan, one Farm Operating Loan, and one opportunity to acquire farmland from USDA inventory property. In 2005 the parties stipulated, and the Court ordered, an extension of the deadline for some aspects of injunctive relief.[30] Pursuant to the April 21, 2005, Stipulation and Order, prevailing class members can request technical assistance, "most favorable light," and priority consideration injunctive relief for up to two years after the date on which the prevailing class member completed the claims process.[31]

Table 6 provides statistics reported by USDA concerning the cumulative number of requests for priority consideration for Farm Ownership Loans, Farm Operating Loans, and the acquisition of inventory property from the beginning of the claims process through December 31, 2006.

---

[30]  The April 21, 2005, Stipulation and Order is available on the Monitor's website at: http://www.pigfordmonitor.org/orders/.

[31]  A class member completes the claims process, for injunctive relief purposes, at one of three possible points. If the class member prevails before the Adjudicator or Arbitrator and no petition for Monitor review is filed, the class member completes the claims process 120 days after the date of the Adjudicator or Arbitrator decision. If a petition for Monitor review is filed and the Monitor denies reexamination, the class member completes the claims process on the date of the Monitor's decision denying reexamination. If a petition for Monitor review is filed and the Monitor grants reexamination, the class member completes the claims process on the date of the reexamination decision. *See* Monitor Update No. 15, "Injunctive Relief: A New Order Changes the Deadlines" (available on the Monitor's website at www.pigfordmonitor.org/updates/).

| Table 6: Statistical Report Regarding Injunctive Relief[32] | |
| --- | --- |
| **Statistical Report as of:** | **End of 2006** |
| A.  Farm Ownership Loans<br>   1.  Number of Requests for Priority Consideration With<br>       Complete Application<br>   2.  Number of Applications Approved | <br><br>125<br>29 |
| B.  Farm Operating Loans<br>   1.  Number of Requests for Priority Consideration With<br>       Complete Application<br>   2.  Number of Applications Approved | <br><br>215<br>75 |
| C.  Inventory Property<br>   1.  Number of Requests for Priority Consideration<br>   2.  Number of Applications Approved | <br>10<br>1 |

## III.  COURT ORDERS

During 2006, the Court issued several Orders relating to "amended" decisions issued in Track A claims. These Orders are discussed in more detail in Section V of this report. In addition, the Court denied a motion for a new hearing in a Track B claim, granted a motion to substitute David J. Frantz for Alexander J. Pires, Jr., as Class Counsel and Co-Lead Counsel, and approved two stipulations regarding the Monitor's duties under the Consent Decree.

Table 7 summarizes the Court's Orders on substantive matters during this reporting period.[33]

---

[32]   These statistics are provided by USDA and are as of December 31, 2006. Appendix 6 contains statistics from prior reporting periods regarding injunctive relief.

[33]   Procedural orders, orders relating to approval of the Monitor's budgets and invoices, and orders and settlement agreements relating to attorneys' fees are not included in this list.

| | | | | |
|---|---|---|---|---|
| | *Table 7*: Court Orders | | | |
| # | Court Docket Number | Date Filed | Title of Order | Major Issues Addressed Include: |
| 1 | 1253 | 02/23/2006 | Memorandum Opinion and Order | Denying without prejudice a motion by *pro se* class members Elmore and Ludean Hicks to enforce the Consent Decree to obtain the $50,000 cash payment and other relief that corresponds to a prevailing credit claim awarded in a November 1, 1999, decision by the Adjudicator. The Court's Order explains that Mr. Hicks received an "Amended" decision on February 29, 2000, which awarded non-credit relief of $3,000. The Court's Order refers the matter to the Monitor for possible resolution pursuant to the Monitor's authority under paragraph 12(b)(iii) of the Consent Decree; orders the Monitor to report to the Court on the matter on or before April 28, 2006; and orders Class Counsel to provide assistance to the *pro se* class members if the class members so desire. |
| 2 | 1254 | 02/23/2006 | Memorandum Opinion and Order | Ordering the Monitor to investigate and report to the Court on the subject of "Amended" Adjudicator decisions in Track A claims, including (1) how many Adjudicator decisions have been amended such that the "Amended" decision resulted in substantive changes to the relief awarded in the initial Adjudicator decision; (2) what relief, if any, was awarded in each of the substantively "Amended" Adjudicator decisions and how it differed from the relief awarded in any earlier Adjudicator decisions for the same claimant on the same claims; (3) whether any class members receiving an "Amended" Adjudicator decision have petitioned for Monitor review; (4) what the outcome has been, if any, of those Monitor reviews; and (5) what relief, if any, class members actually received from the government. |

