UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| _____ | ) | |
| TIMOTHY PIGFORD, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 97-1978 (PLF) |
| | ) | |
| EDWARD T. SCHAFER, Secretary, | ) | |
| United States Department of Agriculture,[1] | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| CECIL BREWINGTON, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 98-1693 (PLF) |
| | ) | |
| EDWARD T. SCHAFER, Secretary, | ) | |
| United States Department of Agriculture, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

OPINION

This matter is before the Court on two motions to enforce the Consent Decree

governing the settlement of this case.  The first motion is brought by class members George

Roberts and Ernest and Ruth Banks.  The second is brought by the estates of class members

_____

[1]        The first amended complaint named Daniel Glickman, former Secretary of
Agriculture, as the party defendant.  The Court subsequently substituted his successor, Ann
Veneman, and then her successor, Mike Johanns, pursuant to Rule 25(d) of the Federal Rules of
Civil Procedure.  The Court now substitutes Edward T. Schafer, Mr. Johanns' successor,
pursuant to that Rule.

Robert and Jessie Howard.[2]  Because the two motions raise essentially the same issues, the Court

will address them together.[3]

          As discussed more fully below, all plaintiffs are "prevailing class members" and

therefore are entitled to the discharge of any debt made eligible for debt relief by the Consent

Decree.  The question presented is when plaintiffs "incurred" their outstanding debts to the

Department of Agriculture.  The question is important because the debt relief provisions of the

Consent Decree entitle a prevailing class member to the discharge of all debts (1) directly

affected by defendant's discriminatory behavior toward the class member, and (2) all debts

subsequently incurred in the same program(s) in which the prevailing class member suffered

discrimination.  See Pigford v. Veneman, Civil Action No. 97-1978 (D.D.C. Feb. 7, 2001)

("Debt Relief Stipulation and Order"); MONITOR'S REPORT AND RECOMMENDATIONS ON

AMENDED DECISIONS at 16-18 (July 9, 2007), available at http://www.pigfordmonitor.org/

reports/rpt20070709_amenddec.pdf.

---

[2]     The instant motion is brought by the Howards' estates because Mr. Howard died
in 1996 and Mrs. Howard died in 2005.

[3]     The papers submitted in connection with these motions are: Motion of George
Roberts and Ernest and Ruth Banks to Enforce the Consent Decree [1315] ("Roberts Motion");
Defendant's Opposition to Motion to Enforce Consent Decree [1327] ("Roberts Opposition");
Reply to Defendant's Opposition to Motion of George Roberts and Ernest and Ruth Banks to
Enforce the Consent Decree [1331] ("Roberts Reply"); Motion of the Estates of Robert and
Jessie Howard to Enforce the Consent Decree [1351] ("Howard Motion"); Defendant's
Opposition to Motion of the Estates of Robert and Jessie Howard to Enforce the Consent Decree
[1355] ("Howard Opposition"); Reply to Defendant's Opposition to the Motion of the Estates of
Robert and Jessie Howard to Enforce the Consent Decree [1358] ("Howard Reply"); and
plaintiffs Ernest and Ruth Banks' Supplemental Memorandum of Points and Authorities in
Support of Motion to Enforce Consent Decree [1431] ("Banks Supplemental Motion").

I.  THE COURT'S AUTHORITY TO ENFORCE THE CONSENT DECREE

As an initial matter, it is important to emphasize that "district courts enjoy no free-ranging 'ancillary' [or inherent] jurisdiction to [interpret or] enforce consent decrees." Pigford v. Veneman, 292 F.3d 918, 924 (D.C. Cir. 2002).  A district court's power to interpret or enforce a consent decree is necessarily limited by a decree's "hybrid character," which includes "qualities of both contracts and court orders."  Id. at 923.  Thus, district courts may exercise only two types of authority over consent decrees: "First, they may interpret and enforce a decree to the extent authorized either by the decree or the related order. . . .  Second, they may modify a decree pursuant to Federal Rule of Civil Procedure 60(b)(5)."  Id.  The Supreme Court has held that a decree modification may be warranted by a "significant change in circumstances."  Rufo v. Inmates of the Suffolk County Jail, 502 U.S. 367, 383 (1992).

