UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
TIMOTHY PIGFORD, <u>et al</u>.,           )
                                        )
        Plaintiffs,                     )
                                        )
    v.                                  )    Civil Action No. 97-1978 (PLF)
                                        )
SONNY PERDUE, Secretary,                )
United States Department of Agriculture, )
                                        )
        Defendant.                      )
_____ )
                                        )
CECIL BREWINGTON, <u>et al</u>.,          )
                                        )
        Plaintiffs,                     )
                                        )
    v.                                  )    Civil Action No. 98-1693 (PLF)
                                        )
SONNY PERDUE, Secretary,                )
United States Department of Agriculture, )
                                        )
        Defendant.                      )
_____ )


<u>OPINION</u>

        This matter is before the Court on the government's motion to dismiss the petition

for monitor review of Maurice McGinnis's claim.  For the following reasons, the Court will

grant the motion and dismiss the petition for monitor review.[1]

_____

        [1]        In connection with the pending motion, the Court has reviewed the following
filings, including the exhibits attached thereto:  Consent Decree [Dkt. No. 167]; Order of
Reference [Dkt. No. 279] ("Order of Ref."); Entry of Appearance [Dkt. No. 1852]; Motion of
Claimant Maurice G. McGinnis for Enforcement of Consent Decree [Dkt. No. 1853] ("Mot. to
Enforce"); Class Counsel David J. Frantz's Submission in Response to Court Order of May 7,
2013 [Dkt. No. 1900] ("Frantz Submission"); Stipulation and Order of Nov. 2, 2015 [Dkt. No.
2008] ("Stip. & Order"); Final Privacy Act Protective Order [Dkt. No. 2009] ("Prot. Order");

## I. FACTUAL AND PROCEDURAL BACKGROUND

The Court has previously recounted the history of this case in its opinion granting Mr. McGinnis's earlier motion to enforce the consent decree and permitting him to pursue his claim under Track B. See Pigford v. Vilsack, 961 F. Supp. 2d 82, 83-87 (D.D.C. 2013). Thus, the Court limits its discussion here to those facts relevant to the instant motion.

In 1997, African-American farmers filed a class action lawsuit against the United States Department of Agriculture ("USDA") alleging that they had been denied access to federal farm credit programs administered by the Department because of their race. The parties settled, and the Court entered a consent decree setting forth the parties' settlement agreement on April 14, 1999. The consent decree established two alternative claim resolution processes to evaluate individual class members' discrimination claims. See Consent Decree at ¶ 5(d). For class members who chose Track A, a third-party neutral "adjudicator" determined whether they had met a minimal burden of proof and, if so, awarded them $50,000 in monetary damages. See id. at ¶ 9. For class members who instead opted for Track B, a third-party neutral "arbitrator" determined whether they had proven their claims by the more demanding preponderance of the evidence standard in a one-day mini-trial and, if so, awarded actual damages without a cap. See id. at ¶ 10.

### A. The Initial Proceedings Under Track A

Mr. McGinnis completed his initial claim form in August 1999 and opted to pursue his claim under Track A, "although his claim form suggest[ed] that he harbored some

---

Joint Status Report of July 5, 2017 [Dkt. No. 2054] ("Joint Status Report"); Motion to Dismiss the Petition for Monitor Review [Dkt. No. 2057] ("Mot."); Opposition to the Motion to Dismiss the Petition for Monitor Review [Dkt. No. 2062] ("Opp'n"); and Reply in Support of the Motion to Dismiss the Petition for Monitor Review [Dkt. No. 2603] ("Reply").

confusion or indecision about that choice." See Pigford v. Vilsack, 961 F. Supp. 2d at 84.

Shortly thereafter, Mr. McGinnis sought to move his claim from Track A to Track B. See id. at

84-87. After a long-running series of errors and miscommunications, his requests were ignored

or denied for over a decade and his claim proceeded under Track A. See id. Mr. McGinnis

eventually prevailed under Track A, but never cashed the $50,000 award check. See id. at 86.

He did not do so because he believed his claim should have been arbitrated under Track B, as he

had requested, and because he did not think the $50,000 award nearly approximated the actual

losses he had experienced as a result of the USDA's discrimination. See id. Ultimately,

Mr. McGinnis looked to the Court for relief. His retained counsel – John M. Shoreman –

formally entered his appearance on behalf of Mr. McGinnis and filed a motion to enforce the

consent decree on November 2, 2012. See Entry of Appearance; Mot. to Enforce. The Court

granted the motion and directed the arbitrator to resolve Mr. McGinnis's claim under Track B.

See Pigford v. Vilsack, 961 F. Supp. 2d at 90-91. In doing so, the Court noted:

> Mr. McGinnis has been warned about the high standard of proof
> required to prevail on a claim under Track B, and the danger that
> by pursuing this course and giving up his Track A victory he will
> end up with nothing at all. Nevertheless he wishes to go down that
> path. He is entitled to do so . . . .