| | Court Docket Number | Date Filed | Title of Order | Major Issues Addressed Include: |
|---|---|---|---|---|
| # | | | | |
| 3 | 1262 | 03/23/06 | Memorandum Opinion and Order | Denying a motion to set aside the Arbitrator's October 8, 2002, decision in a Track B claim filed by New Communities, Inc., or in the alternative, to order a new hearing on the claim. The Court's Memorandum Opinion notes allegations regarding the conduct of Ms. Margaret O'Shea, who represented the government in the claim. The Court's Order further notes that New Communities had filed a petition for Monitor review, which remained pending at the time of the Court's Order. |
| 4 | 1291 | 06/19/2006 | Order | Granting unopposed motion of Class Counsel Alexander J. Pires, Jr., to withdraw as Class Counsel and Co-Lead Counsel and substituting David J. Frantz as Class Counsel and Co-Lead Counsel. |
| 5 | 1295 | 06/30/2006 | Stipulation and Order | Approving an agreement by the parties to permit the Monitor, with the petitioning party's consent, to sever credit claims from non-credit claims in certain pending Track A petitions for Monitor review. |
| 6 | 1296 | 06/30/2006 | Stipulation and Order | Approving an agreement by the parties regarding certain "conservation loan" claims in which class members received amended Adjudicator decisions changing their substantive relief. The Stipulation and Order reinstates the original Adjudicator decisions for certain class members, subject to the government's right to file petitions for reexamination on the issue of whether the claimant alleged discrimination in a farm credit program or in a non-credit program. |
| 7 | 1303 | 07/06/2006 | Stipulation and Order | Approving an agreement by the parties extending the Monitor's appointment until her duties under the Consent Decree are completed or until March 1, 2008, whichever occurs first. |

*Table 7*: Court Orders

| | Court Docket Number | Date Filed | Title of Order | Major Issues Addressed Include: |
|---|---|---|---|---|
| | | | | *Table 7*: Court Orders |
| 8 | 1312 | 08/07/2006 | Memorandum Opinion and Order | Requiring the Monitor to further investigate and report to the Court regarding "Amended" Adjudicator decisions that were not purely clerical and that affected class members' cash relief or debt relief, and any instances in which the Facilitator initially notified a claimant that he or she was eligible to participate in the claims process but later notified that same claimant that the eligibility decision had been "amended" and that the claimant was no longer eligible. The Court's Order directs the Monitor to attempt to resolve with the parties any problems regarding amended Adjudicator decisions that changed a class member's cash relief or debt relief and any problems regarding putative class members who may have received amended notification from the Facilitator resulting in the denial of the putative class members' opportunity to participate in the claims process. |

## IV. MONITOR'S ACTIVITY AND OBSERVATIONS

### A. Reporting — Paragraphs 12(a) and 12(b)(i) of the Consent Decree

#### 1. *Reporting Directly to Secretary of Agriculture*

Paragraph 12(a) of the Consent Decree states that the Monitor shall report directly to the Secretary of Agriculture. The Monitor did not meet with then-Secretary of Agriculture Mike Johanns in calendar year 2006.[34] The Monitor fulfills this Consent Decree requirement in part through work with USDA's Office of the General Counsel. The Monitor had many meetings and

---

[34]   The Monitor met with Secretary Johanns on April 19, 2007.

frequent phone conversations during 2006 with James Michael Kelly, USDA's Deputy General Counsel.

2. *Written Reports to the Court, the Secretary, Class Counsel, and Defendant's Counsel*

Paragraph 12(b)(i) of the Consent Decree, as modified by Stipulation and Order dated March 24, 2003, requires the Monitor to make periodic written reports to the Court, the Secretary, Class Counsel, and Defendant's counsel on the good faith implementation of the Consent Decree regarding each twelve-month period, upon the request of the Court or the parties, or as the Monitor deems necessary.[35] The Monitor submits this report on the good faith implementation of the Consent Decree in calendar year 2006 pursuant to paragraph 12(b)(i) of the Consent Decree and the March 24, 2003, Stipulation and Order.

B. "Resolving Any Problems" — Paragraph 12(b)(ii) of the Consent Decree

Paragraph 12(b)(ii) of the Consent Decree states that the Monitor shall:

> Attempt to resolve any problems that any class member may have with respect to any aspect of this Consent Decree . . . .

To fulfill this responsibility, the Monitor's office works with Class Counsel and with class members: (1) by phone; (2) through correspondence; (3) in person at meetings sponsored by claimant organizations and/or by USDA; and (4) by sending out and otherwise making

---

[35]   During 2006, the Monitor filed the Monitor's Report on Amended Adjudicator Decisions, dated April 7, 2006; the Monitor's Report Regarding Implementation of the Consent Decree for the Period of January 1, 2005, through December 31, 2005, dated October 6, 2006; and the Monitor's Interim Follow-up Report on Amended Adjudicator Decisions, dated December 14, 2006. These Monitor reports are available on the Monitor's website at http://www.pigfordmonitor.org/reports/.

available "Monitor Updates" to disseminate important information to the whole class or to

segments of the class affected by particular issues.

Concerns brought to the Monitor's attention by class members in 2006 were similar to

the concerns class members raised in previous years. They included:

> a. Concerns about delays in the Monitor review process and the Track A and Track B reexamination processes for class members whose Monitor decisions and Adjudicator and Arbitrator reexamination decisions remained pending.

> b. Questions about whether the case will be reopened through congressional action to permit additional claims.

> c. Concerns about efforts by third parties not associated with the litigation to provide misleading information regarding the status of the litigation and the ability of class members to file claims.