Here, plaintiffs invoke the Court's power to interpret and enforce the Consent Decree pursuant to paragraphs 13 and 21 of that Decree.  Under those provisions, the Court retains jurisdiction to enforce the Consent Decree through contempt proceedings if a party alleges a violation of its terms.  See Pigford v. Glickman, 185 F.R.D. 82, 110 (D.D.C. 1999).[4]

II.  BACKGROUND

*A.  The Consent Decree*

This Court approved the Consent Decree embodying the class action settlement of the Pigford lawsuit on April 14, 1999.  See Pigford v. Glickman, 185 F.R.D. at 113.  The

---

[4]     The Consent Decree requires the parties to attempt to resolve their differences without resorting to judicial enforcement procedures, but the Court remains available if the parties cannot resolve their differences.  See Consent Decree ¶ 13.

Consent Decree creates a mechanism for resolving individual claims of class members outside

the traditional litigation process.  <u>See id</u>. at 94.  Class members may choose between two claims

procedures, known as Track A and Track B.  Track A awards $50,000 in monetary damages, debt

relief, tax relief, and injunctive relief to those claimants able to meet a minimal burden of proof.

<u>See id</u>. at 103.  Track A claims are decided by a third-party neutral known as the adjudicator.

Track B imposes no cap on damages and also provides for debt relief and injunctive relief.

Claimants who choose Track B must prove their claims by a preponderance of the evidence in

one-day mini-trials before a third-party neutral known as the arbitrator.  <u>See id</u>. at 106.

Decisions of the adjudicator and the arbitrator are final, except that the monitor, a

court-appointed third-party neutral, may on petition direct the adjudicator and the arbitrator to

reexamine claims if the monitor determines that "a clear and manifest error has occurred" that is

"likely to result in a fundamental miscarriage of justice."  <u>See</u> Consent Decree ¶¶ 9(a)(v), 9(b)(v),

10(i), 12(b)(iii).

## B.  Debt Relief

Class members who prevail under either Track A or Track B are entitled to certain

forms of debt relief in addition to monetary damages, injunctive relief, and, in Track A, tax relief.

With respect to prevailing Track A claimants, the Consent Decree provides that

> [i]n any case in which the adjudicator decides in a class member's
> favor, . . . USDA shall discharge all of the class member's
> outstanding debt to USDA that was incurred under, or affected by,
> the program(s) that was/were the subject of the ECOA claim(s)
> resolved in the class member's favor by the adjudicator.

Consent Decree ¶ 9(a)(iii)(A).  With respect to prevailing Track B claimants, the Consent Decree

provides that

> [i]f the arbitrator determines that the class member has
> demonstrated by a preponderance of the evidence that he was the
> victim of racial discrimination and that he suffered damages
> therefrom, . . . USDA shall discharge all of the class member's
> outstanding debt to the Farm Service Agency that was incurred
> under, or affected by, the program(s) that were the subject of the
> claim(s) resolved in the class member's favor by the arbitrator.

Id. ¶ 10(g)(ii).  After the approval of the Consent Decree, the parties entered into a stipulation,

approved by the Court, clarifying the nature and scope of debt relief owed to prevailing

claimants.  See Debt Relief Stipulation and Order.

Under the Debt Relief Stipulation, the parties agreed that prevailing class

members are entitled to the discharge of

> all debts which were identified by the Adjudicator or the Arbitrator
> as having been affected by the discrimination.  Additionally, such
> relief includes all debts incurred at the time of, or after, the first
> event upon which a finding of discrimination is based, *except that
> such relief shall not include:* (a) debts that were incurred under
> FSA programs other than those as to which a specific finding of
> discrimination was made by the Adjudicator or Arbitrator with
> respect to the class member . . . ; (b) *debts that were incurred by
> the class member prior to the date of the first event upon which the
> Adjudicator's or Arbitrator's finding of discrimination is based,* or
> (c) debts that were the subject of litigation separate from this action
> in which there was a final judgment as to which all appeals have
> been foregone or completed.