Id. at 91. The United States Court of Appeals for the District of Columbia Circuit affirmed this

Court's decision, see Pigford v. Vilsack, 777 F.3d 509 (D.C. Cir. 2015), and Mr. McGinnis

thereafter proceeded under Track B. He now challenges the outcome of the Track B

proceedings.

### B. The Proceedings Under Track B

On May 29, 2015, after the D.C. Circuit had issued its mandate, the arbitrator,

Michael Lewis, issued a formal hearing notice adopting the Track B schedule by which the

parties had agreed to proceed.  See Mot. Ex. 3; Mot. Ex. 4.  In accordance with the arbitrator's

formal hearing notice, both Mr. McGinnis and the government, through their counsel, timely

submitted their lists of witnesses and exhibits.  See Mot. Ex. 5; Mot. Ex. 6.  The list submitted by

Mr. Shoreman on behalf of Mr. McGinnis indicated that he intended to rely on two witnesses:

Mr. McGinnis himself and an expert witness who would testify as to the extent to which

Mr. McGinnis had been treated differently from other program applicants and the amount of

economic loss he had incurred as a result.  See Mot. Ex. 5. at 1-2.

   On July 28, 2015, the parties jointly requested, through their counsel, that the

schedule be stayed in order for them to exchange expert reports and discuss potential settlement.

See Mot. Ex. 7 at 1.  The arbitrator granted this request, indicating that the parties should inform

him of the status of the case on or before September 15, 2015.  See Mot. Ex. 8 at 1.  On

September 15, 2015, counsel for both parties jointly requested that the arbitrator continue the

stay for two additional months.  See Mot. Ex. 12 at 1.  They explained that, due to health issues,

Mr. McGinnis's expert had not yet completed his report.  See id.  Once he did so, the

government's expert planned to review the report and likely produce a report of his own, after

which the parties would be in a better position to discuss the prospect of settlement.  See id.  On

November 16, 2015, the parties' counsel jointly requested another extension of the stay, as the

government had not yet received the report of Mr. McGinnis's expert.  See Mot. Ex. 13 at 1.  In

doing so, they represented that counsel had agreed that Mr. McGinnis would provide the expert

report to the government on or before November 30, 2015.  See id.

   On November 30, 2015, however, Mr. McGinnis did not provide the expert report

to the government.  Instead, Mr. Shoreman indicated in an email that, although the report had

been completed, he had not yet received his client's final approval to disclose it.  See Mot. Ex.

14. On December 4, 2015, counsel for the parties had a conference call with the arbitrator to discuss Mr. McGinnis's unwillingness to release the expert report. See Mot. Ex. 15 at 1-2. And on December 7, 2015, the government represented that it would not object to the arbitrator further discussing the matter with Mr. McGinnis ex parte in an effort to convince him to release the report. See id. at 1. It does not appear that any such conversation subsequently took place.

On December 14, 2015, the arbitrator scheduled an additional conference call in response to "the silence on Mr. Shoreman's part regarding progress on releasing Mr. McGinnis' expert's economic analysis." See Mot. Ex. 16; Mot. Ex. 17. It appears from the record that, during this conference call, counsel for the parties agreed that the expert report would be provided by December 16, 2015. See Mot. Ex. 18. But, again, this did not occur. Instead, on December 18, 2015, Mr. Shoreman emailed government counsel, stating: "I have reached an impasse and may need to seek Mr. Lewis' assistance. Hopefully, I can work through a resolution this weekend. Either way I will let you know on [December 21, 2015]." See Mot. Ex. 19 at 1. Unaware of this email from Mr. Shoreman to government counsel, the arbitrator requested an update from Mr. Shoreman on December 20, 2015. See Mot. Ex. 20. And on December 21, 2015, government counsel emailed Mr. Shoreman and the arbitrator to request an additional conference call if Mr. Shoreman did not provide the expert report that day. See Mot. Ex. 21.

On December 23, 2015, after the expert report was still not disclosed, counsel for the parties and the arbitrator held a conference call to discuss the matter. In an email memorializing the conversation, the arbitrator made clear that he would "permit Mr. McGinnis to have until noon, Monday, December 28, 2015 to release the report of his expert detailing the damages he has incurred due to alleged discrimination at the hands of USDA officials." See Mot. Ex. 22 at 1. If Mr. McGinnis failed to do so, the arbitrator directed that the parties should

"propose a schedule to bring the claim to conclusion through a Track B arbitration hearing."  See id.  It also appears from the record that, during this conference call, Mr. Shoreman discussed the possibility that he would withdraw as counsel.  See id. ("Should Mr. Shoreman not continue as counsel for Mr. McGinnis, claimant shall have two weeks to identify new counsel.").