> d. Concerns regarding the adequacy of the notice provided about the case before the October 12, 1999, claims filing deadline.

> e. Allegations of discrimination by local Farm Service Agency (FSA) offices and of problems obtaining new FSA loans.

> f. Problems with debt relief, including determinations of the proper debt relief and the timing of implementation of debt relief.

> g. Concerns regarding the renewed possibility of USDA foreclosure actions against individuals who have completed the claims process.

> h. Concerns about the low percentage approval rate for requests for permission to file late claims, and concerns about the standards required for the granting of permission to file late claims.

The most significant recurring problems and concerns are described more fully below in

Section V, "Significant Consent Decree Implementation Issues." To address class members'

concerns regarding delays in the claims process, the Monitor has continued to work with the

neutrals and the parties to identify priority cases, to expedite claims processing and the

implementation of relief that has been awarded, and to track claims processing and relief

statistics. The Monitor has attempted to address other concerns by providing information to class

members about the claims process; by providing information about class members' concerns to

the parties, the neutrals, and the Court; and by working directly with Class Counsel and USDA in attempts to solve individual class members' problems. The Office of the Monitor also attended meetings sponsored by class member organizations upon request. The meetings the Monitor's office attended during 2006 are listed in Appendix 7.

In addition to working to resolve individual class members' problems and attending meetings to address class members' concerns, the Monitor maintains a website to provide information for class members at http://www.pigfordmonitor.org. The Monitor's website includes information such as key Court Orders in the case, reports by the Monitor and the Arbitrator, statistics on the claims process, relevant Farm Loan Program (FLP) notices issued by USDA, and helpful links for class members seeking assistance with their farming operations. In 2006, there were 58,231 page "hits" to this website.

C.  Reexamination of Claims — Paragraph 12(b)(iii)

Paragraph 12(b)(iii) of the Consent Decree gives the Monitor responsibility to direct reexamination of a claim where the Monitor finds that a clear and manifest error has occurred in the screening, adjudication, or arbitration of the claim that has resulted or is likely to result in a fundamental miscarriage of justice. The Monitor considers whether reexamination is warranted in response to petitions for Monitor review filed by class members and by USDA. The Facilitator reports that 5,701 timely petitions for Monitor review had been filed as of the end of 2006. The Monitor had issued decisions in response to approximately 5,243 of those petitions by the end of 2006. Table 8 provides statistics regarding Monitor petition decisions as of the end of 2006; Appendix 8 contains statistics from previous reporting periods.

| *Table 8*: Statistical Report Regarding Petitions for Monitor Review[36] | |
|---|---|
| Statistical Report as of: | End of 2006 |
| **Petitions for Monitor Review** | |
| A. Number of Track A and Track B Petitions for Monitor Review | 5,701 |
| 1. Claimant Petitions | 4,945 |
| 2. Government Petitions | 756 |
| **Monitor Decisions** | |
| B. Petition Decisions Issued by Monitor | 5,243 |
| 1. Total Number of Petitions Granted | 2,627 |
| a. Claimant Petitions Granted | 2,508 |
| b. Government Petitions Granted | 119 |
| 2. Total Number of Petitions Denied | 2,616 |
| a. Claimant Petitions Denied | 2,011 |
| b. Government Petitions Denied | 605 |

*1.   Petitions for Review of Facilitator Screening Decisions*

The Facilitator performs the initial screening of all Claim Sheet and Election Forms to determine whether claimants meet the criteria for class membership.[37] As of the end of 2006, the Facilitator reports that a total of 22,440 claimants had been screened and found eligible for class

---

[36]   These statistics are provided by the Facilitator and are as of December 31, 2006.

[37]   Paragraph 2(a) of the Consent Decree defines the class as follows:

> All African American farmers who (1) farmed, or attempted to farm, between January 1, 1981, and December 31, 1996; (2) applied to the United States Department of Agriculture (USDA) during that time period for participation in a federal farm credit or benefit program and who believed that they were discriminated against on the basis of race in USDA's response to that application; and (3) filed a discrimination complaint on or before July 1, 1997, regarding USDA's treatment of such farm credit or benefit application.

In addition to responding to questions on the Claim Sheet, claimants must also provide proof that a qualifying discrimination complaint was made or that the requirements of Consent Decree paragraph 6(a) are met. *See* Consent Decree, paragraphs 5 and 6. The type of documentation required under paragraph 5(b) of the Consent Decree is described on page 2 of the Claim Sheet and Election Form. A sample Claim Sheet and Election Form is attached as Appendix 9 to this report.

membership.[38] If the Facilitator determines a claimant is not eligible to participate in the claims process, the Facilitator sends a Notification of Rejection to the claimant.[39] In some circumstances, claimants who received a Notification of Rejection from the Facilitator could file a petition for Monitor review of the Facilitator's class membership screening decision.[40]

As of the end of 2006, the Monitor had received a total of ninety-four petitions requesting reexamination of the Facilitator's screening decision. By the end of 2006, the Monitor had issued decisions in response to all of these ninety-four petitions. Many of the claimants who petitioned for Monitor review of the Facilitator's screening decision had been deemed ineligible due to a determination by the Facilitator that they had not complained of discrimination to USDA between January 1, 1981, and July 1, 1997, or they had not provided sufficient proof that they complained of discrimination to USDA during this time. In some of the petitions for Monitor review, claimants provided supplemental information with their petitions, which the Monitor admitted into the record.[41] The Monitor directed the Facilitator to reexamine a total of

---

[38]   This figure includes both timely filed Claim Sheets that the Facilitator had determined were complete and Claim Sheets filed by claimants who had been granted permission by the Arbitrator to file a late claim pursuant to ¶ 5(g) of the Consent Decree.