Debt Relief Stipulation and Order at 3-4 (footnote omitted) (emphasis added).

## III.  MOTIONS TO ENFORCE

Several prevailing Track A claimants have moved to enforce the debt relief

provisions of the Consent Decree as clarified by the Debt Relief Stipulation and Order.  They

argue that defendant's view of when a debt is "incurred" is impermissibly narrow and they

proffer their own view of when a debt is incurred.  For the reasons set forth below, the Court

rejects plaintiffs' view and denies plaintiffs' motions to enforce.

### A.  Motion of George Roberts, Ernest Banks and Ruth Banks

### 1.  George Roberts

Class member George Roberts prevailed on his Track A claim in 1999.  The

adjudicator found that USDA had discriminated against Mr. Roberts by denying him certain

loans in 1988.  At the time of the adjudicator's decision, Mr. Roberts had two USDA loans: loan

41-01 and loan 44-02.[5]  Both of these loans originated in 1982 and were subsequently

rescheduled or reamortized through USDA loan servicing programs on four occasions – in 1984,

1986, 1990 and 1997.  See Roberts Mot. at 4-5.[6]

The adjudicator's original decision did not grant Mr. Roberts any debt relief.  See

Roberts Mot., Ex. 11, Decision of Adjudicator at 3 (Nov. 12, 1999).  Mr. Roberts sought review

of the adjudicator's decision by the monitor.  The monitor found that the adjudicator's failure to

acknowledge that Mr. Roberts was entitled to debt relief as outlined by the Debt Relief

Stipulation and Order (which had been issued subsequent to the adjudicator's original decision)

constituted a "fundamental miscarriage of justice," see id., Ex. 12, Decision of the Monitor at 5

---

[5]      The USDA loans at issue in these motions are coded as follows: Farm Ownership
Loans begin with the number "41"; Emergency Loans begin with the number "43"; and
Operating Loans begin with the number "44."

[6]      USDA regulations permit financially distressed and delinquent borrowers to
reschedule or reamortize – that is, restructure – their loans.  See 7 C.F.R. §§ 766.101 et seq.
(2007).  Such restructuring may include debt consolidation, repayment period extension, interest
capitalization, interest rate revision, or debt forgiveness.  See Roberts Opp. at 3-4.

(Nov. 27, 2002), and she therefore directed the adjudicator to reexamine his decision.

Upon reexamination, the adjudicator issued a revised decision.  In that decision, the adjudicator

expressly stated that Mr. Roberts was entitled to all debt relief guaranteed by the Debt Relief

Stipulation and Order, concluding that

> in addition to the relief previously awarded, Claimant shall be
> relieved of any USDA Farm Ownership and/or Operating Loan
> debt *incurred between January 1, 1988 and December 31, 1996*,
> and shall receive 25% of that debt relief in tax credits.

Roberts Mot., Ex. 13, Decision of Adjudicator on Reexamination at 2 (May 16, 2003) (emphasis

added).  Notably, the revised decision did not specifically direct USDA to discharge loans 41-01

and 44-02, although the former is a Farm Ownership Loan and the latter is an Operating Loan.

See Roberts Mot. at 6.

Nevertheless, Mr. Roberts takes the position that the adjudicator's revised

decision "*ipso facto* discharged these debts [because they were] Mr. Roberts' only outstanding

obligations to USDA" at the time of the decision.  Roberts Mot. at 6.  Defendant has refused to

discharge Mr. Roberts' loans on the ground that they originated prior to 1988, and hence were

not "incurred" between January 1988 and December 1996.

### 2.  Ernest and Ruth Banks

Class members Ernest and Ruth Banks are also successful Track A claimants.