After the expert report was not released on December 28, 2015, government counsel proposed a schedule for proceeding.  See Mot. Ex. 23.  The government proposed that Mr. McGinnis file and serve his expert report on or before February 11, 2016, and if he failed to do so, that he would be "precluded from offering any expert report, testimony, or other expert evidence in this case . . . ."  See id. at 1.  The government also proposed other dates by which it would file and serve its own expert report (March 28, 2016), discovery would close (April 29, 2016), the parties would file and serve direct testimony (May 27, 2016), the parties would file pretrial factual and legal memoranda (June 30, 2016), and the parties would exchange the names of witnesses they intended to cross-examine (June 30, 2016).  See id. at 1-2.  On December 29, 2015, Mr. Shoreman responded that these proposed deadlines were "acceptable."  See Mot. Ex. 24.  In that same email to government counsel, however, Mr. Shoreman also stated that he would "need to withdraw" his appearance and that Mr. McGinnis would likely proceed pro se.  See id. In light of Mr. Shoreman's response – purporting to accept proposed deadlines on behalf of a client from whom he planned to withdraw his representation – government counsel attempted to clarify whether Mr. McGinnis had personally agreed to the proposed schedule and how and when Mr. Shoreman planned to withdraw.  See Mot. Ex. 25 at 1.  Government counsel also recommended that Mr. Shoreman promptly notify the arbitrator of his need to withdraw.  See id.

On January 8, 2016, Mr. Shoreman provided Mr. McGinnis's mailing address to government counsel and the arbitrator, while clarifying that he did still represent Mr. McGinnis.

See Mot. Ex. 28 at 1 ("I still represent Mr. McGinnis at this time.").  Accordingly, the arbitrator

issued a formal revised hearing notice on January 21, 2016, adopting the schedule to which

counsel had agreed and setting a hearing for July 20, 2016.  See Mot. Ex. 31 at 1-2.  The

arbitrator's formal revised hearing notice made clear:  "Should Claimant fail to provide an expert

report [on or before February 11, 2016,] he shall be precluded from offering any expert report,

testimony, or other expert evidence related to economic damages."  See id. at 2.

Mr. McGinnis failed to meet the February 11, 2016, deadline.  See Mot. at 12.  He

also failed to take any discovery before discovery closed on April 29, 2016.  See id. at 12-13.

Neither Mr. McGinnis nor his counsel sought to depose the government's expert witness or any

other witness listed in the government's disclosures.  See id. at 13.  Nor did they take any

discovery related to the government's expert witness report, the issues set forth in its disclosures,

or any other topic.  See id.  Mr. McGinnis also failed to submit any written direct testimony by

the May 27, 2016, deadline – he did not even submit testimony from himself.  See id. at 14.  The

government, in contrast, complied with the deadlines set forth in the hearing notice.  See id. at

12-14.  And on June 22, 2016, the government filed its memorandum of legal and factual issues,

which it styled as a motion for judgment as a matter of law.  See Mot. Ex. 36.

Concerned that Mr. McGinnis had submitted nothing in prosecution of his claim

beyond the initial witness and exhibit lists provided nearly a year prior, the arbitrator scheduled a

conference call with the parties to discuss the status of Mr. McGinnis's claim.  See Mot. Ex. 37

at 3.  During the June 23, 2016, conference call, the arbitrator decided to cancel the arbitration

hearing pending receipt of Mr. McGinnis's pretrial memorandum of disputed legal and factual

issues, which under the revised hearing notice was due on June 30, 2016.  See id.  But no such

memorandum was submitted.  Instead, on June 30, 2016, Mr. Shoreman submitted two sets of

documents on Mr. McGinnis's behalf.  See Mot. Ex. 38.  First, Mr. Shoreman provided an

unsigned economic damages report from Mr. McGinnis's designated expert labeled "November

20, 2015 Draft."  See Mot. Ex. 39.  Second, he provided a package of miscellaneous documents

that included a three-page letter from Mr. McGinnis himself, dated May 10, 2016, and various

attachments – prior court rulings with unexplained hand-written annotations, the government's

notice of deposition, deeds of trust, letters attesting to Mr. McGinnis's leases of land, canceled

checks, and what appears to be a table or balance sheet of some sort.  See Mot. Ex. 40.

       The arbitrator responded to this June 30, 2016, submission on July 5, 2016.  See

Mot. Ex. 41.  The arbitrator clarified that because the expert's economic damages report had

been filed well out of time, "Mr. McGinnis was barred from introducing any evidence of

economic damages" and the arbitrator would not consider the economic damages analysis in

assessing the claim.  See id. at 1.  And having reviewed the May 10, 2016, letter from

Mr. McGinnis and the attachments thereto, the arbitrator further explained that he had

determined "it would be an exercise in futility to hold a hearing in this claim."  See id.

       On December 13, 2016, the arbitrator issued his decision granting the

government's motion for judgment as a matter of law and dismissing Mr. McGinnis's Track B

claim.  See Mot. Ex. 37.  The arbitrator explained that Mr. McGinnis had not timely introduced

any evidence in support of his claim aside from the June 30, 2015, filing of his witness and

exhibit lists.  See id. at 6-7.  And because Mr. McGinnis had submitted so little evidence in

support of his claim, the arbitrator determined that Mr. McGinnis had neither demonstrated by a

preponderance of the evidence that the USDA had discriminated against him, nor established any

damages.  See id.