[39]   For an explanation of the screening procedures used by the Facilitator and a sample of the type of notices putative class members received in the screening process, see the Facilitator's Letter to the Monitor, dated January 15, 2007, attached as Exhibit 1 to the Monitor's Progress Report on Amended Adjudicator Decisions, January 16, 2007 (available on the Monitor's website at http://www.pigfordmonitor.org/reports/).

[40]   By Order dated October 29, 2002, the Court set a 120-day deadline for filing a petition for review of a notification of rejection received by claimants who had timely filed a complete claim package. The October 29, 2002, Order is available on the Monitor's website at http://www.pigfordmonitor.org/ orders/. The circumstances under which claimants could petition to the Monitor regarding eligibility denials are explained in the October 29, 2002, Order and in Monitor Update No. 5 (available at http://www.pigfordmonitor.org/updates/).

[41]   In accordance with the October 29, 2002, Order, the Monitor may consider supplemental information provided with a petition for Monitor review of the Facilitator's screening decision if the information addresses a potential flaw or mistake in the claims process that in the Monitor's opinion would result in a fundamental miscarriage of justice if left unaddressed.

twenty-two claims in which claimants provided supplemental information and/or explanations regarding their prior complaint of discrimination to USDA.

Table 9 provides statistics regarding the screening decision outcome for claims in which petitions for review of Facilitator decisions had been filed and decided as of the end of 2006.

| *Table 9*: Statistical Report Regarding Petitions for Monitor Review of Facilitator Eligibility Screening Decisions[42] | |
| --- | --- |
| **Statistical Report as of:** | **End of 2006** |
| **Petitions for Monitor Review of Facilitator Screening Decision** | |
| A. Number of Petitions for Monitor Review | 94 |
| B. Petition Decisions Issued by Monitor | 94 |
|    1. Total Number of Petitions Granted | 22 |
|    2. Total Number of Petitions Denied | 72 |
| C. Facilitator Decision on Reexamination | |
|    1. Number of Claimants Deemed Eligible on Reexamination | 22 |
|    2. Number of Claimants Deemed Ineligible on Reexamination | 0 |

2.  *Petitions for Review of Adjudicator Decisions*

As of the end of 2006, the Monitor had received 5,547 petitions for Monitor review seeking reexamination of an Adjudicator decision in a Track A claim. Paragraph 8 of the Court's April 4, 2000, Order of Reference[43] provides that the Monitor may admit into the record supplemental information provided in the petition or petition response when such information addresses a potential flaw or mistake in the claims process that in the Monitor's opinion would result in a fundamental miscarriage of justice if left unaddressed.

---

[42]   These statistics are provided by the Facilitator and are as of December 31, 2006.

[43]   The Order of Reference, dated April 4, 2000, addresses many aspects of the Monitor's duties and is available on the Monitor's website at http://www.pigfordmonitor.org/orders/.

In each Track A Monitor decision, the Monitor indicates whether supplemental information has been offered by the parties. The Monitor also indicates the Monitor's determination as to whether each piece of supplemental information should be accepted into the record. Supplemental information provided by claimants often includes additional proof that USDA treated a specifically identified, similarly situated white farmer more favorably than the claimant.[44] Supplemental information provided by USDA often relates to searches of USDA computer databases of farm borrowers and archived records of borrowers' loan and repayment histories.[45]

As of the end of 2006, the Monitor had directed reexamination of a total of 2,597 Track A Adjudicator decisions. As of the end of 2006, the Adjudicator issued reexamination decisions in 1,957 of those claims. Table 10 provides statistics regarding Adjudicator reexamination decisions issued as of the end of 2006; Appendix 10 contains similar information from prior reporting periods.

---

[44]   *See* Consent Decree, paragraph 9(a)(i). During a hearing on July 31, 2000, regarding a motion by certain claimants to reconsider the fairness of the Consent Decree, Class Counsel acknowledged that identifying specific similarly situated white farmers for each claimant had proved more difficult than anticipated. The Court's January 4, 2001, Memorandum Opinion and Order denying the motion to reconsider the fairness of the Consent Decree also noted the difficulties of identifying similarly situated white farmers. The Court's January 4, 2001, Memorandum Opinion and Order noted that counsel "expects to identify many more" similarly situated white farmers before filing Petitions for Monitor Review with respect to those Track A claims that were denied due to the lack of white farmer allegations. *See generally Pigford v. Glickman,* Memorandum Opinion and Order (D.D.C. Jan. 4, 2001), *published at* 127 F. Supp. 2d 35 (D.D.C. 2001).