The adjudicator found that the Banks suffered discrimination when USDA processed their

Operating Loan applications in a discriminatory manner in 1981 and therefore instructed USDA

to discharge all of the Banks' Operating Loan debt incurred between 1981 and 1985.  See

Roberts Mot. at 7; id., Ex. 24, Decision of Adjudicator at 2-4 (Aug. 2, 2000).  At the time of the

adjudicator's decision, the Banks had four outstanding USDA loans: Emergency Loan 43-19, Emergency Loan 43-20, Emergency Loan 43-22, and Emergency Loan 43-23.[7]  All of these loans originated before 1981, but were rescheduled in 1991.  Like Mr. Roberts, the Banks insisted that the adjudicator's award required defendant to discharge their loans.  Defendant resisted, again arguing that the Banks' loans were not eligible for discharge because they were not incurred after the date of discrimination.[8]

### B.  Motion of the Estates of Robert and Jessie Howard

Class members Robert and Jessie Howard were successful Track A claimants. The Howards co-signed promissory notes for several USDA loans in the late 1970s and 1980s. Three of those loans – Emergency Loan 43-07, Emergency Loan 43-10 and Operating Loan 44-07 – are at issue here.  Those loans originated in 1978 and 1979 and were rescheduled in 1981, 1987 and 1989.  In addition, the Howards signed a "shared appreciation agreement" with USDA in 1989.  As part of that agreement, USDA agreed to "write down" – that is, forgive – much of the unpaid debt on nine other loans, while reserving the right to recoup some of the unpaid debt

--------

[7]     Emergency Loans are often sought for operating purposes.  Thus, if it can be determined "that an outstanding [Emergency Loan] clearly was made for operating purposes," then USDA may, in some cases, discharge Emergency Loans incurred subsequent to the date of discrimination even if an adjudicator's decision identifies only the Operating Loan program, not the Emergency Loan program, as the program in which a prevailing claimant suffered discrimination.  Roberts Mot., Ex. 25, Information Memo for the Monitor, Memo No. 4 at 2 (date unknown) (memorandum describing USDA's criteria for discharging loans).

[8]     Defendant did discharge the Banks' Emergency Loan 43-29, which originated in 1981.  See Roberts Mot. at 8.

should the property securing the loans later increase in value.  See Howard Mot. at 7; id., Ex. 1

(shared appreciation agreement and summary of Howard debt transactions).

Mrs. Howard filed a Track A claim on behalf of her husband in 1999.  See

Howard Mot. at 8.  She prevailed on that claim when the adjudicator concluded that Mr. Howard

had suffered discrimination beginning in 1981.  The adjudicator's decision directed USDA to

discharge all of the Howards' Operating Loan debts incurred between 1981 and 1987.  Mrs.

Howard petitioned the monitor for review of the adjudicator's decision, contending that the

award did not discharge "all the debt tainted by the discrimination."  Id. at 9.  She also argued

that the adjudicator's decision should have precluded defendant from enforcing the shared

appreciation agreement, on the theory that defendant was required to discharge all of the loans on

which it was based.  Id. at 9-10.

The monitor concluded that the adjudicator's decision included "clear and

manifest error because the record was incomplete regarding the precise type of loan for operating

purposes received by [Mr. Howard] during the claim years."  Howard Mot., Ex. 13, Decision of

the Monitor at 5-7 (Mar. 31, 2004).  The monitor thus instructed the adjudicator to reexamine his

decision.

Upon reexamination, the adjudicator clarified the scope of debt relief owed to the

Howards.  Specifically, the adjudicator concluded that his previous decision was in error because

it excluded any Emergency Loans incurred after the date of discrimination and received for

operating purposes.[9]  Thus, the adjudicator concluded that

---

[9]      Again, because Emergency Loans are often put to the same uses as Operating
Loans, they may be discharged when it is found that the claimant suffered discrimination within
the Operating Loan program.  See supra note 7.