*C. The Petition for Monitor Review of the Track B Proceedings and*
*Subsequent Motion to Dismiss*

On April 12, 2017, Mr. Shoreman submitted a petition for monitor review

purportedly on behalf of Derrick K. Jones, the newly appointed conservator for the person and

estate of Mr. McGinnis.  See Mot. Ex. 43.[2]  The petition requests that the monitor review the

Track B arbitration of Mr. McGinnis's claim and, based on a clear and manifest error resulting in

a fundamental miscarriage of justice, direct the arbitrator to reexamine his decision granting the

government's motion for judgment as a matter of law.  See id. at 1.  The petition does not dispute

that Mr. McGinnis repeatedly failed to meet deadlines and, as a result, did not submit sufficient

evidence to prove his claim by a preponderance of the evidence.  Rather, the petition asserts that

these failures resulted from Mr. McGinnis's diminished mental capacity and deteriorating ability

to assist his counsel, issues which assertedly arose due to the stressful and long-running nature of

the case.  See id. at 5-6.  As evidence of Mr. McGinnis's diminished capacity, the petition

includes as attachments:  (1) an order from the Chancery Court of Humphreys County,

Mississippi, issued on April 4, 2017, finding Mr. McGinnis unable to handle his financial affairs

as a result of his mental infirmities and appointing Mr. Jones as the conservator of his person and

estate; and (2) an independent medical evaluation report dated February 13, 2017, diagnosing

---

[2]     The Court notes that both the petition for monitor review and the opposition to the
government's motion to dismiss were filed by Mr. Shoreman purportedly on behalf of Mr. Jones
as conservator for the person and estate of Mr. McGinnis.  Yet it does not appear that Mr. Jones
has been properly substituted as a party pursuant to Rule 25(b) of the Federal Rules of Civil
Procedure, nor does it appear that Mr. Shoreman has filed anything to formally indicate whether
Mr. Jones has retained Mr. Shoreman in his capacity as Mr. McGinnis's conservator.  The
government has also made clear that it "does not concede that Mr. Jones' appointment or
substitution in this matter is proper."  See Joint Status Report at 1 n.1; see also Mot. at 1, 19.
Considering that the petition must be dismissed as futile regardless, the Court sees no point in
further delaying resolution of this matter in order to permit an attempt to comply with the
requirements of Rule 25(b).  Thus, the Court considers the arguments raised on Mr. McGinnis's
behalf on their merits.

Mr. McGinnis with depression and paranoia. The petition also cites Mr. McGinnis's May 10, 2016, letter as evidence of his diminished capacity, arguing that Mr. McGinnis's deteriorating mental state was "obvious" and "evident" to the arbitrator. <u>See</u> <u>id</u>. at 4-5.[3] Because Mr. McGinnis lacked the mental capacity to participate and instruct counsel, the petition concludes that the "strict application" of deadlines to Mr. McGinnis under Track B resulted in the kind of fundamental miscarriage of justice warranting reexamination of his claim and a "re-set" of procedural deadlines "in order for the Track B arbitration claim to proceed under the direction of McGinnis' court-appointed Conservator." <u>See</u> <u>id</u>. at 6-7.

The government filed the instant motion to dismiss the petition for monitor review on July 28, 2017. In the motion, the government argues that the Court should dismiss the petition because the monitor lacks authority to grant the requested relief. <u>See</u> Mot. at 20-24. The government also emphasizes that Mr. McGinnis did not proceed <u>pro se</u>, but was represented by counsel for the duration of the Track B process. <u>See</u> <u>id</u>. at 23-24.[4] Yet counsel did not raise the issue of Mr. McGinnis's competence at any time prior to submitting the petition for monitor review. <u>See</u> <u>id</u>. at 24. And although Mr. McGinnis apparently refused to authorize Mr. Shoreman to release the prepared expert report, the government notes that Mr. Shoreman has not explained why he also failed to proffer any direct testimony, take any discovery, or submit

---

[3]    In addition, the petition refers to an August 15, 2016, letter written from Mr. McGinnis to the U.S. Court of Appeals. But because this letter does not appear to be in the record now presented, the Court does not consider it.

[4]    Although Mr. Shoreman alone entered his appearance on behalf of Mr. McGinnis in this case, Mr. Jones, now appointed as conservator of Mr. McGinnis's person and estate, is also Mr. McGinnis's nephew and long-time personal attorney. <u>See</u> Mot. Ex. 43; Frantz Submission Ex. 1 at ¶ 8. And Mr. Jones attended Mr. McGinnis's deposition in this capacity. In doing so, he made clear that although he had generally discussed the deposition process with Mr. McGinnis, he did not formally represent him in the arbitration process, but remained only his "personal attorney." <u>See</u> Mot. Ex. 33 at 12:20-13:10.

any pretrial brief on his client's behalf.  See id.  To the contrary, the government asserts, "[t]he

Petition provides no explanation as to how all of this can be attributed to Mr. McGinnis's

supposed incompetence.  Nor does the Petition explain why Mr. Shoreman (or Mr. Jones) never

sought to have a conservator appointed until days before Mr. McGinnis's petition for monitor

review was due."  See id.