[45]   The Government noted in many claims that time constraints prevented the Government from providing in initial claim responses information from the Government's paper loan files, computer database, and archived records regarding the loan history of each individual claimant and of each white farmer identified as similarly situated.

| *Table 10*: Statistical Report Regarding Track A Adjudicator Reexamination Decisions[46] | |
| --- | --- |
| **Statistical Report as of:** | **End of 2006** |
| Reexamination Decisions Issued by Adjudicator | 1,957 |
| 1. Reexamination Decisions After Claimant Petition Granted by Monitor | 1,880 |
| a. Claimant Prevailed on Reexamination | 1,704 |
| b. Claimant Did Not Prevail on Reexamination | 176 |
| 2. Reexamination Decisions After Government Petition Granted by Monitor | 77 |
| a. Government Prevailed on Reexamination | 68 |
| b. Government Did Not Prevail on Reexamination | 9 |

As of the end of 2006, a total of 438 petitions for review of Track A decisions remained pending before the Monitor.

### 3. *Petitions for Review of Arbitrator Decisions*

As of the end of 2006, the Monitor had received a total of sixty-four petitions for Monitor review from class members and/or from USDA seeking reexamination of decisions issued by the Arbitrator in a total of fifty-nine Track B claims. The number of petitions is greater than the number of claims because in some cases both the claimant and the Government petitioned for Monitor review.[47] When both a claimant and USDA request reexamination of the same Arbitrator decision, the parties have stipulated and the Court has ordered the Monitor to issue one Monitor decision letter in response to both petitions.[48]

---

[46]   These statistics are provided by the Facilitator and are as of December 31, 2006.

[47]   In some Track B claims involving multiple allegations of discrimination, the Arbitrator granted relief in part and denied relief in part. In some of these cases, both the claimant and USDA have petitioned for Monitor review.

[48]   Order, ¶¶ 1-2 (D.D.C. July 18, 2002). A copy of the Court's July 18, 2002, Order is available on the Monitor's website at http://www.pigfordmonitor.org/orders/.

As of the end of 2006, the Monitor had issued a total of forty Monitor decisions in forty Track B claims in response to forty-three petitions for Monitor review. The Monitor directed reexamination in eight of the forty claims. Table 11 provides statistics about reexamination decisions issued by the Arbitrator as of the end of 2006.

| *Table 11*: **Statistical Report Regarding Track B Arbitrator Reexamination Decisions**[49] | |
| --- | --- |
| **Statistical Report as of:** | **End of 2006** |
| Reexamination Decisions Issued by Arbitrator | |
| A. Reexamination Decisions After Claimant Petition Granted by Monitor | 6 |
|   1.  Claimant Prevailed | 1 |
|   2. Claim Settled | 1 |
|   3. Pending Final Arbitrator Decision | 4 |
| B. Reexamination Decisions After USDA Petition Granted by Monitor | 2 |
|   1. Damages Award Revised | 1 |
|   2. Debt Relief Order Revised | 1 |
|   3. Pending Final Arbitrator Decision | 0 |

As of the end of 2006, petitions for Monitor review from claimants and/or from the Government remained pending before the Monitor in a total of twenty Track B claims.

D.  Calls to Toll-Free Telephone Number

Paragraph 12(b)(iv) of the Consent Decree gives the Monitor the responsibility to staff a toll-free telephone line that class members and the public can call to lodge Consent Decree complaints. The Monitor's office operates a toll-free telephone number: 1-877-924-7483. Individuals who call this number reach phone operators who are knowledgeable regarding issues

---

[49]   These statistics are provided by the Facilitator and are as of December 31, 2006.

in the case and who have access to a database containing certain factual information about each claimant. The operators are able to answer certain categories of questions at the time the claimant calls. When callers raise complex issues or problems that phone operators are not able to answer, the operator sets up a time when the caller can talk to an attorney in the Monitor's office.

The Monitor's toll-free line received 7,457 incoming calls during 2006. Sometimes the operators also made outgoing calls to follow up with callers or to provide additional information. The operators staffing the toll-free line made 145 outgoing calls in this period. The total number of calls staffed by the toll-free line operators was therefore 7,602 during 2006. Many of the callers requested information about the status of their claims. Often, those requesting information about the status of their claims had filed a petition or had a decision that was petitioned by USDA. Other callers reported concerns regarding late payments or requested information about whether the case would be reopened to permit more claimants to file claims. Some callers expressed concern about whether they obtained appropriate relief in the claims process. These calls included concerns about tax relief, debt relief, and injunctive relief. The most common concerns raised in calls to the Monitor during calendar year 2006 are described more fully below in Section V, "Significant Consent Decree Implementation Issues."

## V.   SIGNIFICANT CONSENT DECREE IMPLEMENTATION ISSUES

The most significant Consent Decree implementation issues addressed by the parties, the neutrals, and the Court during calendar year 2006 are described more fully below.