> in addition to the relief previously awarded, Claimant shall be
> relieved of all USDA Emergency Loan for operating purposes debt
> incurred between January 1, 1981 and December 31, 1996, and all
> Operating Loan debt incurred between January 1, 1984 and
> December 31, 1996 . . . .

Howard Mot., Ex. 15, Decision of Adjudicator on Reexamination at 3 (Sept. 9, 2005).  Like Mr.

Roberts, the Howard estates take the position that this language *ipso facto* discharges loans 43-

07, 43-10 and 44-07, because those are the Howards' only outstanding Operating Loans and

Emergency Loans.  Defendant, however, maintains that these loans should not be discharged

because they originated prior to 1981.  Defendant also maintains that it can continue to enforce

the shared appreciation agreement with respect to any of the underlying loans which originated

before the date of discrimination.[10]

## IV.  DISCUSSION

Plaintiffs claim that they are entitled to the discharge of certain debts originated

prior to the date on which they have shown they suffered discrimination, even though the Debt

Relief Stipulation and Order expressly excludes from the scope of debt relief "debts that were

incurred by the class member prior to the date of the first event upon which the Adjudicator's or

---

[10]     Unfortunately, the parties' papers make it difficult to understand which underlying
Operating Loans and Emergency Loans, if any, originated after the applicable dates of
discrimination.  See Howard Mot. at 11 ("On information and belief, it is understood that
[defendant] has determined that at least some of the nine loans written down in 1989 and
underlying the agreement are not subject to discharge under the Consent Decree because
[defendant] believes them to be just reaffirmations of debts incurred prior to the first
discriminatory event."); id., Ex. 15, Decision of Adjudicator on Reexamination at 2 (Sept. 9,
2005) (observing that defendant represented to the adjudicator that only two of the nine loans
underlying the shared appreciation agreement originated after the date of discrimination);
Howard Opp. at 4 n.2 (suggesting that defendant believes that none of the loans underlying the
shared appreciation agreement originated after the date of discrimination).

Arbitrator's finding of discrimination is based."  Debt Relief Stipulation and Order at 4.

Plaintiffs make two arguments in support of this counterintuitive position.

Plaintiffs' first and primary argument is based on an interpretation of the term

"incurred" as it is used in the Consent Decree and Debt Relief Stipulation and Order.  Plaintiffs

reason that their outstanding debts were "incurred" not only when their loans *originated*, but also

when their loans subsequently were *restructured*.  See Roberts Mot. at 10-12; Howard Mot. at

12-13.  According to plaintiffs, their debts were "incurred" when restructured because the

promissory notes used to restructure their loans did not merely affirm debts already owed; rather,

the new notes created entirely new obligations.  See Roberts Mot. at 12; Howard Mot. at 12.  See

also Roberts Reply at 4 ("The new promissory notes restructuring or reamortizing the original

notes are new obligations and not mere renewals or reaffirmations of the original debt.").

Plaintiffs base this conclusion primarily on the fact that when their loans were restructured, the

parties did not revise the original promissory notes but rather "executed new instruments with

new principal amounts and payment terms subject to a new statute of limitations."  Roberts Mot.

at 11; see also Howard Mot. at 12-13.  They argue that since a debt is "incurred" when a loan is

restructured (at least when a loan is restructured pursuant to a new promissory note), and since

the loans at issue were restructured pursuant to new promissory notes after plaintiffs suffered

discrimination, the loans should be discharged.  See Roberts Mot. at 10-12; see also Howard

Mot. at 12-14.