       The opposition to the motion to dismiss largely restates the arguments advanced

in the petition for monitor review, at times even doing so verbatim.  The opposition argues that

Mr. McGinnis's diminished capacity was "evident to all involved in the process," explaining that

Mr. McGinnis's May 10, 2016, letter made "obvious[]" that "Mr. McGinnis had no grasp on the

process and a misapprehension that his prior victories in the case had brought him to the award

stage at which he should have been paid."  See Opp'n at 4-5.  The opposition acknowledges that

Mr. McGinnis's interests were not placed in conservatorship until after the arbitrator granted the

government's motion for judgment as a matter of law, but asserts that "the Consent Decree does

not authorize the Arbitrator to appoint a Guardian ad litem when confronted with an incompetent

claimant."  See id. at 6.[5]  The opposition further asserts that "[d]ismissing the case of an

incompetent party for failure to meet procedural deadlines is fundamentally unfair and runs

counter to the central values of the American judicial process . . . ."  See id.  But the opposition is

largely unresponsive to the specific arguments raised in the government's motion and cites few

---

[5]    Although the government agrees that the consent decree does not affirmatively
authorize appointment of a guardian ad litem as part of the claim resolution process, see Mot. at
22, it is not clear to the Court why this would have precluded counsel from raising the issue of
Mr. McGinnis's competency, or otherwise advocating on his client's behalf, at any point during
the arbitration proceedings.

sources of law in support of the requested relief.[6]  It alleges that an unjust result "requires an exercise of this Court's equitable jurisdiction," but fails to identify what provision or provisions of the consent decree might serve as the source for such an exercise of jurisdiction.  See id. at 6-7.

In its reply brief, the government notes that the opposition is largely unresponsive to the arguments raised in its motion.  See Reply at 2.  Specifically, the government points out that it remains unexplained why the "failure to meaningfully prosecute Mr. McGinnis's claim is even attributable to Mr. McGinnis's supposed incompetence":  "Although Mr. McGinnis apparently prohibited his counsel from submitting an expert damages report, counsel has never provided details on this refusal, and has not even attempted to explain how the remaining deficiencies can be attributed to Mr. McGinnis's supposed incompetence."  See id. at 4.  And because the precise request for relief is unclear, the government argues that not only would a wholesale do-over of the Track B arbitration process be barred by the plain language of the consent decree, but any remedy short of a wholesale do-over would be futile.  See Reply at 3 n.1 ("[T]he late filed submissions the Arbitrator declined to consider . . . consist of a draft expert damages analysis from Mr. O'Brien which is not even signed, and a three-page letter from Mr. McGinnis that contains neither written testimony nor other evidence that would support a Track B award." (internal quotations and citations omitted)).[7]

---

[6]     The Court also notes that the few legal authorities cited are not relevant to the circumstances presented here – they either apply where an incompetent party is unrepresented or where a court refuses to grant counsel's request to assess the competency of a criminal defendant.  See FED. R. CIV. P. 17; Drope v. Missouri, 420 U.S. 162 (1975).

[7]     The petition for monitor review requests that the monitor "direct the arbitrator to re-examine the grant of Defendant's Motion for Judgment and to re-set procedural deadlines in order for the Track B arbitration claim to proceed . . . ."  See Mot. Ex. 43.  In the opposition to the motion to dismiss, however, the request for relief appears to be narrower:  "The late-filed

## II. LEGAL STANDARD

A district court may exercise two types of authority over a consent decree. <u>See</u> Pigford v. Veneman, 292 F.3d 918, 923 (D.C. Cir. 2002). First, a district court may interpret and enforce a consent decree to the extent authorized either by the decree itself or by a related order. <u>See</u> <u>id.</u> (citing <u>Bd. of Trs. of Hotel & Rest. Emps. Local 25 v. Madison Hotel, Inc.</u>, 97 F.3d 1479, 1484 n.8 (D.C. Cir. 1996)). Second, a district court may modify a consent decree pursuant to Rule 60(b)(5) of the Federal Rules of Civil Procedure. <u>See</u> <u>id.</u> (citing <u>Rufo v. Inmates of Suffolk Cty. Jail</u>, 502 U.S. 367, 378-379 (1992)). "These two sources of authority reflect a consent decree's hybrid character, having qualities of both contracts and court orders." <u>See</u> <u>id.</u> (citing <u>Rufo v. Inmates of Suffolk Cty. Jail</u>, 502 U.S. at 378). Beyond these two sources of authority, courts lack jurisdiction to otherwise interpret or enforce consent decrees. <u>See</u> <u>e.g.</u>, <u>Pigford v. Vilsack</u>, 777 F.3d at 514 (quoting <u>Pigford v. Veneman</u>, 292 F.3d at 924).