### A.   Late Claims

Pursuant to paragraph 5(g) of the Consent Decree, class members who wished to file a claim form after the October 12, 1999, deadline were permitted to participate in the Consent Decree claims process only if the class members could show that extraordinary circumstances

beyond their control prevented them from filing a completed claim package by October 12, 1999.

Michael Lewis, the Arbitrator for Track B claims, is the final decision maker in the "5(g)" or

"late-claims" process.[50] During 2006, the Arbitrator continued to review the 65,952 requests for

permission to file late that were postmarked on or before the September 15, 2000, deadline

established by Court Order for such filings.[51] The Arbitrator reported that as of the end of 2006,

a total of 2,257 (approximately 3 percent) of the 65,952 late claims requests had been approved

and a total of 63,695 (approximately 97 percent) of the late claims requests had been denied.

 After a request for permission to file late is approved, the Facilitator sends the claimant a

Claim Sheet and Election Form, with a deadline to complete and return the form. Once a timely,

completed Claim Sheet and Election Form is received by the Facilitator, the Facilitator makes a

determination of eligibility. If the claimant is deemed eligible, the claim is then processed under

the Consent Decree provisions for Track A or Track B.

 Individuals whose requests for permission to file late were denied by the Arbitrator

continued to contact the Monitor's office during calendar year 2006 to express frustration with

the very low percentage approval rate of requests for permission to file late. The Monitor and the

---

[50] In an Order dated December 20, 1999, the Court delegated to the Arbitrator the authority to determine, on a case-by-case basis, whether putative class members who did not submit completed claim forms by the October 12, 1999, deadline "can demonstrate that their failure to submit timely claim forms 'was due to extraordinary circumstances beyond [their] control'" as required by paragraph 5(g) of the Consent Decree. A copy of the Court's December 20, 1999, Order is available on the Monitor's website at http://www.pigfordmonitor.org/orders/.

[51] In a Stipulation and Order dated July 14, 2000, the parties agreed and the Court ordered that all putative class members who wished to petition for permission to file a "late claim" under paragraph 5(g) of the Consent Decree "shall submit requests for such relief to the Facilitator—without a Claim Sheet and Election Form—postmarked not later than September 15, 2000." The Stipulation and Order provides that "no extensions of that deadline will be granted for any reason." Stipulation and Order, ¶ 2 (D.D.C. July 14, 2000). A copy of the July 14, 2000, Stipulation and Order is available on the Monitor's website at http://www.pigfordmonitor.org/orders/.

Facilitator have provided information to numerous parties regarding the status of the late-claims process and the deadlines established by the Consent Decree and Court Orders for participation in the *Pigford* claims process.

B. Claims Processing

During 2006, the parties continued to address issues regarding claims processing. These issues included (1) completing the processing of pending claims, and (2) relief for claimants who received "amended" decisions outside of the petition for Monitor review process.

1. *Pending Claims*

Although the vast majority of eligible class members had received a final decision on their claims as of the end of 2006, some claims remained pending before the Adjudicator, the Arbitrator, and the Monitor. The parties continued to discuss ways to expedite the final resolution of all pending claims, including the late claims admitted by the Arbitrator under paragraph 5(g) of the Consent Decree.

2. *Amended Adjudicator Decisions*

On February 23, 2006, the Court issued an Order directing the Monitor to work with the parties to attempt to determine the appropriate relief for a husband and wife who had received an "amended" Adjudicator decision. This amended decision had purported to change the couple's prevailing claim from a credit claim to a non-credit claim, which would have resulted in the couple's cash relief decreasing from $50,000 to $3,000.

In a separate Memorandum Opinion and Order dated February 23, 2006, the Court also directed the Monitor to investigate any other Adjudicator decisions that had been amended such that the amended decision resulted in substantive changes to the relief awarded to successful class members, and report to the Court the results of the investigation. On April 7, 2006, the Monitor filed a report with the Court stating that sixty-six Adjudicator decisions had been

amended through a "substantive" amendment after review by an Adjudicator and 379

Adjudicator decisions had been amended through a "technical" amendment after review by the

Facilitator.[52] In June 2006, the parties agreed to a stipulation regarding forty-three of the sixty-

six "substantively" amended Adjudicator decisions; this group of forty-three decisions was

referred to as the "Conservation Loan" group. The Court approved the parties' stipulation in a

June 30, 2006, Order which provided that the initial Adjudicator decision would be reinstated for

certain Conservation Loan group claims, subject to USDA's right to petition the Monitor for

review of the issue of whether the claim in question concerned discrimination in a farm credit

program or in a non-credit program.[53]

On August 7, 2006, the Court issued a Memorandum Opinion and Order directing the

Monitor to further investigate the remaining amended decisions that affected or may have

affected class members' substantive relief, and report to the Court the results of the

investigation. The Monitor worked with the Facilitator, the Adjudicator, and the parties in 2006

to obtain the information necessary to respond to the Court's Order and to address any problems

relating to the categories of amended decisions noted in the Court's Order.[54] The Monitor will

---

[52]   The Monitor reported that 61 of the 379 "technical" amendments may have involved changes to the "relief" page of the Adjudicator's decision or to the text of the decision. The Monitor's Report on Amended Adjudicator Decisions, filed April 7, 2006, is available on the Monitor's website at http://www.pigfordmonitor.org/reports/.