Plaintiffs also rely heavily on the remedial goals expressed in the Consent Decree

and the Debt Relief Stipulation and Order.  Plaintiffs argue that limiting debt relief to loans

originated after the date of discrimination is inconsistent with the purpose of the debt relief

feature of the Pigford settlement, which is to "remed[y] consequential harm to a prevailing class

member caused by discrimination."  Debt Relief Stipulation and Order at 2.  Plaintiffs claim that

> [t]he discriminatory denial of access to timely and appropriate
> loans has both immediate and ongoing adverse impact upon the
> farmer.  It affects both the amount and type of credit assistance
> needed in the future.  For example, if a farmer is denied a loan one
> year, the resulting financial distress will adversely impact his
> current farming operation and will impact his ability to pay-off
> [sic] any existing debt, forcing him to seek rescheduling or
> reamortization of that debt.  Accordingly, the prospective relief
> from debt incurred after the discriminatory treatment implements
> the parties' intent to "remed[y] the consequential harm . . . caused
> by discrimination" and requires that farm loan debt, original and
> rescheduled or reamortized, be covered by the debt relief
> provisions.

Roberts Mot. at 8-9 (quoting Debt Relief Stipulation and Order at 2).  See also Howard Mot. at

13 ("Thus, one ripple effect of the discrimination is the creation of a need to seek rescheduling of

. . . older debt.").[11]  In other words, plaintiffs assert that there is a remedial imperative to extend

debt relief to loans restructured after the date of discrimination because defendant's post-

origination (but pre-restructuring) discrimination likely contributed to plaintiffs' need to

restructure their loans.[12]

---

[11]    On occasion, plaintiffs suggest that their restructured loans are "tainted" in a more
direct way as well – that is, that their loans were actually restructured in a discriminatory manner
by USDA officials.  See Roberts Reply at 3; Howard Reply at 6.

[12]    The Howards' estates also rely on the "internal language" of the restructuring
notes executed by the Howards in 1989.  Howard Reply at 3.  They contend that the language of
the 1989 notes transforms the Howards' restructured loans into debt eligible for debt relief
because the 1989 notes refer to the Howards' 1987 restructuring notes (which were executed
after Mr. Howard suffered discrimination) as the "original debt" rescheduled by the 1989 notes.
See Howard Mot. at 15-17.  Defendant responds that

> [c]ontrary to [plaintiffs'] assertion . . . nothing in the language of
> the 1989 notes suggests that the referenced 1987 notes are the

Defendant argues that plaintiffs' interpretation of the term "incurred" is untenable because it is inconsistent with the clearly expressed intent of the parties as indicated by the plain language of the Consent Decree and the Debt Relief Stipulation and Order.  See Howard Opp. at 5 ("A debt 'originates' when it is 'incurred,' and vice versa.  It cannot be the case that [plaintiffs'] debt 'originated' *before* the discriminatory event, yet was 'incurred' *after*.").  In essence, says defendant, the problem with plaintiffs' understanding of the term "incurred" in the Consent Decree and Debt Relief Stipulation and Order is that "it confuses a debt with a debt instrument."  Roberts Opp. at 11.  Defendant acknowledges that it executed new promissory notes with plaintiffs when it restructured plaintiffs' loans, and that those new notes altered plaintiffs' loan obligations in a number of ways.  See Howard Opp. at 5.  But, says defendant, the mere fact that the parties chose to restructure pre-existing debts by executing new promissory notes does not change the fact that at the time those notes were executed, everyone – plaintiffs included – understood that plaintiffs were renewing their original promise to repay on revised terms, not satisfying old obligations or creating new and independent obligations.  See Roberts Opp. at 9-11; see also Howard Opp. at 5.

––––––––––––––––––––

> "original loan" or the "original debt" [and thus eligible for debt relief]. . . .  Any such inference is refuted by the 1987 notes themselves, which specify that they are being issued to reschedule, *not satisfy*, the 1981 and 1978 [restructuring] notes  . . . ; the 1981 notes, in turn, specify that they are being issued to reschedule, *not satisfy*, the 1978 and 1979 [original] notes . . . .  Taken together, the notes make clear that the [Howards' original debts] were never satisfied or extinguished [via restructuring], but were simply carried forward from note to note.

Howard Opp. at 7-8.  The Court agrees.