Because a consent decree is the written reflection of the parties' bargain in resolving their case, courts interpret and enforce consent decrees according to principles of contract law. <u>See</u> <u>Pigford v. Vilsack</u>, 777 F.3d at 514; <u>United States v. Volvo Powertrain Corp.</u>, 758 F.3d 330, 339 (D.C. Cir. 2014); <u>Segar v. Mukasey</u>, 508 F.3d 16, 21 (D.C. Cir. 2007). Thus, when interpreting a consent decree, the meaning of its terms generally are "discerned within its four corners," <u>see</u> <u>Page v. Pension Benefit Guar. Corp.</u>, 213 F. Supp. 3d 200, 207 (D.D.C. 2016) (citation omitted), although "the use of aids to construction, including 'the circumstances surrounding the formation of the consent order,' is permitted," <u>see</u> <u>Pigford v. Vilsack</u>, 777 F.3d at 514-15 (quoting <u>United States v. ITT Cont'l Baking Co.</u>, 420 U.S. 223, 238 (1975)). "In other

---

submissions the Arbitrator declined to consider should be admitted to the record and the case allowed to proceed to hearing and award." <u>See</u> Opp'n at 2.

words, the 'interpretation of a decree must be grounded in the text of the agreement and contemporaneous understandings of its purposes, not in the court's conception of wise policy.'" See Page v. Pension Benefit Guar. Corp., 213 F. Supp. 3d at 207 (quoting United States v. W. Elec. Co., 894 F.2d 430, 434 (D.C. Cir. 1990)).

Rule 60(b)(5) permits courts, "[o]n motion and just terms," to "relieve a party or its legal representative from a final judgment" if applying the judgment prospectively "is no longer equitable." See FED. R. CIV. P. 60(b)(5). For example, a significant change in circumstances, such as an "unforeseen obstacle," may make a decree "unworkable" and thus warrant modification of a consent decree under Rule 60(b)(5). See Pigford v. Veneman, 292 F.3d at 925 (citing Rufo v. Inmates of Suffolk County Jail, 502 U.S. at 383-84). Any such modification, however, "must be 'suitably tailored to the changed circumstances.'" See id. (quoting Rufo v. Inmates of Suffolk County Jail, 502 U.S. at 370). And a court may not skirt the requirements of Rule 60(b)(5) by "tak[ing] action that purports only to interpret a decree but that in fact modifies it." See Page v. Pension Benefit Guar. Corp., 213 F. Supp. 3d at 207 (quoting United States v. W. Elec. Co., 894 F.2d at 434).

## III. ANALYSIS

### A. *Interpretation and Enforcement Authority*

The plain language of the consent decree makes clear that decisions of the arbitrator are final and monitor review is appropriate only in limited circumstances. See Consent Decree at ¶ 10(i) (stating that decisions of the arbitrator "shall be final, except as provided by ¶ 12(b)(iii)"). In turn, the monitor may only "[d]irect the . . . arbitrator to reexamine a claim where the Monitor determines that a clear and manifest error has occurred in the . . . arbitration

of the claim and has resulted or is likely to result in a fundamental miscarriage of justice." <u>See</u> <u>id</u>. at ¶ 12(b)(iii).

The Court's order of reference further limits the monitor's role, setting forth procedures by which the monitor shall review petitions under paragraph 12(b)(iii) of the consent decree. <u>See</u> Order of Ref. ¶ 8. The order of reference emphasizes that "[t]he Monitor does not have the power to reverse any decision," but may only direct reexamination of a claim. <u>See</u> <u>id</u>. at ¶ 8(b). And in determining whether the standard for directing reexamination has been met for a Track B claim, the monitor may review "only . . . the Petition for Monitor Review, any response thereto, the record that was before the . . . Arbitrator, and the decision that is the subject of the Petition for Monitor Review" – she is "not . . . permitted to consider additional materials on review or to supplement the record for review upon reexamination." <u>See</u> <u>id</u>. at ¶ 8(e).

In addition, on November 2, 2015, the Court entered a wind-down stipulation and order releasing the monitor from her duties under the consent decree, with one potential exception. <u>See</u> Stip. & Order. at ¶ 1(a)(5). This wind-down stipulation and order expressly provides: "In the event that a Track B hearing is ever conducted in the matter of Maurice McGinnis, the Court <u>may</u> request that the Monitor resume her duties in the future for the limited purpose of reviewing any Petition for Monitor Review of the Arbitrator's decision in that matter." <u>See</u> <u>id</u>. (emphasis added). The Court thus has discretion in determining whether to reappoint the monitor for the limited purpose of directing her to review the instant petition. <u>See</u> <u>Zhu v. Gonzales</u>, 411 F.3d 292, 296 (D.C. Cir. 2005) ("[T]he usual presumption is that 'may' confers discretion." (internal quotations and citation omitted)); <u>see also</u> <u>PCH Mut. Ins. Co. v.</u> <u>Casualty & Sur., Inc.</u>, 750 F. Supp. 2d 125, 144 (D.D.C. 2010) ("[A]s a general matter of contract law, the word 'may' is viewed as a permissive, rather than mandatory, term . . . ."). And

the Court may decline to use its discretion if doing so would be an exercise in futility and thus needlessly waste judicial (or quasi-judicial) resources. Cf. In re Interbank Funding Corp. Sec. Litig., 629 F.3d 213, 215 (D.C. Cir. 2010) ("A district court has discretion to deny a motion to amend on grounds of futility where the proposed pleading would not survive a motion to dismiss." (quoting Nat'l Wrestling Coaches Ass'n v. Dep't of Educ., 366 F.3d 930, 945 (D.C. Cir. 2004))).