[53]   The Stipulation and Order was filed June 30, 2006, and is available on the Monitor's website at http//www.pigfordmonitor.org/orders/.

[54]   The Monitor filed an Interim Follow-up Report on Amended Adjudicator Decisions on December 14, 2006. The Monitor filed additional reports on amended decisions on January 16, March 29, and July 9, 2007. The Monitor's reports are available on the Monitor's website at http://www.pigfordmonitor.org/reports/.

continue to work with the parties and report to the Court regarding steps taken to ensure implementation of the appropriate relief for each affected class member.

## C.  Relief for Successful Class Members

During 2006, the parties identified a number of issues in implementing relief for successful class members. These issues included: (1) cash relief, (2) tax relief, and (3) debt relief.

### 1.  *Payments of Cash Relief*

Four issues arose regarding cash relief in 2006. The first concerns payments of cash relief on behalf of deceased class members. Class Counsel raised concerns about whether the payee formulations on checks in these cases were sufficiently restrictive to direct the cash relief funds to the estate of the deceased class member.[55] This issue is still being considered by the parties. Second, the parties considered how to handle a small number of checks that are not cashed or are returned to the Facilitator as "undeliverable." Third, the parties continued to confer on a regular basis regarding the status of payments to prevailing class members. And fourth, during 2006, USDA reviewed the payment status of claimants who had prevailed on non-credit claims. USDA took additional steps to expedite the payment of the $3,000 cash component of these claimants' relief.

### 2.  *Tax Relief*

Previous Monitor reports described the problems class members have experienced relating to delays in the establishment of their tax accounts. During 2006, the Facilitator reported that tax accounts were established for the vast majority of the claimants who prevailed in

---

[55]   Class Counsel is concerned that if the payee formulation is not sufficiently restrictive, the representative of the deceased class member may have deposited the funds into an account other than the account of the estate, or may have improperly allocated the funds among family members.

Track A credit claims as of the end of calendar year 2005.[56] USDA and the Facilitator also reported more timely processing of Forms 1099 in 2006. The IRS's National Taxpayer Advocate continued to offer support for class members who experienced *Pigford*-related tax difficulties. The National Taxpayer Advocate conducted trainings and provided a memorandum for all taxpayer advocate service employees, dated May 25, 2006, describing *Pigford* tax issues and tax problems class members may experience.[57] Although many of the problems reported in prior years have been resolved, individual class members continued to request assistance with the tax aspects of their claims during 2006.

   3.  *Debt Relief*

The Consent Decree and a February 7, 2001, Stipulation and Order ("the Debt Relief Stipulation and Order") create a two-step debt relief process that USDA must implement for each class member who prevails on a credit claim. In the first step, the agency reviews the Adjudicator's or Arbitrator's decision and forgives all debts identified by the Adjudicator or the Arbitrator as "affected by" discrimination. In the second step, USDA implements what is referred to as "forward sweep" debt relief, applying the principles set forth in the Consent Decree and the Debt Relief Stipulation and Order to forgive all subsequent loans that are in the same loan program as the affected debt.[58]

---

[56]  The Facilitator reported that, as of October 2006, tax accounts had been established for all but 12 prevailing claimants whose claims had been paid as of the end of 2005.
[57]  The National Taxpayer Advocate (NTA) can be reached through the NTA website at http:///www.irs.gov/advocate.index.html. The May 25, 2006, letter can be found at http://www.irs.gov/pub/foia/ig/tas/tas-13-0607-001.pdf.pdf. Class members with tax problems or questions may contact Class Counsel toll-free by calling 1-866-492-6200 or the Facilitator (1-800-646-2873) for more information.
[58]  USDA typically grants forward sweep debt relief for all subsequent loans in the loan program of the affected debt through December 31, 1996 (the end of the class period).

During 2006, as part of the Monitor's investigation of amended Adjudicator decisions, the parties and the Monitor began to understand that debt relief implementation was an issue that needed further attention. The Monitor worked with the parties regarding debt relief issues throughout 2006 and into 2007. Several of the Monitor's reports about amended decision issues focused on debt relief issues that emerged in the amended decisions work.[59] The parties are working together to ensure that debt relief is fully implemented for all prevailing class members who are entitled to debt relief. In cases in which class members have made payments or have had funds taken by offsets to pay debt that should be forgiven, USDA is working to refund the payments and offsets. In addition, USDA has agreed to implement a system to ensure that class members who receive *Pigford* debt relief receive the benefits of USDA's "no adverse effect" policy.[60] Under this policy, USDA has agreed that debt that is forgiven through the *Pigford* Consent Decree claims process and debt that would have received *Pigford* debt forgiveness had

---

[59]   The Monitor's December 14, 2006, Interim Follow-up Report on Amended Adjudicator Decisions described the Monitor's requests to USDA and to the Facilitator to investigate whether class members received amended decisions that affected their debt relief. The Monitor's January 15, 2007, Progress Report on Amended Adjudicator Decisions attached a letter from the Facilitator as Exhibit 1 describing the decision coding process used for Track A decisions, the implementation issues created by the February 7, 2001, Debt Relief Stipulation and Order, and the reasons why certain class members received amended Adjudicator decisions that may have affected their debt relief. The Monitor's Second Progress Report on Amended Adjudicator Decisions, dated March 27, 2007, and the Monitor's Report and Recommendations on Amended Decisions, dated July 9, 2007, contain additional information regarding debt relief issues, including (1) the two-step process for determining *Pigford* debt relief, and (2) the steps necessary to ensure appropriate implementation of debt relief for all prevailing class members who are entitled to debt relief.