13

Defendant also takes issue with plaintiffs' remedial argument.  First, defendant contends that discharging a loan that was made *before* a plaintiff suffered discrimination would not remedy harm flowing from that discrimination.  See Roberts Opp. at 14; see also Howard Opp. at 9.  Moreover, even assuming that class members were compelled to seek restructuring for a pre-discrimination loan because of the "ripple effects" of discrimination suffered after that loan was made, defendant points out that the Consent Decree and the Debt Relief Stipulation and Order were intended to remedy a discrete set of consequential harms suffered by class members – not *all* consequential harms suffered by class members.  See Roberts Opp. at 15 n.9 (noting other limitations of the debt relief provisions and arguing that while "remedying . . . consequential harm is a characteristic of the debt relief provisions[,] . . . it does not follow that the parties agreed to institute any and all measures that might remedy consequential harm").  The Court agrees with the defendant on both points.

Courts generally apply ordinary principles of contract law when interpreting consent decrees and stipulations.  See USX Corp. v. Penn. Cent. Corp., 130 F.3d 562, 566 (3d Cir. 1997) ("A consensual stipulation of the parties is to be interpreted according to the general principles of contract construction.") (internal quotation marks omitted); United States v. Western Elec. Co., 12 F.3d 225, 229 (D.C. Cir. 1993) ("In interpreting the Decree, we apply ordinary principles of contract law.").  When interpreting contracts, "the judicial task . . . is to give effect to the mutual intent of the parties," and "when the language of a contract is clear and unambiguous on its face, a court will assume that the meaning ordinarily ascribed to those words reflects the intention of the parties."  Mesa Air Group, Inc. v. Dep't of Transp., 87 F.3d 498, 503 (D.C. Cir. 1996) (quoting NRM Corp. v. Hercules, Inc., 758 F.2d 676, 681 (D.C. Cir. 1985)).

14

Parties asserting ambiguity must establish that ambiguity by objective evidence.  See Mesa Air Group, Inc. v. Dep't of Transp., 87 F.3d at 503.

Here, plaintiffs have provided no objective evidence that the term "incurred" is ambiguous as it is used in the Consent Decree and Debt Relief Stipulation and Order.  See Nationwide Mutual Ins. Co. v. Richardson, 270 F.3d 948, 954 (D.C. Cir. 2001) (noting that "mere disagreement among parties as to the meaning of a term [does not] constitute ambiguity").  The Court concludes that the term "incurred" is not ambiguous, and it therefore is to be given its ordinary meaning.  As discussed below, plaintiffs' position is plainly at odds with that ordinary meaning.

The Debt Relief Stipulation and Order indicates that the parties intended by the Consent Decree to discharge loans incurred after the applicable date of discrimination, but not those incurred before the date of discrimination.  See Debt Relief Stipulation and Order at 3 (expressly excluding from scope of debt relief "debts that were incurred by the class member prior to the date of the first event upon which a finding of discrimination is based").  Using the ordinary meaning of the word, a class member "incurs" his or her debts when he or she becomes liable to repay those debts.  See BLACK'S LAW DICTIONARY 768 (8th ed. 2004) (defining "incur" as "[t]o suffer or bring on oneself (a liability or expense)"); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1146 (1993) (defining "incur" as to "become liable or subject to"); 7 OXFORD ENGLISH DICTIONARY 835 (2d ed. 1989) (defining "incur" as "to become through one's own action liable or subject to; to bring upon oneself").  A class member becomes liable to repay those debts when he or she executes the first promissory note memorializing his or her promise to repay – that is, when the debt is originated.  Nothing in the Consent Decree or the

15

Debt Relief Stipulation and Order suggests that the parties intended the term "incur" to be interpreted to mean "originate or restructure," rather than simply "originate."  As the Court's duty is to give effect to the intent of the parties through a common sense reading of unambiguous terms, see Mesa Air Group, Inc. v. Dep't of Transp., 87 F.3d at 503, it will not strain to justify plaintiffs' more creative reading of the word "incurred."