Here, monitor review of the petition would be futile because it cannot be demonstrated that a "clear and manifest error" has resulted or is likely to result in "a fundamental miscarriage of justice." This is because the consent decree and order of reference explicitly limit the monitor, in determining whether this standard has been met, to the record before the arbitrator. Were the Court to direct the monitor to review the petition, she would not be permitted to consider any of the new evidence now presented in support of Mr. McGinnis's incompetence claim. Admittedly, counsel has identified some evidence which was before the arbitrator – namely, Mr. McGinnis's letter dated May 10, 2016, and his general unwillingness to release the expert report and prosecute his claim – that would have indicated to the arbitrator that Mr. McGinnis was both frustrated with the handling of his claim and possibly confused about its status. See Mot. Ex. 40. But this would not necessarily lead one to infer that Mr. McGinnis was mentally incompetent. More importantly, it does not explain why his counsel did not raise the issue of competence with Mr. Lewis at any point during the arbitration process. To the contrary, Mr. Shoreman has not proffered any credible reason why he could not have presented and preserved the issue of Mr. McGinnis's mental deterioration or incompetence in the record before the arbitrator. As a result of Mr. Shoreman's failures to do so, there is simply insufficient evidence in the relevant record of Mr. McGinnis's alleged mental incapacity to support a finding

by the monitor that "clear and manifest error" has resulted or is likely to result in "a fundamental miscarriage of justice." And the briefings do not identify any other "clear and manifest error" that undermined the Track B proceeding. In light of the numerous continuances and extensions consented to by the government and granted by the arbitrator, it certainly does not appear that the deadlines were "strict[ly] appli[ed]" to Mr. McGinnis or that the arbitrator was anything other than appropriately accommodating under the circumstances presented.

Furthermore, to the extent the petition for monitor review requests that the monitor direct the arbitrator to "re-set procedural deadlines," effectively permitting a wholesale do-over of the arbitration process, the monitor simply does not have the authority to grant this relief – she is explicitly limited to directing reexamination of the record.[8] The D.C. Circuit has made clear that the plain language of the consent decree precludes such an extension of Track B deadlines – doing so would go beyond any mere interpretive authority and "deny the Department the benefit of its bargain." See Pigford v. Veneman, 292 F.3d at 924-25.

Because Mr. McGinnis is unable to demonstrate a "clear and manifest error" in the arbitration record and because the consent decree explicitly bars any re-set of the Track B deadlines, monitor review of the petition would be futile. Thus, the Court declines to exercise its discretion under the wind-down stipulation to direct the monitor to review the petition.

---

[8] Of course, to the extent the request for relief is limited to directing the arbitrator to consider the late-filed submissions as part of the record and proceed to a hearing and award, see Opp'n at 2; see also supra note 7, Mr. McGinnis simply has failed to show why it was "clear and manifest error" for the arbitrator to disregard these late-filed submissions in the first place.

## B. Rule 60(b)(5) Modification Authority

Although the parties did not brief the matter, the Court further notes that

Mr. McGinnis is not entitled to modification of the consent decree under Rule 60(b)(5), despite

the questionable conduct of his counsel.

In the history of this case, the D.C. Circuit has already emphasized the importance

of competent legal representation to effectuating the consent decree's purpose and terms.  The

D.C. Circuit has explained:

> The decree's express purpose is to ensure that in their dealings
> with USDA, all class members receive full and fair treatment, and
> its main accomplishment was the <u>establishment of a process</u> to
> adjudicate individual claims.  Unless the farmers have competent
> counsel, we cannot imagine how they could ever obtain full and
> fair treatment in a claims process where . . . missing a single
> deadline could be fatal.

<u>Pigford v. Veneman</u>, 292 F.3d at 927 (internal quotations and citations omitted).  As a result,

"the decree itself assumes competent representation for the farmers."  <u>See</u> <u>id</u>.; <u>see also</u> <u>Pigford v.</u>

<u>Glickman</u>, 182 F.R.D. 341, 350 (D.D.C.1998) (describing the adequacy of representation in

deciding to grant class certification).  In fact, the D.C. Circuit has held that the assistance of

competent counsel is so fundamental to the consent decree's terms that class counsel's failure to

meet a handful of Track B deadlines amounted an "unforeseen obstacle" rendering the decree

"unworkable" and justifying its modification under Rule 60(b)(5).  <u>Pigford v. Veneman</u>, 292

F.3d at 925-27 (citing <u>Rufo v. Inmates of Suffolk Cty. Jail</u>, 502 U.S. at 384).