[60]   Ordinarily, if USDA forgives or writes off debt and the forgiveness causes a loss to the government, that forgiveness has an adverse effect on the borrower's ability to obtain future loans or loan servicing from USDA. *See* 7 C.F.R. §§ 1941.12(a)(8), 1943.12(a)(10) (2007). USDA's "no adverse affect" policy for prevailing *Pigford* claimants is found in USDA Notice FLP-460, Priority Consideration for Prevailing Claimants, at 8 (May 23, 2005). The policy is further explained in Monitor Update No. 14. Both the FLP and Monitor Update No. 14 are available on the Monitor's website, at http://www.pigfordmonitor.org/flp/ and http://www.pigfordmonitor.org/updates/.

it still been outstanding at the time of the final decision in the claims process will not be used as a reason to deny new loans or loan servicing to class members.

USDA has committed to implement systems that will ensure that prevailing claimants receive all of the debt relief that they are entitled to receive under the Consent Decree and February 7, 2001, Stipulation and Order. The implementation work is in progress. The Monitor will continue to work with the parties and report to the Court on USDA's debt relief implementation.

4.  *Injunctive Relief*

Consent Decree injunctive relief offers prevailing class members the opportunity for some or all of the following:

> a. "Priority consideration" for one Farm Ownership Loan, one Farm Operating Loan, and one opportunity to acquire farmland from USDA inventory property;
>
> b. Technical assistance with loan applications; and
>
> c. The right to have future loan and loan servicing applications considered in the "most favorable light."[61]

The Monitor has noted in previous reports that Class Counsel and class members have expressed concern about the low number of prevailing class members who have taken advantage of their injunctive relief rights. Class Counsel has also expressed concern regarding the low number of approvals of class members' requests for priority consideration. Table 6 and

---

[61]   All of these types of injunctive relief are available to claimants who prevail on Track A or Track B credit claims; some of these types of relief are available to claimants who prevail on non-credit claims. See Consent Decree paragraphs 9(a)(iii)(D), 9(b)(iii)(B), 10(g)(iii), and 11. The Monitor has issued Monitor Updates describing injunctive relief and the deadlines for injunctive relief. *See* Monitor Update No. 4, "Injunctive Relief in *Pigford v. Johanns*" (rev. May 18, 2005), and Monitor Update No. 15, "Injunctive Relief: A New Order Changes the Deadlines" (May 5, 2005). These updates are available on the Monitor's website, at http://www.pigfordmonitor.org/updates/.

Appendix 6 include information about the number of priority consideration loan applications completed and the number of loan applications approved for Farm Ownership Loans, Farm Operating Loans, and the purchase of inventory property from USDA. The Monitor works with the parties to address any individual class member's problems or concerns regarding injunctive relief that are brought to the Monitor's attention.

### D. Government Accountability Office (GAO) Report

In response to a request by members of Congress, the Government Accountability Office (GAO) issued a report on March 17, 2006, entitled "Pigford Settlement: The Role of the Court-Appointed Monitor." The report contains information gathered by GAO investigators on the implementation of the Consent Decree, including the number of claimants who filed timely claims and the number of claimants who requested permission to file a late claim. In addition, the report describes the role of the Monitor in conducting outreach activities to class members and in reviewing timely filed claims in response to petitions for Monitor review. The report states that no concerns have been raised by members of Congress or by the Court regarding the Monitor's performance of her assigned responsibilities in this case.[62]

## VI. GOOD FAITH IMPLEMENTATION OF THE CONSENT DECREE

The Consent Decree implementation process is nearing completion for the class members who have been deemed eligible to participate in the claims process. During calendar year 2006, the parties and the neutrals (the Facilitator, the Adjudicator, and the Arbitrator) worked in good faith to address the remaining implementation issues. The parties began

---

[62]   See GAO, "Pigford Settlement: The Role of the Court-Appointed Monitor," Enclosure III, at 24 (March 17, 2006). The GAO's report is available at http://www.gao.gov/new.items/d06469r.pdf.

discussions to identify all of the tasks that must be addressed to responsibly "wind-down" the Consent Decree processes and to achieve full implementation of the Consent Decree. The Monitor will continue to work with the parties and report to the Court as directed regarding the remaining stages of the Consent Decree implementation process.

Dated: December 31, 2007.

Respectfully submitted,

Randi Ilyse Roth
Monitor
Post Office Box 64511
St. Paul, Minnesota 55164-0511
877-924-7483