Plaintiffs object that this interpretation reads into the debt relief provisions of the Consent Decree and Stipulation a limitation that is nowhere expressly stated.  They argue that if defendant had wished to exclude from the scope of debt relief loans that were originated before but restructured after the applicable date of discrimination, defendant should have bargained for express language to that effect.  See Roberts Reply at 2-4.  The answer to this objection is that contracting parties need not – and could not – bargain for language precluding every possible interpretation of contract terms that might be adverse to their interests.  Here, the fact that the debt relief provisions fail to specify that a debt is incurred *only* when it is originated – rather than when it is originated *or* restructured – does not compel the conclusion that the latter interpretation is more consistent with the intent of the parties.  Rather, it indicates that the latter interpretation is so inconsistent with the ordinary meaning of the term "incur" that neither party foresaw a need to foreclose it.

Plaintiffs also insist that because they executed new promissory notes as part of their post-discrimination transactions, their loans were effectively "incurred" or "originated" during restructuring.  See Roberts Mot. at 10-11; Howard Mot. at 12-13.  This view elevates form over substance.  At no point were plaintiffs' original obligations to repay ever forgiven or satisfied; rather, the restructuring transactions merely amended or altered the underlying

16

obligations plaintiffs incurred when they signed their original promissory notes.  Cf. *supra* note

12.  Moreover, as plaintiffs themselves acknowledge, the post-discrimination restructuring

transactions at issue here were undertaken pursuant to regulations governing servicing for

*existing* loans, not regulations governing *new* loans.  See Roberts Mot. at 9-10; Howard Mot. at

5-6.  In light of the parties' intent – as evidenced by their behavior and a common sense reading

of their agreements – the Court concludes that the effect of these restructuring transactions was to

"service" plaintiffs' existing outstanding loans, not to "incur" or "originate" new ones.

      Plaintiffs' remedial argument also is flawed.  To begin with, the premise on which

plaintiffs rely so heavily – that is, that the *goal* of debt relief is to "remed[y] consequential harm

to a prevailing class member caused by discrimination," Debt Relief Stipulation and Order at 2 –

is in fact not based on one of the terms agreed to in the Debt Relief Stipulation and Order.  It is

based on predicate language which cannot trump the enforceable terms of the Stipulation.  See,

e.g., Grynberg v. FERC, 71 F.3d 413, 416 (D.C. Cir. 1995) (observing that "it is standard

contract law that a Whereas clause, while sometimes useful as an aid to interpretation, cannot

create any right beyond those arising from the operative terms of the document") (internal

quotation marks omitted).  For better or worse, the parties bargained for the *terms* of the Consent

Decree and the Debt Relief Stipulation and Order, and it therefore is those terms which the Court

must enforce.  As defendant correctly points out, those terms were intended to remedy some, but

not all, of the conceivable consequential harms flowing from defendant's discriminatory

behavior.  See Roberts Opp. at 15 n.9.  The harms that plaintiffs identify fall outside the scope of

the remedy provided by the debt relief provisions.

That leaves only one loose end to address.  As noted above, see *supra* note 10, it is difficult to tell which loans underlying the Howards' shared appreciation agreement, if any, originated after defendant discriminated against Mr. Howard.  Under the reasoning of this Opinion, defendant is precluded from enforcing the shared appreciation agreement with respect to any Operating Loans or Emergency Loans originated after the applicable dates identified by the adjudicator in his revised decision.  Before defendant may demand payment under that agreement, it must provide to the Howards' estates a clear and comprehensive accounting of which loans underlying the shared appreciation agreement originated after the date of discrimination against Mr. Howard and therefore are not subject to recapture under the shared appreciation agreement.  This accounting must also describe, to the satisfaction of both the estates and this Court, how defendant has calculated the amount now owed under the shared appreciation agreement.

Plaintiffs' interpretation of the Consent Decree and the Debt Relief Stipulation and Order must be rejected because it is inconsistent with the plain meaning of those documents. An Order consistent with this Opinion will issue this same day.

/s/_____
PAUL L. FRIEDMAN
United States District Judge

DATE: February 20, 2008

18