In so holding, however, the D.C. Circuit also emphasized that an attorney's

mistakes generally cannot form the basis for modification of a consent decree.  <u>See</u> <u>Pigford v.</u>

<u>Veneman</u>, 292 F.3d at 926.  Where a client voluntarily chooses his attorney, he cannot "avoid the

consequences of the acts or omissions of this freely selected agent."  <u>See</u> <u>Link v. Wabash R.R.</u>

Co., 370 U.S. 626, 633-34 (1962); see also Pioneer Inv. Servs. Co. v. Brunswick Assocs., 507 U.S. 380, 396-97 (1993). But the D.C. Circuit concluded that this general rule does not always apply in a class action context, where class members do not "voluntarily" choose class counsel in the traditional sense. See Pigford v. Veneman, 292 F.3d at 926. As a result, and under such circumstances, the D.C. Circuit determined that the failure of class counsel to meet critical Track B deadlines amounted to an "unforeseen obstacle" that made the decree "unworkable," and thus warranted modification under Rule 60(b)(5). See id. at 927.

As this Court has already explained, however, the D.C. Circuit decision to allow Rule 60(b)(5) modification "relied exclusively on this case's status as a class action and the lack of voluntary choice of counsel on the part of the class members." See Pigford v. Veneman, 344 F. Supp. 2d 149, 151 (D.D.C. 2004) (citing Pigford v. Veneman, 292 F.3d at 925-26). In so holding, the D.C. Circuit did not do away with the general rule that parties are "bound by the acts of their lawyers, whom they have voluntarily chosen to represent them." See Sabbagh v. United Arab Emirates, 87 Fed. App'x 188, 188 (D.C. Cir. 2004) (citing Link v. Wabash R.R.Co., 370 U.S. at 633-34); see also Pigford v. Veneman, 292 F.3d at 926. Because Mr. McGinnis has been represented by Mr. Shoreman in this matter since at least 2012, see Entry of Appearance, he is not entitled to a Rule 60(b)(5) modification for any failures or mistakes made by his retained counsel. Rather, he is bound by his agent's acts and omissions. See also Pigford v. Veneman, 344 F. Supp. 2d at 151.

In reaching this conclusion, the Court notes its discomfort in applying this standard where, from the record now before the Court, it appears Mr. McGinnis may be mentally incompetent and may not have had or currently have the capacity to supervise his agent. Cf. Pigford v. Veneman, 292 F.3d at 926-27; Breen v. Chao, No. 05-0654, 2018 WL 1515220,

at *10 (D.D.C. Mar. 27, 2018).  In fact, as of April 4, 2017, the state of Mississippi determined that Mr. McGinnis is no longer competent to manage his financial affairs "because of mental infirmity" and appointed a conservator as a result.  See Mot. Ex. 43.  Yet Mr. Shoreman failed to raise the issue of mental competency or otherwise advocate for his client's interests during the Track B proceeding, despite his ongoing professional and ethical obligations as counsel to do so.  Indeed, after January 8, 2016, it does not appear that Mr. Shoreman ever again even attempted to advocate for his client as filing deadline after filing deadline passed.  Nor did Mr. Shoreman ever raise the issue of his client's competency.  And although Mr. McGinnis apparently refused to authorize Mr. Shoreman to release the prepared expert report, Mr. Shoreman has never explained why he failed to proffer any direct testimony, take any discovery, or submit any pretrial brief on his client's behalf.  In fact, Mr. Shoreman does not appear to have done anything to advance his client's interests in this case from the time the arbitrator issued the formal revised hearing notice on January 21, 2016, until Mr. Shoreman submitted a haphazard collection of documents to the arbitrator on June 30, 2016, in lieu of the legal brief that was due that day.

Good lawyers have many options for advancing a client's interests independent of their client's relative competence and, of course, a conservator might have been appointed at an earlier time in the proceedings of this case.  Rather than the Court initiating sua sponte what would become a mini-trial on a matter ancillary to the merits of this case, however, the Court believes any grievance Mr. McGinnis may have with his counsel would be more properly resolved in a separate malpractice action.  See Anderson v. Chevron Corp., 190 F.R.D. 5, 12 (D.D.C. 1999).  And considering that Mr. Jones – Mr. McGinnis's nephew and long-time personal attorney – has now been appointed conservator of Mr. McGinnis's person and estate, the Court sees no reason why Mr. Jones could not pursue a malpractice action on behalf of

Mr. McGinnis against Mr. Shoreman, should such a lawsuit be warranted. See, e.g., MODEL RULES OF PROF'L CONDUCT rr. 1.1, 1.3, 1.14 (AM. BAR ASS'N 2015). Mr. Jones certainly stands in a better position than the Court to make that determination at this time.

## IV. CONCLUSION

For reasons set forth in this opinion, the Court will grant the government's motion to dismiss the petition for monitor review of Maurice McGinnis's claim. An order consistent with this opinion shall issue this same day.

SO ORDERED.


_____/s/_____
PAUL L. FRIEDMAN
United States District Judge

DATE: May 31, 2018